**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------------- X

Towaki Komatsu,

                            Plaintiff,

        -vs-

The City of New York, Ritchie Torres, Sgt. Bradley, Rafael Perez,
NYPD Officer Lin (shield #: 25714), Jane Doe 11/13/19, Keith Powers,
Kalman Yeger, Diana Ayala,

- All of the defendants listed above who are people are being sued in
  their individual and official capacities,

                          Defendants.

-------------------------------------------------------------------------------- X

**20-cv-9154**

<u>**COMPLAINT**</u>

**JURY DEMAND**

## <u>TABLE OF CONTENTS</u>

I.   Preliminary Remarks ................................................................................. 5

II.  Jurisdiction ............................................................................................ 18

III. Parties .................................................................................................. 19

IV.  Background and Retrospective Facts ....................................................... 26

A. Legal precedents that were established and/or reinforced on 12/14/17 and 2/4/19 during public hearings that committees of the City Council conducted that confirmed that I had a Fourteenth Amendment and First Amendment right to testify in subsequent City Council public hearings about matters that were unrelated to their agenda without being interrupted: ................................................ 26

B. Violations of the rules of the New York City Council, New York City Charter, and my constitutional rights by Defendant Torres and other New York City Council personnel before and after 11/13/19 ................................ 31

1. Use of cell phones by Ritchie Torres and other members of the City Council in violation of the City Council's rules and my due process rights during public hearings that the City Council conducted ............................... 31

2. Room reassignments for public hearings without sufficient advance notice violated my rights as a speaker while testifying ............................... 45

3. Failures by the City Council personnel in granting me reasonable accommodations to enable me to present pertinent video recordings in conjunction with my testimony in City Council public hearings violated my First Amendment and Fourteenth Amendment due process and equal protection rights as a speaker to communicate information to the entire audience in real-time ................................................................................... 56

4. Violations of the City Council's legal duty pursuant to New York City Charter §1063 as well as my First Amendment and Fourteenth Amendment rights to have the video recordings of the public hearings conducted by City Council committees available on the Internet for the public to be able to watch no later than 3 days after such hearings ended ....................... 67

5. Arbitrary and capricious scheduling of testimony that I give to City Council committees during public hearings to have that occur toward the very end of such hearings in violation of my First Amendment and Fourteenth Amendment rights as standardless discretion, First Amendment retaliation, and viewpoint discrimination ................................ 78

6. Illegal viewpoint discrimination, First Amendment retaliation, and standardless discretion by members of the City Council who boycott testimony that I present during public hearings that City Council committees conduct by abandoning such hearings before my testimony begins in them and otherwise not being present as I testify in them ............... 86

7. Past and ongoing viewpoint discrimination by Ritchie Torres, Donovan Richards, Chaim Deutsch, and Barry Grodenchik of the New York City Council by being denied access to public forums that were established on the Internet through the use of Twitter accounts registered to them in violation of *Knight First Amendment Inst. Columbia v. Trump*, 928 F.3d 226 (2d Cir. 2019) .............. 97

C. Violations of my Fourteenth Amendment equal protection and due process rights that occurred as a result of unequal treatment that people received while protesting inside of New York City Hall ............... 101

1. Protests in City Hall on 12/12/18 during which due process was accorded to protesters instead of immediate ejection from a public hearing that the New York City Council conducted ............... 101

2. Protests in City Hall on 12/11/18 during which protesters blocked doors and passageways on the first floor in that building while trying to be arrested for that without success ............... 103

3. The length of time that protesters were allowed to engage in a protest in City Hall's main chamber on 1/21/20 during the public hearing that the City Council's Committees on General Welfare and Public Safety jointly conducted ............... 107

D. My conversations with Ritchie Torres on 3/26/18, 3/18/19, 3/26/19 ............... 108

E. Ritchie Torres' attempt to violate the First Amendment and Fourteenth Amendment rights of New Yorkers by discriminating against them through a subversive proposal he had about FOIL that would benefit whistleblower news censors in journalism ............... 122

V. Legal Standards ............... 122

VI. Statement of Facts ............... 143

A. Violations of my constitutional rights on 11/13/19 as I testified in the public hearing that the New York City Council's Committee on Oversight and Investigations conducted ............... 149

B.  Violations of my constitutional rights on 11/13/19 to access New York City Hall's property after Ritchie Torres terminated my ability to testify in the public hearing that the New York City Council's Committee on Oversight and Investigations conducted ........................................................................................................ 167

VII.   Causes of Action ................................................................................................ 170

VIII.  Jury Demand ...................................................................................................... 181

IX.   Prayer for Relief ................................................................................................ 181

Plaintiff Towaki Komatsu (hereinafter referred to in the first-person as "I", "me", and "my"), proceeding pro se in this action, does hereby state and allege all that follows in this pleading.

## PRELIMINARY REMARKS

1.     The next screenshot is from the elapsed time of 57 minutes and 29 seconds in a video recording that was recorded on 3/26/19 by a video security camera controlled by the NYPD that was then installed in the Committee Room inside of New York City Hall ("City Hall") as I testified in the public hearing that the New York City Council's Committee on Oversight and Investigations conducted while Defendant Torres flagrantly violated rule 7.65 that the New York City Council ("City Council") established that prohibited him from using a cell phone in that hearing as he also violated my rights pursuant to the Fourteenth Amendment in regards to due process and the First Amendment in regards to my right to communicate directly to government officials and to petition for redress.



2.      The man shown in the upper-left corner in the preceding screenshot is someone who is a coworker of Defendants Perez and Bradley. He works for the City Council and is supposed to make certain that public hearings are conducted are conducted in an orderly manner and in accordance with rules that the City Council established. However, he allowed Mr. Torres to use a cell phone during that hearing instead.

3.      The next image is a magnified version of the area in which Mr. Torres appears in the preceding screenshot to better showcase his illegal behavior then against me that also violated NYPL §195.00, New York City Charter §1116, and the constitutional oath of office that he was required to have taken to work for the City of New York that required him to uphold the U.S. Constitution while performing his job as an employee of the City of New York and to do so to the best of his abilities.



4.      Mr. Torres was recorded on video using a cell phone at least 5 times as I testified in that hearing. This screenshot confirms that he wasn't paying proper attention to a critically significant and entirely relevant video recording that I was then lawfully playing back from my laptop that I turned to face him in conjunction with my testimony. New York City Department of Investigations Commissioner Margaret Garnett and a third person also testified in that hearing. The video recording that I just discussed confirms that as Ms. Garnett did so, Mr. Torres was recorded using a cell phone at least 19 times instead of paying proper attention to her testimony.

5.      The patently illegal acts that Defendant Torres had the audacity to commit against me on 11/13/19 in violation of my constitutional rights and other applicable laws that are among my claims in this action and gave rise to additional claims that this complaint addresses occurred less than 8 months after he repeatedly violated an explicitly defined rule that the City Council established that I just discussed, my constitutional rights, and other applicable laws while doing so on 3/26/19. I will further discuss his illegal use of cell phones on 3/26/19 and related matters in the "Background Facts" section in this complaint.

6.      This action is largely about mootness as well as illegal abuse of process, viewpoint discrimination, First Amendment retaliation, illegal prior restraints on First Amendment rights, selective-enforcement, standardless discretion, and the use of a fraudulent pretext to violate constitutional rights in a public forum. For that reason, it would be helpful for this Court to keep in mind the following excerpt from _Hansen v. Harris_, 619 F.2d 942 (2d Cir. 1980) in mind that addresses government estoppel and applies to the fact that Defendant was barred from being able to object to how I conducted myself on 11/13/19 largely because of how he conducted himself on 3/26/19 and previously in regards to me:

> The Government may sometimes be estopped from enforcing its rules, based on the conduct of its agents.

7.      The following applies throughout this complaint in the interests of brevity:

a.      Acronyms and aliases in the second column of the following table will be used

throughout this pleading instead of the entries in the third column to which they

correspond:

| # | Abbreviation | Corresponds To |
|---|---|---|
| 1 | ACLU | American Civil Liberties Union |
| 2 | CCRB | New York City Civilian Complaint Review Board |
| 3 | City Council | New York City Council |
| 4 | Defendant City | Defendant City of New York |
| 5 | DHS | New York City Department of Homeless Services |
| 6 | DOI | New York City Department of Investigations |
| 7 | DSS | New York City Department of Social Services |
| 8 | FOIL | Freedom of Information Law |
| 9 | FRCP | Federal Rule of Civil Procedure |
| 10 | HPD | New York City Department of Housing, Preservation and Development |
| 11 | HRA | New York City Human Resources Administration |
| 12 | The Mayor | New York City Mayor Bill de Blasio |

| 13 | Mayor's 10/4/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, Defendant Torres, and other government officials as a mostly traditional public forum on 10/4/17 at 2452 Washington Avenue in the Bronx. That public forum was subject to New York State's Open Meetings Law. I was illegally barred from attending that public forum:

**a)** While I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted,

**b)** Just 1 day after NYPD Detective Nicholas Mason (shield #: 6995) and NYPD Officer Hansen (shield #: 4028) illegally prevented me from attending a public press conference in front of City Hall that concerned reforming the NYPD.

**c)** Just 1 day after both Manhattan District Attorney Cyrus Vance, Jr. and Lawrence Byrne, Jr. informed me during a meeting that was conducted at the New York City Bar Association that was partly recorded on audio that they would willfully violate their Fourteenth Amendment affirmative legal duty as law-enforcement officials to intervene on my behalf to uphold my constitutional rights by refusing to do their jobs as I apprised them of crimes that members of the NYPD were committing against me at public forums that the Mayor was conducting and they told me then that they would not do anything about that.

**d)** Just 2 days after I testified to New York City Councilman Eric Ulrich and others during the public hearing that the City Council's Committee on Veterans conducted in City Hall partly about being illegally barred from public forums that the Mayor conducted. |
| 14 | Mayor's 3/18/19 public hearing | The public hearing that the Mayor conducted at 4:30 pm on 3/18/19 in the Blue Room inside of City Hall for which the Mayor's Office issued public notice on the Internet that is available at https://a856-cityrecord.nyc.gov/RequestDetail/20190307108 and confirmed that the agenda for that hearing partly concerned labor rights. |

| 15 | Mayor's 3/18/19 public hearing video | The video recording that the Mayor's office arranged to be recorded of the Mayor's 3/19/17 town hall. That video is available on the Internet at https://www.youtube.com/watch?v=rqwyR7ZD23M. |
| 16 | Mr. Banks | HRA Commissioner Steven Banks |
| 17 | My HRA lawsuit | The hybrid lawsuit that I commenced against HRA in January of 2017 that corresponds to _Komatsu v. New York City Human Resources Administration_, No. 100054/2017 (Sup. Ct., New York Cty.) and is being appealed. I asserted claims in that case that my claims in this case relate back to and amplify. Prior to 6/8/17, I asserted claims in that case that concerned illegal acts and omissions that were committed against me by defendants in this action that caused me to have been illegally barred from attending both the Mayor's 4/27/17 town hall and the Mayor's 5/23/17 public resource fair meeting. |
| 18 | NTT Data, Inc. | NTT |
| 19 | NYCLU | New York Civil Liberties Union |
| 20 | Second Circuit | United States Court of Appeals for the Second Circuit |
| 21 | Urban | Urban Pathways, Inc. It is the slumlord for the building in which I reside. |

8.      My claims in this action are mostly about the public hearing that the City Council's Committee on Oversight and Investigations conducted on 11/13/19 at 10 am on the 16th floor of the building that is located at 250 Broadway in Manhattan. The City Council arranged for that hearing to be recorded on video that is available on the Internet at

https://councilnyc.viebit.com/player.php?hash=mrXTN2FyDz20. I will hereinafter refer to that video recording as the "11/13/19 oversight hearing video".

9.      In response to a FOIL demand that I submitted to the NYPD on 3/26/19, it provided me with a video recording that was recorded on 3/26/19 by a video security camera that it controls that was installed in the Committee Room inside of City Hall as it illegally didn't provide me video recordings that were recorded by other video security cameras that it controls and were then installed in that room. The video recording that the NYPD provided to me that I just discussed is one hour in length, begins at 12:49:59 pm on 3/26/19, and a copy of that video is

available on the Internet at

https://drive.google.com/file/d/1ftLeyENJXlHGZYNEKAtXqDqY42eVSYYN/view?usp=sharin

g. Although that video recording has the filename of "19-03-26 CITYHALL-C059-2nd FL-City

Council Comm. Room SW (27155).mp4", I will hereinafter refer to that video recording as

"3/26/19 aerial video".

10.     In response to a FOIL demand that I submitted to the NYPD on 8/13/19, it provided me

with 2 video recordings that were recorded on 8/13/19 by 2 video security camera that it controls

that were installed in the Committee Room inside of City Hall. One of those video recordings

that the NYPD provided to me that I just discussed is one hour in length, begins at 12:59:57 pm

on 8/13/19, has the filename of "CITYHALL-C060-2nd FL-City Council Comm. Room SE

(32983).mp4", and a copy of that video is available on the Internet at

https://drive.google.com/open?id=1CMdnGMfvMoYhZBeNeybeFuhtcjgvw14F. I will

hereinafter refer to that video recording as "8/13/19 right aerial video". The other video

recording that was recorded on 8/13/19 that the NYPD provided to me and that I just discussed is

also one hour in length, begins at 12:59:57 pm on 8/13/19, has the filename of "CITYHALL-

C059-2nd FL-City Council Comm. Room SW (32982).mp4", and a copy of that video is

available on the Internet at

https://drive.google.com/open?id=1ArU0Hd3QJgZKn8gQfDu7WCP_WF_vHgCh. I will

hereinafter refer to that video recording as "8/13/19 left aerial video".

11.     At 10:57 am on 11/13/19, I recorded a video with my cell phone as I inadvertently

recorded that video in an upside-down manner. A copy of that video that I have rotated to have it

properly shown is available on the Internet at

https://drive.google.com/file/d/1n_Xyfdva2Qq7JH6frCMveslPkQR-fP2z/view?usp=sharing.

That video recording has the filename of "IMG_1378.mov". I recorded that video mainly of Defendant Perez while we were in the building that is located at 250 Broadway in Manhattan after I was illegally coerced to leave the room in which I just testified before Defendant Torres illegally caused my testimony to end while subjecting me to standardless discretion, First Amendment retaliation, an illegal prior restraint that was imposed on my First Amendment rights, viewpoint discrimination, and violations of my due process and equal protection rights.

12.     At 10:53 am on 11/13/19, I recorded a video with my cell phone. A copy of that video is available on the Internet at https://drive.google.com/file/d/1slFHA-LnEVn0gWD55fAojrhi_96Y-kQP/view?usp=sharing. That video recording has the filename of "IMG_1377.MOV". I recorded that video of Defendants Torres, Yeger, Powers, Ayala, and Sgt. Bradley Perez while we were in the building that is located at 250 Broadway in Manhattan after I was illegally coerced to leave the room in which I just testified.

13.     At 11:01 am on 11/13/19, I recorded a video with my cell phone. A copy of that video is available on the Internet at

https://drive.google.com/open?id=1LPyr5MAgkvzGLjuHDYNzKOUvelCRHB28. That video recording has the filename of "IMG_1379.MOV". I recorded that video of Defendant Perez by the Broadway entrance to City Hall as I talked with him and he illegally prevented me from being able to exercise my First Amendment and Fourteenth Amendment rights to walk past him to City Hall's building to attend public hearings inside of it and to try to cross paths with reporters there to apprise them of the fact that Defendant Torres had just illegally terminated my testimony as well as the fact that Defendant Perez was illegally preventing me from accessing City Hall while I was conducting myself in a lawful manner in stark contrast to him.

14.     At 11:08 am on 11/13/19, I recorded a video with my cell phone. A copy of that video is

available on the Internet at

https://drive.google.com/open?id=1YMhFuZ_e36OYypUQwe9PGTGznHdGXYPN. That video

recording has the filename of "IMG_1380.MOV". I recorded that video of Defendant Lin near

the NYPD guardhouse located just inside of the Broadway entrance to City Hall.

15.     References to HRA, DHS, and DSS will be used interchangeably in this pleading for

simplicity.

16.     The illegal acts and omissions that were committed against me on 11/13/19 at the sites of

public forums that my claims in this complaint concern were committed in relation to my efforts

to have exercised my constitutional rights to have done the following:

        a.      Lawfully attended those public forums in accordance with my constitutional

        rights.

        b.      Exercised the full extent of my rights while attending them partly by lawfully

        criticizing Defendant Torres and engaging in protected whistleblowing about a broad

        array of matters of public concern and private matters.

17.     This is a civil rights action to vindicate my rights in response to illegal acts and omissions

that were committed against me on 11/13/19 at the sites of public forums that members of the

City Council conducted and were otherwise public forums then. Those who violated my civil

rights on 11/13/19 through their acts and omissions that my claims in this action concern did so

as co-conspirators for that purpose and otherwise with deliberate indifference in violation of 42

USC §1986 in regards to violations of my constitutional rights and other laws that occurred then

in their immediate presence and partly include 18 USC §245(b)(5), 18 USC §241, 42 USC

§1985, 5 U.S.C. §1502(a), NYPL §240.20, NYPL §215.10, NYPL §195.00, New York City

Charter §1116, New York General Business Law §349, and New York State's Open Meetings

Law.

18.     This action is also being used to perform a civic duty to expose complicit censorship in journalism that covers-up illegal acts and omissions by New York City government officials.

19.     The commission of the illegal acts and omissions against me on 11/13/19 that my claims in this complaint concern was part of a larger and ongoing campaign of unequal treatment, discrimination, harassment, viewpoint discrimination, and standardless discretion, and violations of additional rights of mine pursuant to the First Amendment and Fourteenth Amendment with respect to public hearings that the City Council conducted and public forums that Defendant Torres established through his use of a Twitter account that is registered to him that has the usermame of "@RitchieTorres".

20.     Such illegal acts and omissions against me by members of the City Council and Defendant Lin ultimately and unforgivably culminated in the preventable death of a disabled military veteran named Robert Vargas on or about 8/11/20 in the building in which I reside that I firmly believe occurred because of inexcusable criminal negligence by personnel of Urban and HRA that include Mr. Banks and Ann Marie Scalia who is HRA's Deputy General Counsel. Mr. Vargas lived in apartment 1D in the building in which I reside. Moreover, I believe that Mr. Vargas' death was facilitated by inexcusable inaction and reckless indifference by Defendant Torres, other members of the City Council, the Mayor, other personnel of HRA, HPD, DOI, and others. Mr. Vargas' death occurred long after I twice testified specifically on his behalf to the City Council and after I otherwise testified to both it and the Mayor about conditions in the building in which I reside. I previously testified to Defendant Torres on 3/26/18 about deficient conditions in the building in which I reside as I then pointedly asked him if there was something that he could do to resolve that. He then told me that that he and his staff could follow-up with

HPD about that. I have every reason to believe that he lied to me then about that because the deficiencies to which I referred as I testified to him on 3/26/18 continued to exist in the building in which I reside longer after that and some still exist in it.

21.    Mr. Vargas' death was something he foresaw and was gravely concerned about as I talked with him on 8/2/20 and recorded part of that conversation on audio.  His death also occurred after I had communications with Mr. Banks, Ms. Scalia, and HPD about him and conditions in the building in which I reside. What follows shows an e-mail message that I sent to Mr. Banks, Ms. Scalia, and HRA's General Counsel (Martha Calhoun) on 8/3/20 at 1:27 pm about Mr. Vargas in which I clearly apprised them of the fact that he sorely and urgently needed an air conditioner to be installed in his apartment while it was then Summer in New York City and had recently been quite humid in the building in which I reside that lacks sufficient ventilation in public areas within it:

> **From:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Question about helping a disabled military veteran in my building
> **Date:** August 3, 2020 at 1:27:32 PM EDT
> **To:** "Scalia, Ann Marie" <scaliaa@dss.nyc.gov>
> **Cc:** "banksst@dss.nyc.gov" <banksst@dss.nyc.gov>, "Calhoun, Martha" <calhounm@dss.nyc.gov>
>
> Ms. Scalia,
>
> I'm sending you this to find out what you, Mr. Banks, and HRA is willing to do to help the disabled military veteran who lives in apartment 1D in the building in which I reside who needs an air conditioner to be installed in his living room.
>
> He told me yesterday that Urban Pathways, Inc.'s personnel told him that though it has an air conditioner to install that is located in the basement of that building, it will take 2 weeks from when he was told last week for bars to be cut outside of his living room window to install that air conditioner.
>
> I previously talked with you and Mr. Banks on his behalf and i also testified on his behalf during a City Council public hearing.

The person I'm talking about has had several strokes and can barely move.

It is unconscionable for HRA to allow him to have to sweat in his apartment only because Urban's personnel, its contractors, and HRA won't get off of their fat ass to abide by applicable health and safety laws in the middle of Summer.

I'm not anticipating a response to this e-mail and will likely use it in my federal lawsuit to further establish that HRA is blatantly disregarding its legal duties with its business partners.

From,

Towaki Komatsu

22.     Instead of having had an air conditioner installed in his apartment in the building in which I reside, Mr. Vargas received a black body-bag for his lifeless body to be put in by personnel who work for the New York City's Chief Medical Examiner's Office on 8/11/20 when they visited his apartment and rolled him out of it on a stretcher after personnel of the FDNY broke open the front door to his apartment. The FDNY then responded in that way because Mr. Vargas was no longer responding to people who were checking up on how he was doing in his apartment and his apartment's door was locked from the inside. Before I sent the preceding e-mail message to Mr. Banks, Ms. Scalia, and Ms. Calhoun about Mr. Vargas, he told me that he was having major problems with being able to contend with the heat and humidity in his apartment because he lacked an air conditioner in it. I recall that he told me on 8/2/20 that he was having sleeping problems because of that. Prior to 8/2/20, I knew that Mr. Vargas had suffered multiple severe strokes that caused him to be severely disabled because he told me so. As I talked with him on 8/2/20, I expressed concern about his health with respect to how his ongoing lack of an air conditioner was causing him to be susceptible to further health problems that were preventable by having an air conditioner promptly installed in his apartment. Less than 5 hours

after Mr. Vargas passed away, I talked with one of Urban's personnel who works in the building in which I reside. I talked with him then in front of that building about the fact that no one installed an air conditioner in Mr. Vargas' apartment while he resided in it. He told me then that the City of New York only required adequate ventilation to exist in the building in which I reside and that Mr. Vargas had a fan in his apartment. I immediately pointed out to him that a fan wasn't the same thing as an air conditioner because it didn't cool air. Mr. Vargas' death confirms that I won that stupid debate that I certainly would have preferred to never have had in the first place partly by having Defendant Torres uphold a commitment he made to me on video on 3/26/18 as he told me then that he would follow-up with HPD about deficiencies that then existed in the building in which I reside.

23.      Mr. Vargas was a very nice man who was grouchy in an amusing way. I genuinely regret that there wasn't more that I could have done to have saved his life and am still somewhat haunted by the fact that he is gone. He was also someone that I had been thinking about using in entirely valid litigation that I commenced against the City of New York and HRA as well as litigation that I was preparing to commence against Urban, Mr. Banks, and Ms. Scalia that I have since commenced. Mr. Vargas' death occurred after a nice woman named Gilda Giscombe also died in the building in which I reside in December of 2017 due to negligence by Urban's personnel. She resided in apartment 3A in that building. I recorded a face-to-face conversation that I had with Mr. Vargas on 12/19/19 at 2:25 pm as I stood in front of his apartment in the lobby of the building in which I reside as he told me that Gilda collapsed in that lobby earlier that month upon returning to it and that she asked one of Urban's personnel who worked in that building then who she encountered for help to get to her apartment. That video recording is available on the Internet at

https://drive.google.com/file/d/1KRAiloeCKFB_aWofL7cMIV14C6R0Gx1s/view?usp=sharing.

Mr. Vargas told me during my conversation with him then that her request to that person for help

was refused and that someone else later helped her to get to her apartment. Less than 5 days later

after Gilda collapsed in that lobby, she died in her apartment.

24.     I also regard Mr. Banks, Defendant Torres, the Mayor, and other New York City

government officials and agencies as sharing negligence for Ms. Giscombe's death largely

because they could and should have decisively and immediately intervened against Urban long

before December of 2017 by immediately terminating all of Urban's contracts with the City of

New York and assigning a responsible replacement company to act as the landlord of the

building in which I reside while making absolutely certain that that new landlord would fully and

consistently comply with all applicable laws in how it performed its duties as the landlord of that

building.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C.

§§1331 and 1343. This action is brought pursuant to 42 U.S.C. §§1983, 1985, 1988 and the First,

Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution.

2.     My claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§2201 and

2202, FRCP Rules 57 and 65, and the general legal and equitable powers of this Court.

3.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because I reside in the Bronx and the

illegal acts and omissions that were committed against me that this complaint concerns occurred

in Manhattan.

4.     An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

5.     Consistent with the requirements of New York General Municipal Law § 50-e, I filed a

timely Notice of Claim with the New York City Comptroller within 90 days of the accrual of my claims under New York law.

6.      My claims have not been adjusted by the New York City Comptroller's Office.

## PARTIES

1.      I am, and was at all times relevant to this action, a resident of Bronx County in the State of New York. I am also a U.S. Navy veteran, who swore to defend the U.S. Constitution against all of its enemies indefinitely and without exceptions. I have honored that oath and continue to do so.

2.      At all times relevant herein Defendants Ritchie Torres, Keith Powers, Kalman Yeger, and Diana Ayala were employees of the City of New York and New York City Councilmembers.

3.      At all times relevant herein, Defendant Torres was the Chairman of the City Council's Committee on Oversight and Investigations and beneficiary of a stolen 2017 New York City government election about which I have commenced separate federal court litigation that is ongoing. On 11/13/19, Defendant Torres was trying to be elected as a member of the U.S. Congress. That is a critically significant fact that corresponds to him having violated the federal Hatch Act (5 U.S.C. §1502(a)(1)) on 11/13/19 by how he treated me during the public hearing that the City Council's Committee on Oversight and Investigations conducted as I then sought to lawfully use that public forum partly to apprise voters, potential voters, and his political rivals by video about the fact that Mr. Torres was clearly unqualified to become a member of the U.S. Congress.

4.      At all times relevant herein Defendants Sgt. Bradley and Rafael Perez were employees of the City of New York as people who worked for the City Council to provide security services for it.

5.      The next screenshot clearly shows Defendant Sgt. Bradley on 11/13/19 as he stood in the doorway of the room in which I had just testified to the City Council's Committee on Oversight and Investigations for just roughly 30 seconds during which Defendant Torres flagrantly subjected me to illegal witness tampering, viewpoint discrimination, and First Amendment retaliation. This screenshot corresponds to what appears in the video that has the filename of "IMG_1377.mov" at the elapsed time of 15 seconds.



6.      Defendant Perez has worked for the City Council at all times relevant herein as its Chief Sergeant at Arms. The following is a link to his LinkedIn profile on the Internet that reflects his career and indicates that he has worked for the City Council as its Chief Sergeant at Arms since November of 2012:

https://www.linkedin.com/in/rafael-perez-37232484/

7.      The following facts apply to the defendants in this action who I identify with John Doe and Jane Doe in their names:

> a.      They were people whose real names I don't know.
>
> b.      They worked for the City Council or NYPD at all times relevant herein.
>
> c.      They appear in video recordings that I discuss in this complaint.
>
> d.      They both had a realistic opportunity to intervene on my behalf on 11/13/19 to try to end the illegal acts that were being committed against me in violation of my constitutional rights in regards to my lawful efforts to **a)** exercise my First Amendment and Fourteenth Amendment to continue to attend and testify in the 11/13/19 public hearing that the City Council's Committee on Oversight and Investigations conducted and **b)** access public forums on City Hall's property on 11/13/19 after 11 am and lawfully exercise my constitutional rights in other ways while doing so.

8.      Upon information and belief, Defendant Jane Doe 11/13/19 is a female attorney who works for the City Council and attended the public hearing that the City Council's Committee on Oversight and Investigations conducted on 11/13/19. The following screenshot is from the 11/13/19 oversight hearing video at the elapsed time of 37 minutes and 3 seconds and shows how she then appeared in it as she sat directly next to Defendant Torres:



9.      Defendant City of New York is a municipal corporation duly incorporated and authorized under the laws of the State of New York pursuant to §431 of its Charter. The City of New York is authorized under the laws of the State of New York to maintain a police department, the NYPD, which is supposed to act as its agent in the area of law-enforcement and for which it and the Mayor are ultimately responsible. The City and the Mayor both assume the risks incidental to the maintenance of a police force and the employment of police officers.

10.     Defendant NYPD Officer Lin was at all times relevant herein an employee of the City of New York who worked for the NYPD as a police officer. On 11/13/19, my interactions with him were limited to the period of time during which he stood near the NYPD guardhouse that is located just inside of the Broadway entrance to City Hall.

11.     The defendants in this action who are people violated oaths that they were required to take through the illegal acts and omissions that they committed against me on 11/13/19 in relation to my efforts to lawfully continue to **a)** attend and testify in the public hearing that the City Council's Committee on Oversight and Investigations conducted on that date and **b)** access public forums on City Hall's property on 11/13/19 after 11 am and otherwise lawfully exercise my constitutional rights while doing so.

12.     The specific oaths that the defendants violated on 11/13/19 in regards to me were those that they were required to take upon **a)** joining the NYPD and/or **b)** otherwise working for the City of New York. Those oaths required them to swear or affirm that they would perform their duties as members of the NYPD and/or other personnel of the City of New York in accordance with the U.S. Constitution and New York State Constitution to the best of their abilities. In regards to this point, the Mayor's press office made a transcript available on the Internet of a swearing-in ceremony for new members of the NYPD that the Mayor presided over on 10/8/15. That transcript is available on the Internet at https://www1.nyc.gov/office-of-the-mayor/news/702-15/transcript-mayor-de-blasio-delivers-remarks-nypd-swearing-in-ceremony.

13.     The next screenshot shows an excerpt from that transcript that reflects how those new members of the NYPD pledged to uphold the U.S. and New York Constitution and to faithfully discharge their duties as members of the NYPD to the best of their abilities. Hindsight confirms that Defendant Lin lied in the oath that he took upon joining the NYPD by having thereafter refused to perform his job as a police officer in full compliance with that oath in regards to me on 11/13/19.

> **Mayor:** I do hereby pledge – I'm sorry, I should say repeat after me – I do hereby pledge and declare –
>
> **Recruits:** I do hereby pledge and declare –
>
> **Mayor:** – to uphold the Constitution of the United States –
>
> **Recruits:** – to uphold the Constitution of the United States –
>
> **Mayor:** – and the Constitution of the State of New York –
>
> **Recruits:** – and the Constitution of the State of New York –
>
> **Mayor:** – and faithfully discharge my duties –
>
> **Recruits:** – and faithfully discharge my duties –
>
> **Mayor:** – as a New York City Police Officer –
>
> **Recruits:** – as a New York City Police Officer –
>
> **Mayor:** – to the best of my ability –
>
> **Recruits:** – to the best of my ability –
>
> **Mayor:** – so help me God.
>
> **Recruits:** – so help me God.

14.     In a similar vein, other personnel of the City of New York are required upon working for the City of New York by New York State Civil Service Law §62 to take and file an oath or affirmation in which they pledge and declare that they will support the U.S. and New York State Constitution and faithfully discharge the duties of their jobs with the City of New York to the best of their abilities. The terms of New York State Civil Service Law §62 are shown on the New York State Senate's web site at https://www.nysenate.gov/legislation/laws/CVS/62. The following are two relevant excerpts from that law:

    a.     "Every person employed by the state or any of its civil divisions, except an employee in the labor class, before he shall be entitled to enter upon the discharge of any of his duties, shall take and file an oath or affirmation in the form and language prescribed by the constitution for executive, legislative and judicial officers, which may be administered by any officer authorized to take the acknowledgment of the execution of a deed of real property, or by an officer in whose office the oath is required to be filed. In lieu of such oath administered by

an officer, an employee may comply with the requirements of this section by subscribing and filing the following statement: **"I do hereby pledge and declare that I will support the constitution of the United States, and the constitution of the state of New York, and that I will faithfully discharge the duties of the position of ............, according to the best of my ability.** " Such oath or statement shall be required only upon original appointment or upon a new appointment following an interruption of continuous service, and shall not be required upon promotion, demotion, transfer, or other change of title during the continued service of the employee, or upon the reinstatement pursuant to law or rules of an employee whose services have been terminated and whose last executed oath or statement is on file."

(boldface formatting added for emphasis)

b.     "The refusal or wilful failure of such employee to take and file such oath or subscribe and file such statement shall terminate his employment until such oath shall be taken and filed or statement subscribed and filed as herein provided."

15.     On a closely related note, the following shows the terms of New York City Charter Section 435(a) that address the legal duties that all members of the NYPD have and underscores the fact that Defendant Lin illegally refused to intervene on my behalf to stop illegal acts that Defendant Perez was committing in his immediate presence by illegally preventing me from accessing City Hall's property on 11/13/19:

"**The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public** streets, **sidewalks**, parks and places; **protect the rights of persons** and property, **guard the public health**, **preserve order at** elections and **all public meetings and assemblages**; subject to the provisions of law and the rules and regulations of the commissioner of traffic,* regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; **remove all nuisances in the public** streets, parks and **places**; arrest all street mendicants and beggars; provide proper police attendance at fires; inspect and observe all places of public amusement, all places of business having excise or other licenses to carry on any business; **enforce and prevent the violation of all laws and ordinances in force in the city**; and for these purposes **to arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses**.

(boldface formatting added for emphasis)

16.     By committing the illegal acts and omissions against me that my claims in this action concern, the defendants who did so and were then personnel of the City of New York violated New York City Charter §1116 that requires them to be promptly fired and prohibited from working for the City of New York again.

17.     The individual defendants are being sued herein in their individual and official capacities.

18.     At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD and City of New York. They were acting for and on behalf of the NYPD, City Council, and one another at all times relevant herein. While doing so, the defendants in this action who are members of the NYPD did so with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

19.     The individual defendants' acts hereafter complained of were carried out intentionally, recklessly, and oppressively with malice and egregious, callous, and wanton disregard of my rights.

20.     At all relevant times, the individual defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## BACKGROUND AND RETROSPECTIVE FACTS

1.     I incorporate by reference the statements that I made in all of the preceding paragraphs as though fully set forth herein.

**Legal precedents that were established and/or reinforced on 12/14/17 and 2/4/19 during public hearings that committees of the City Council conducted that confirmed that I had a**

**Fourteenth Amendment and First Amendment right to testify in subsequent City Council public hearings about matters that were unrelated to their agenda without being interrupted:**

2.        On 12/14/17, I testified to the City Council's Committee on Public Safety in the

Committee Room in City Hall while that hearing was recorded on video as a result of

arrangements that the City Council made. That video recording is available on the Internet at

https://councilnyc.viebit.com/player.php?hash=iHTEDJq355gP. My testimony in that hearing

begins at the elapsed time of 3 hours, 29 minutes, and 43 seconds in that video. The City Council

also arranged to have a written transcript to be prepared as a PDF file from that hearing. That

transcript is available on the Internet at

https://legistar.council.nyc.gov/View.ashx?M=F&ID=5738899&GUID=9F6E14F2-33D6-4564-

91E1-A3E83C81DC25. The next screenshot is of lines 3 thru 8 that appear on page 186 in that

transcript and correspond to testimony that I gave in that hearing about matters pertaining to Mr.

Banks and HRA that were not related to the agenda of that hearing.

```
3   following that meeting that he lied to my face. So,
4   in terms of oversight, I know it's not specific to
5   this particular meeting, if you have a Commissioner
6   of HRA whose engaging in deceit and that is
7   essentially a waste of taxpayer resources, who
8   provides oversight of HRA?  And when people like me
```

3.        The next screenshot is from the elapsed time of 3 hours, 31 seconds, and 41 seconds as I

began stating the remarks that appear in line 3 in the preceding screenshot as I clearly

acknowledged in lines 4 and 5 in that transcript that I was discussing matters that were unrelated to that hearing's agenda.



4.      The next screenshot is of lines 13 thru 18 that appear on page 188 in that transcript and correspond to remarks that New York City Councilman Corey Johnson stated to me in response to my testimony in that hearing. As the Speaker of the City Council, Mr. Johnson has greater authority than Defendant Torres with respect to their positions as members of the City Council. Mr. Johnson explicitly stated in his remarks on 12/14/17 that appear in this screenshot that I was able to say whatever I wanted to as I testified in that 12/14/17 hearing. That fact established a legal precedent that prospectively made it permissible for me pursuant to my Fourteenth Amendment due process and equal protection rights as well as my First Amendment rights to briefly discuss matters as I testified in subsequent public hearings that City Council committees

conducted that were beyond the scope of the agenda for those hearings.

```
13          CHAIRPERSON JOHNSON:  Thank you for your
14    testimony today. I don't agree with much of what you
15    said, but you have the, of course, legal right to say
16    it, and we didn't want to interrupt your testimony.
17    You're able to say whatever you wanted, and I really
18    appreciate you coming today.
```

5.      The next screenshot is from the elapsed time of 3 hours, 34 seconds, and 48 seconds in the video of that hearing as Mr. Johnson was making his remarks to me that appear in the preceding screenshot. That screenshot also strongly suggests that New York City Councilwoman Vanessa Gibson has just been using a cell phone that is shown near her right hand as its screen was then shown to be on. As I will discuss shortly, members of the City Council were prohibited then from using cell phones during public hearings that City Council committees conducted as they attended them.



6.      On 2/4/19, a woman named Jazmine Headley and I both testified to the City Council's

Committee on General Welfare in the main chamber in City Hall while that hearing was

recorded on video as a result of arrangements that the City Council made. That video recording

is available on the Internet at https://councilnyc.viebit.com/player.php?hash=46UZCNDWuRk4.

The City Council also arranged to have a written transcript to be prepared as a PDF file from that

hearing. That transcript is available on the Internet at

https://legistar.council.nyc.gov/View.ashx?M=F&ID=7079729&GUID=B6C93984-2D01-4430-

9FA2-BFD1F1E73570.

7.      The next screenshot is from lines 3 thru 8 on page 31 of that transcript. The information

in that screenshot establishes that New York City Councilwoman Laurie Cumbo and Ms.

Headley engaged in a totally irrelevant discussion during that hearing at the expense of

additional time that I could have otherwise been granted to present testimony in that hearing that was relevant to the agenda of that hearing. The agenda for that hearing is listed in a PDF file that the City Council prepared that is available on the Internet at

https://legistar.council.nyc.gov/View.ashx?M=A&ID=674116&GUID=B72ECAA5-DA79-4101-A873-B0C344818A45. Much of that agenda concerned discussing experiences that people had while dealing with HRA. The birthday of Ms. Cumbo's son was certainly irrelevant to that hearing's agenda and her invitation to Ms. Headley to join her at an event at Madison Square Garden was also irrelevant. However, a discussion about those matters occurred without interruption during that hearing at the expense of the amount of additional time that I could have otherwise used to testify about matters that were relevant to that hearing's agenda.

```
3        COUNCIL MEMBER CUMBO:  And my son will be
4   celebrating his birthday soon and we're going to be
5   going to see Sesame Place at Madison Square Gardens,
6   we'd love if you could come.
7        JAZMINE HEADLEY:  Nice, I would gladly
8   appreciate that, yeah, thank you.
```

**Violations of the rules of the City Council, New York City Charter, and my constitutional rights by Defendant Torres and other City Council personnel before and after 11/13/19:**

- **Use of cell phones by Ritchie Torres and other members of the City Council in violation of the City Council's rules and my due process rights during public hearings that the City Council conducted:**

8.    The City Council issued a report that is available as a PDF file on the Internet at

http://council.nyc.gov/wp-content/uploads/2016/05/2016-02-23-Council-Rules.pdf that is

entitled "Rules of the Council" and is effective as of 2/5/16.  The following is the text of Rule

number 7.65 that appears on page 19 in that report:

> **7.65. Prohibition on the Use of Mobile Telephones -** The Council prohibits the use of
> all mobile telephones during the course of committee meetings. The committee
> chairperson shall enforce this Rule during the course of committee hearings by directing
> that all mobile telephones be silenced or placed on vibrate at the start of such committee
> meeting, and that they not be in use during the meeting until its conclusion.

9.      That rule unambiguously prohibited the use of cell phones by New York City

Councilmen and New York City Councilwomen during public hearings that City Council

committees conducted while they were in attendance at such hearings. A key reason why use of

cell phones is prohibited in daily activities that include while driving and conducting public

hearings is because they are distraction to those who use them while they instead need to be

paying proper attention to driving and those who testify in public hearings.

10.     The discussion that follows that is about events that occurred before and after 11/13/19

establish that Defendant Torres and other City Council personnel were equitably estopped from

being able to object to how I conducted myself while I attended the public hearing that the City

Council's Committee on Oversight and Investigations conducted on 11/13/19 in which I briefly

testified. Defendant Torres and other members of the City Council violated City Council rule

number 7.65 as they attended public hearings that City Council committees conducted on the

dates shown in the table that appears next. Their violations of that rule equitably barred members

of the City Council from objecting to what I regard as a doubtful violation of a City Council rule

that Mr. Torres suggested I committed on 11/13/19 strictly by my criticism of him that lasted for

just a few seconds before he retaliated against my protected speech against him by rudely

interrupting me during what was just my opening statement as I lawfully testified in the public

hearing that the City Council's Committee on Oversight and Investigations conducted on that

date.

| # | Date | Committee Hearing | Offender | Notes |
|---|------|-------------------|----------|-------|
| 1 | 3/26/19 | Oversight and Investigations | Ritchie Torres | The following elapsed times within the video that I stated earlier in this complaint that I would refer to as "3/26/19 aerial video" in it correspond to at least **19 instances** in which Mr. Torres appeared in the lower-right corner in that video as he used 2 cell phones during the period in which DOI Commissioner Margaret Garnett testified in that hearing:<br><br>**a)** 14 minutes and 2 seconds, **b)** 15 minutes and 10 seconds, **c)** 15 minutes and 58 seconds, **d)** 16 minutes and 14 seconds, **e)** 17 minutes and 3 seconds, **f)** 18 minutes and 43 seconds, **g)** 19 minutes and 5 seconds, **h)** 25 minutes and 27 seconds, **i)** 27 minutes and 55 seconds, **j)** 28 minutes and 52 seconds, **k)** 29 minutes and 40 seconds, **l)** 30 minutes and 50 seconds, **m)** 31 minutes and 6 seconds, **n)** 31 minutes and 17 seconds, **o)** 31 minutes and 28 seconds, **p)** 33 minutes and 8 seconds, **q)** 33 minutes and 19 seconds, **r)** 33 minutes and 56 seconds, and **s)** 33 minutes and 56 seconds<br><br>The following elapsed times within that same video correspond to at least **5 instances** in which Mr. Torres appeared in the lower-right corner in that video as he used a cell phone during the period in which I testified in that hearing:<br><br>**a)** 57 minutes and 25 seconds, **b)** 57 minutes and 33 seconds, **c)** 57 minutes and 46 seconds, **d)** 58 minutes and 4 seconds, and **e)** 58 minutes and 47 seconds |

| 2 | 10/16/17 | Courts and Legal Services | Rory Lancman | He is clearly heard saying his full name at the elapsed time of 2 minutes and 55 seconds in the video recording that the City Council arranged to be recorded of that hearing that is available on the Internet at https://councilnyc.viebit.com/player.php?hash=6D4LixzIe9Bs as I testified to him. The totality of the circumstances make it objectively reasonable to infer that he then said his full name because he was then answering a telephone call that he just received on his cell phone while he was prohibited from using a cell phone then, |
| 3 | 11/15/17 | Oversight and Investigations | Unknown woman | She appears on the right at the elapsed time of 2 hours, 26 minutes, and 36 seconds in the video of that hearing that is available on the Internet at https://councilnyc.viebit.com/player.php?hash=L6JKJXgGe0My as she was clearly shown using a cell phone in one of her hands. I testified in that hearing, |
| 4 | 2/4/19 | General Welfare | Adrienne Adams, Barry Grodenchik, and Brad Lander | Adrienne Adams, Barry Grodenchik, and Brad Lander of the City Council appear at the elapsed time of 50 minutes, and 43 seconds in the video of that hearing that is available on the Internet at https://councilnyc.viebit.com/player.php?hash=46UZCNDWuRk4 as they were shown using cell phones as Jazmine Headley testified in it. I also testified in that hearing, |
| 5 | 2/4/19 | General Welfare | Vanessa Gibson | As I testified in that hearing at the elapsed time of 11 minutes and 56 seconds in the video that the City Council arranged to be recorded of that hearing, I deliberately made remarks in which I called Ms. Gibson out by name in response to the fact that she was then flagrantly violating my due process rights then as I was testifying by using a cell phone during my testimony instead of paying proper attention to my testimony. |

| 6 | 3/19/19 | Public Safety | Rory Lancman | As I testified in that hearing at the elapsed time of 3 hours, 41 minutes and 5 seconds in the video that the City Council arranged to be recorded of that hearing that is available on the Internet at https://councilnyc.viebit.com/player.php?hash=xCbxmcRFE4wC, I deliberately made remarks that I addressed to Mr. Lancman as I urged him to pay attention to my testimony instead of continuing to violate my due process rights then by using a cell phone or tablet computer as I testified. He refused to comply and continued to use that device as I testified. He is heard at the elapsed time of 3 hours, 41 minutes, and 56 seconds in that video saying that he was then "multitasking" in response to my remarks about the fact that he wasn't paying attention to my testimony as I referred to the fact that he was then instead using an electronics device. |
| 7 | 8/13/19 | General Welfare | Laurie Cumbo, Brad Lander, Unknown woman | Laurie Cumbo, Brad Lander, and an unknown woman who were then members of the City Council appear at the elapsed time of 4 minutes and 59 seconds in the video recording that I stated earlier in this complaint I would refer to as "8/13/19 right aerial video". All of them are shown at that point in that video as they used cell phones during that hearing that I attended. |

11.     To vividly showcase the points that I just made, I will begin with a discussion of how Defendant Torres flagrantly violated my Fourteenth Amendment due process rights and my First Amendment right to petition for redress and communicate directly to government officials as he violated rule number 7.65 of the City Council as I testified in the public hearing that he conducted as the Chairman of the City Council's Committee on Oversight and Investigations in the Committee Room in City Hall on 3/26/19 as I testified in it. The next screenshot is from the elapsed time of 57 minutes and 43 seconds in 3/26/19 aerial video and shows him as he illegally used a cell phone as I testified in that hearing. That screenshot is the result of playing back that video with software that features a picture-in-picture function that shows me in the upper-left

corner as I then testified to Mr. Torres. This screenshot shows a magnified image of Mr. Torres at that point in that video that confirms that he then had both of his hands on a cell phone as he was using it.



12.     The next screenshot is from the same point in that video from which the preceding

screenshot was created. However, this screenshot reflects normal playback of that video without

any special features being used for that playback. Three computer monitors are clearly shown in

this screenshot as they stood in an upright position in front of the table at which I then testified

and faced Mr. Torres instead of also facing the audience members who sat behind me as I

testified in that hearing. Those monitors could be used to present and project video recordings,

photographs, audio recordings, and other presentations reports by people who testify in public

hearings that the City Council conducts if personnel of the City Council properly set them up for

that purpose.



13.     The next screenshot is from the elapsed time of 33 minutes and 21 seconds in that same

video recording. DOI Commissioner Margaret Garnett is shown in the top-left corner in this

screenshot as she testified in that hearing while Defendant Torres also violated her due process

rights and NYPL §195.00, New York City Charter §1116, and rule number 7.65 of the City

Council by using a cell phone. He is shown in in the lower-right corner in that screenshot as his right hand was on or next to a cell phone that he certainly was then using. New York City Councilman Andrew Cohen then sat next to Mr. Torres in that 3/26/19 hearing. By the judge of things, Mr. Cohen ironically looked the other way in regards to Mr. Torres' illegal use of his cell phone during that public hearing before Mr. Cohen embarked on a campaign to be elected as a judge in New York City.



14.     The next screenshot is from the elapsed time of 21 minutes and 11 seconds in that same video and shows Mr. Torres as he illegally used a cell phone while Mr. Garnett testified in that hearing. That screenshot is the result of playing back that video with software that features a picture-in-picture function that shows Ms. Garnett in the upper-left corner as she testified to Mr.

Torres. This screenshot shows a magnified image of Mr. Torres at that point in that video that confirms that he was then slouching as he used a cell phone with his left hand. That occurred as Andrew Cohen opted not to judge Mr. Torres in an unfavorable way for illegally doing so while that may not have been an oversight on his part as he then wore eyeglasses for better vision.



15.     The next screenshot is from the same point in that video from which the preceding screenshot was created. However, this screenshot reflects normal playback of that video without any special features being used for that playback.



16.     The next screenshot corresponds to the elapsed time of 50 minutes and 43 seconds in a video recording the NYPD provided to me in response to a FOIL demand that I submitted to it. That video recording was recorded by a video security camera that the NYPD controls that was installed in the main chamber in City Hall on 2/4/19.  That video recording has the filename of "CITYHALL-C057-2nd FL-City Council Chambers SE Ctr (25141).mp4". I will hereinafter refer to it as "2/4/19 right aerial video". The NYPD also provided me a separate video that was recorded by another video security camera that it controls that was also installed in the main chamber in City Hall on 2/4/19. The beginning of "2/4/19 right aerial video" corresponds to the time of 12:59:57 pm on 2/4/19 and the length of that video is one hour and 3 seconds. This screenshot reflects the fact that the point in the video recording that it was created from was at a time when that video was recording the public hearing that the City Council's Committee on General Welfare was then conducting in the main chamber in City Hall.



17.     The following facts are entirely true and accurate about what appears in the preceding screenshot:

    a.    Ms. Headley is shown in it as she testified in that hearing while she sat at a table that is shown toward the top of that screenshot and near its horizontal center.

    b.    Roughly 15 New York City Councilmen and Councilwomen appear in that screenshot as they sat at tables that appear vertically in that screenshot near its horizontal center.

    c.    Most of those New York City Councilmen and Councilwomen were then paying proper attention to Ms. Headley's testimony.

    d.    New York City Councilmen Brad Lander and Barry Grodenchik as well as New York City Councilwoman Adrienne Adams appeared to be violating rules that the City Council established by using cell phones during that hearing.

    e.    Mr. Banks and I also appear in that screenshot as we sat in the audience section.

18.     The next screenshot is a cropped and enlarged version of the preceding screenshot that is being presented to emphasize the fact that members of the City Council were flagrantly violating Ms. Headley's due process right to be properly heard by them as she testified in that hearing as a result of the fact that they were using their cell phones in violation of rules that the City Council established that prohibit the use of cell phones by members of the City Council during public hearings that are conducted by committees of the City Council.



19.     In this preceding screenshot, **a)** Brad Lander is shown in the lower-left area as he used a cell phone with both of his hands, **b)** Adrienne Adams is shown in the lower-right area as she used a cell phone with her right hand, and **c)** Barry Grodenchick is shown sitting directly to the right of Ms. Adams as he used she used a cell phone with his left hand as all of them violated NYPL §195.00, New York City Charter §1116, rule number 7.65 of the City Council, and their constitutional oath of office as employees of the City of New York by doing so.

20.     The next screenshot corresponds to the elapsed time of 4 minutes and 59 seconds in a video recording the NYPD provided to me in response to a FOIL demand that I submitted to it. That video recording was recorded by a video security camera that the NYPD controls that was installed in the Committee Room in City Hall on 8/13/19.  That video recording has the filename of "CITYHALL-C060-2nd FL-City Council Comm. Room SE (32983).mp4" and I will hereinafter refer to it as "8/13/19 left aerial video". The NYPD also provided me a separate video that was recorded by another video security camera that it controls that was also installed in that room on 8/13/19. The beginning of "8/13/19 left aerial video" corresponds to the time of 12:59:57 pm on 8/13/19 and the length of that video is one hour and 2 seconds. This screenshot reflects the fact that the point in the video recording that it was created from was at a time when that video was recording the public hearing that the City Council's Committee on General Welfare was then conducting in that room. New York City Councilman Brad Lander, New York City Councilwoman Laurie Cumbo (shown wearing a pink jacket and eyeglasses), and an unknown female member of the City Council are shown from top to bottom in that screenshot as they used cell phones in violation of the City Council's rules. New York City Councilman Stephen Levin is the second person from the bottom in that screenshot as he was then the chairman of that committee and condoned the fact that his colleagues were then violating the

City Council's rules by using cell phones. That video recording is available on the Internet at

https://drive.google.com/open?id=1CMdnGMfvMoYhZBeNeybeFuhtcjgvw14F.



21.     The next screenshot is from that same point in that video without the image being

cropped as much as the preceding screenshot. Two male security personnel for the City Council

appear near the door shown at the top in that screenshot that leads to the main chamber in City

Hall. Those security personnel were then condoning the fact that Mr. Lander, Ms. Cumbo, and an

unknown female member of the City Council were then violating City Council rules by using

cell phones during that hearing.



- **<u>Room reassignments for public hearings without sufficient advance notice that violated my rights as a speaker while testifying</u>**:

22.     When I testify in public hearings that are conducted in City Hall, one of the things that I consider is the size of the room in which I will do so. I also sometimes prepare for that testimony by considering where computer monitors may be setup by members of the City Council in the rooms that will host such hearings in order to enable me to properly present video recordings, reports, and other material to the audience as I testify in order to enable as many audience members as possible to effectively view and hear the information that is presented and projected from them those monitors. I also consider where members of the audience will sit in the rooms in which I testify. Such audiences are comprised of government officials, members of the press, and ordinary members of the public. I consider where they will sit as I testify in those hearings to

assess to what extent I will be able to see them while testifying in such hearings to try to determine to what extent and how my testimony will be received, ignored, and perhaps recorded on video or through photographs that could possibly further spread the reach of my testimony that can partly alleviate rampant censorship by whistleblower news censors in journalism and government officials. I also consider where ordinary members of the public and the press may sit or stand among the audience at such hearings to determine to what extent they will be able to identify the extent to which government officials and whistleblower news censors in journalism boycott my testimony by not being present and otherwise ignore it to allow such members of the audience witness the extent to which government officials and whistleblower news censors don't support democratic values that include all that the First Amendment and Fourteenth Amendment represent.

23.     When I testify in the main chamber in City Hall, my back faces a wall because of where I sit and I can do all of the following as I testify in that room:

    a.  Look straight ahead and clearly see how many New York City Councilmen and Councilwomen are in attendance, assess the extent to which they are and aren't paying attention to my testimony, and watch them as they violate rules of the City Council and my due process by using electronic devices as I testify instead of paying proper attention to my testimony.

    b.  Look straight ahead and clearly determine the extent to which members of the press and whistleblower news censors are present while also determining the extent to which they're ignoring or paying attention to my testimony.

    c.  Look to my right and observe those who are in the audience section on the main floor and in the balcony while making assessments about the extent to which they're

paying attention to my testimony and are supportive of it to engage in expressive

association with them then and perhaps thereafter as well in accordance with my First

Amendment rights.

d.   Rotate the screen of my laptop to alternate between having it face **a)** those in the

audience who are located to the right of where I sit and **b)** government officials in

front of me as I may then be presenting relevant video recordings, photographs,

and/or reports in conjunction with my testimony in situations in which I'm unable to

instead project that material from an external monitor that the City Council

sometimes sets up for that purpose as a consequence of **a)** arbitrary and capricious

witness tampering and viewpoint discrimination by members of the City Council to

my detriment and/or **b)** their incompetence by virtue of not granting me a reasonable

accommodation to facilitate my ability to properly present my testimony during such

public hearings by not causing me to be provided a computer monitor with which to

use in conjunction with that testimony.

24.   In contrast to what I just discussed, when I testify in the Committee Room in City Hall,

my back faces the audience that is comprised of members of the public as well as journalists and

whistleblower news censors in journalism. Also, the following is entirely true and accurate about

how things are when I testify in that room:

a.   Only members of the City Council are in front of me. This means that unless I

awkwardly turn around as I testify, I can't determine who is still in the audience as I

do so as well as the extent to which they're paying attention to my testimony,

ignoring it, perhaps recording it, and perhaps talking about it with others. This also

means that I can't identify members of the press that are actually journalists that I can

possibly have an opportunity to talk with following my testimony to follow-up with them about it.

b.  It is far more awkward to rotate the screen of my laptop to alternate between having it face **a)** those in the audience who are located behind where I sit and members of the City Council who sit in front of me as I may then be presenting relevant video recordings, photographs, and/or reports in conjunction with my testimony in situations in which I'm unable to instead simultaneously project that material from external monitors that would face both the members of the City Council in front of me and the audience behind me.

c.  Since no balcony exists in the Committee Room, members of the audience cannot literally look down from one at the members of the City Council in front of me partly to determine the extent to which people that include Ritchie Torres may be addicted to illegally violating my constitutional rights that include my Fourteenth Amendment due process rights and my First Amendment right to petition for redress as well as other laws and City Council rules as I testify partly by using cell phones and other electronic devices as they do not pay proper attention to my testimony.

d.  The seating capacity in the Committee Room is likely less than half of what it is in the main chamber in City Hall. This means that my ability to exercise my First Amendment right to communicate information as a speaker and otherwise engage in expressive association with respect to the members of the public and press in the audience as I testify in the Committee Room is significantly reduced compared to how I could otherwise benefit by being able to testify in the main chamber.

e.  Those who don't have an electronic device with them as they attend public hearings

in which I testify in the Committee Room in City Hall and sit behind me in the

audience while doing that they could otherwise use to watch a video recording of

such hearings are unable to receive information in real-time that I may possibly

communicate while doing so with respect to body language that I may outwardly

exhibit mainly in the form of facial expressions that can be used for a variety of

purposes that include expressing skepticism, sarcasm, frustration and anger, and

satisfaction that may complement and enhance the testimony that I present through

my remarks as I testify.

25.     Both on 3/26/19 and 11/18/19, personnel of the City Council arbitrarily violated my

Fourteenth Amendment, First Amendment, and Fifth Amendment rights that correspond to

testimony that I sought to present in public hearings that were originally scheduled to be

conducted in the main chamber in City Hall on those dates by the City Council's Committees on

**a)** Oversight and Investigations on 3/26/19 and **b)** Public Safety on 11/18/19. New York City

Charter §46 confirms that the City Council's personnel are required to provide "reasonable

advance notice of committee meetings to the public." My rights pursuant to the First

Amendment, Fifth Amendment, and Fourteenth Amendment with respect to those 3/26/19 and

11/18/19 public hearings by the City Council's Committees on **a)** Oversight and Investigations

on 3/26/19 and **b)** Public Safety on 11/18/19 were violated as a result of the fact that Defendant

Perez and other personnel of the City Council arbitrarily and unlawfully suddenly decided to

change the room assignments for those hearings at the last minute to cause both of them to

instead be conducted in the Committee Room in City Hall instead of granting me my Fourteenth

Amendment due process right to accorded sufficient advance notice of those changes to enable

me to mount a possible legal challenge against the decision to change those rooms assignments

that was made at the same time that I had ongoing litigation in which I asserted entirely valid claims that were partly about the fact that I was illegally prevented from attending a public town hall meeting and public resource fair meeting that were conducted by members of the City Council, the Mayor, Mr. Banks, members of the NYPD, and other government personnel in a collaborative manner with members of the public that were public forums at the same time that I had ongoing litigation against HRA and was engaged in whistleblowing against the Mayor's administration, members of the NYPD, Mr. Banks, and HRA's business partners. Those who were involved in making those room assignment changes on 3/26/19 and 11/18/19 likely were aware of that litigation involving me on those dates because I previously testified about it in public hearings that the City Council conducted as they attended them.

26.     The next screenshot is from a public notice that was issued as a PDF file for the public hearing the City Council's Committee on Oversight and Investigations conducted on 3/26/19 that I downloaded on 3/20/19 from the City Council's web site at

https://legistar.council.nyc.gov/View.ashx?M=A&ID=680109&GUID=6123128D-BBFA-45B5-B613-1579BD262E16.



27.    The preceding screenshot clearly indicates that the public hearing that the City Council's Committee on Public Safety conducted on 11/18/19 was also originally scheduled to be conducted in the main chamber in City Hall instead of its Committee Room.

28.    The next screenshot is from a public notice that was issued as a PDF file for the public hearing the City Council's Committee on Public Safety conducted on 11/18/19 that I downloaded on 11/17/19 from the City Council's web site at

https://legistar.council.nyc.gov/View.ashx?M=A&ID=735835&GUID=84D658B7-4202-487F-877F-BB05006147ED.



## The New York City Council

City Hall
New York, NY 10007

## Committee Green Sheet

### Committee on Public Safety

Donovan J. Richards, Chair
Members: Adrienne E. Adams, Justin L. Brannan, Fernando Cabrera,
Andrew Cohen, Chaim M. Deutsch, Vanessa L. Gibson,
Rory I. Lancman, Carlos Menchaca, I. Daneek Miller, Keith Powers,
Ydanis A. Rodriguez and Paul A. Vallone

| Monday, November 18, 2019 | 10:00 AM | Council Chambers - City Hall |
|---|---|---|

| T2019-5353 | Oversight - NYPD's Roll-Out of Body Worn Cameras |
|---|---|
| Int 1136-2018 | A Local Law to amend the administrative code of the city of New York, in relation to requiring the New York City police department to issue public reports on the department's use of body-worn cameras |

29.     The preceding screenshot clearly indicates that the public hearing that the City Council's Committee on Public Safety conducted on 11/18/19 was originally scheduled to be conducted in the main chamber in City Hall instead of its Committee Room.

30.     Since the main chamber in City Hall was already reserved on both 3/26/19 and 11/18/19 for hosting the public hearings that the City Council's Committees on **a)** Oversight and Investigations and **b)** Public Safety would conduct on those dates in which I testified, members of the City Council were prohibited from being able to lawfully make last-minute changes to the room assignments for those hearings because that would violate the Fourteenth Amendment due process rights of those who would testify in those hearings. As a result, the City Council personnel who sought to cause different hearings to be conducted in the main chamber in City Hall at 12 pm on 3/26/19 and at 10 am on 11/18/19 needed to instead find some other place in which to conduct them or otherwise reschedule those other hearings to be conducted in the main

chamber in City Hall on a different date and time. However, personnel of the City Council went ahead and unlawfully caused the public hearings that the City Council's Committees on **a)** Oversight and Investigations and **b)** Public Safety conducted on 3/26/19 and 11/18/19 to be conducted in the Committee Room in City Hall instead of within its main chamber just a few minutes before those public hearings began. There is no objectively valid reason why the members of the City Council who caused those room assignment changes to occur couldn't have instead rescheduled the other events that were conducted at the same time as those hearings in the main chamber in City Hall to a date and time that would be after those hearings would have otherwise been conducted in that chamber in order to avoid violating the constitutional rights of those who testified in the public hearings that the City Council's Committees on **a)** Oversight and Investigations and **b)** Public Safety conducted on those dates.

31.     Also, what follows shows the e-mail message that I sent to Defendant Torres on 3/23/19 at 4 pm to have proper arrangements made by the City Council to facilitate my ability to present video recordings in conjunction with the testimony that I would give on 3/26/19 during the public hearing that the City Council's Committee on Oversight and Investigations was then scheduled to conduct on 3/26/19 in the main chamber of City Hall.

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Testifying on 3/26/19 during the New York City Council Oversight and Investigations Committee hearing
> **Date:** March 23, 2019 at 4:00:51 PM EDT
> **To:** Rtorres@council.nyc.gov
>
> Mr. Torres,
>
> This is Towaki Komatsu.
>
> I'm sending you this message to request that your staff make arrangements to let me present audio and video recordings through the use of an external computer monitor or television set to be provided by the New York City Council's staff in conjunction with

testimony that I intend to provide during the public hearing you will conduct for the New York City Council's Oversight and Investigations Committee on Tuesday. The First Amendment grants me the legal right to testify in this way and there are no rules in the New York City Charter that interfere with my desire to do so.

In the event that these reasonable accommodations aren't made in spite of this advance notice, it will give me sufficient grounds to have a federal judge in my lawsuit against the City of New York to void that hearing without hesitation pursuant to section 107 of New York State's Open Meetings Law.

Regards,

Towaki Komatsu

32.     The hostility that I expressed in that e-mail message was in response to the fact that

previous similar requests that I submitted to other members of the City Council to have

comparable arrangements made by the City Council to enable me to present pertinent video

recordings in conjunction with testimony that I would give during public hearings that were

conducted by City Council committees and have such video recordings projected for the

audience's benefit were ignored in violation of my constitutional rights. In particular, rights of

mine that were violated in that regard included **a)** my Fourteenth Amendment rights that pertain

to due process, equal opportunity, and prohibitions against discrimination, selective-

enforcement, and abuse of process and **b)** my First Amendment rights that pertain to freedom of

expression, the right to petition for redress, the right to engage in expressive association, and the

right to receive information (such as being interrupted by audience members as I testified to be

asked for clarification about my testimony).

33.     I didn't receive any response to that e-mail message and no arrangements were made by

the City Council to enable me to present video recordings on 3/26/19 as I testified in the public

hearing that the City Council's Committee on Oversight and Investigations conducted in the

Committee Room in City Hall in a way that would have had those video recordings to be

projected for viewing by those who sat it the seats behind me as I testified in that hearing. This is entirely true and accurate in spite of the fact that 3 computer monitors stood upright on the ground between where Mr. Torres and I sat in that hearing as I testified in it while those monitors were facing Mr. Torres instead of the audience who sat behind me. There is no valid reason why at least one of those monitors could not have been setup on top of the table at which I sat as I testified in that hearing and rotated in a way that would cause its screen to face the audience members who sat behind me as I testified in that hearing to enable me to present video recordings on it as well as one more computer monitors that would be setup in that room that would face Mr. Torres as I testified in that hearing to enable me to effectively give a video presentation simultaneously in conjunction with my testimony to everyone who attended that hearing. If I had been permitted to testify as scheduled on 3/26/19 in that hearing in the main chamber in City Hall, I could have benefited from the fact that a computer monitor would have been available for use that I previously used on 2/4/19 in that chamber to playback video recordings in conjunction with my testimony and project them on that monitor in a way that would allow members of the public who would be sitting in the audience to view and hear those video recordings because of how that monitor would have faced.

34.     On 11/18/19, I talked with Defendant Perez as he was suddenly changing the room assignment for the room in which the public hearing that the City Council's Committee on Public Safety would be conducted on that date in which I testified. That hearing was also originally scheduled to be conducted in the main chamber in City Hall. I also testified in that hearing and also played back video recordings in conjunction with my testimony. Just a few minutes before that hearing was scheduled to begin, Mr. Perez announced that he was changing its room assignment from the main chamber to cause it to be conducted in the Committee Room.

As Mr. Perez was causing that to occur in flagrant violation of my constitutional rights, I asked

him why he was doing so without providing proper advance notice of that change. He then lied

to me by telling me that he could make that change without providing advance notice of it. As a

result of that change, I recall that the room in which that hearing was conducted was packed with

people as a group of people had to stand as that hearing was conducted because there were no

more available seats in that room. I also recall that people were blocking the exits for that room

because of how packed that room then was. I further recall talking with members of the City

Council after that hearing got underway about the fact that people were blocking the exits to that

room because that caused a fire hazard to then exist that would inhibit the ability that people in

that room had to quickly exit it in the event that a fire would suddenly begin in that room. If that

hearing had instead been conducted in the main chamber in City Hall, it would not have been

overcrowded. Although people gradually left that room during that hearing that caused that fire

hazard to no longer exist, that doesn't negate the fact that such a hazard impermissibly existed

earlier during that hearing because of that room assignment change for that hearing.

- **Failures by the City Council personnel in granting me reasonable accommodations to enable me to present pertinent video recordings in conjunction with my testimony in City Council public hearings violated| my First Amendment and Fourteenth Amendment due process and equal protection rights as a speaker to communicate information to the entire audience in real-time:**

35.     As I discussed above, proper arrangements arbitrarily weren't made by City Council

personnel to enable me to present pertinent video recordings in conjunction with the testimony

that I presented on 3/26/19 in the public hearing that the City Council's Committee on Oversight

and Investigations conducted that would be shown on computer monitors for the entire audience

at that hearing to both see and hear in real-time in the room in which I testified. That violated my

First Amendment and Fourteenth Amendment rights. That wasn't the first nor last time that my

First Amendment and Fourteenth Amendment rights were similarly violated in regards to

testimony that I presented during public hearings that City Council committees conducted.

36.      On 12/14/17, no arrangements were made by City Council personnel to enable me to be

able to present video recordings in conjunction with the testimony that I gave during the public

hearing that the City Council's Committee on Public Safety conducted on that date in the

Committee Room in City Hall that I briefly discussed earlier. On a related note, what follows

shows remarks that are attributable to testimony that I gave during that 12/14/17 public hearing

and appear between lines 21 on page 187 and 12 on page 188 of the written transcript that the

City Council arranged to be prepared from that hearing as I made a grievance to New York City

Councilman Corey Johnson about the fact that nothing was done by the City Council to enable

me to present pertinent video recordings in conjunction with that testimony in a way that would

enable the entire audience to watch and hear them in accordance with constitutional due process

rights. As I spoke to Mr. Johnson about that, I pointed out that I had called the City Council prior

to that hearing to try to have such arrangements made by its personnel to enable me to present

video recordings in that manner during that hearing to no avail. As I continued to address that

matter during that hearing, I referred to the findings that the U.S. Supreme Court issued about

what is required of due process in _Goldberg v. Kelly_, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d

287 (1970) as I expressed frustration with the fact that City Council personnel violated my due

process rights by not accommodating my reasonable request to be granted an accommodation

that would enable me to present video recordings during that hearing in a way that would allow

its entire audience to view and hear them in real-time:

> "before coming here today I also had videos that I wanted to present during my
> testimony. I called ahead to try to make arrangements for that. There's a U.S. Supreme
> Court case that talks about the right to be heard in a meaningful way at a meaningful
> time. So, if I contacted City Hall in advance of my testimony today and specifically

requested to have arrangements made such that I could present that video so that people in the audience could watch it, could make independent decisions as to whether I'm full of it, or whether there's substance to what I'm stating. I don't see why this City Council, this Committee would act in defiance of an existing U.S. Supreme Court decision that is essentially about fundamental due process."

37.     The next screenshot is from the elapsed time of 3 hours, 34 minutes, and 7 seconds in the video recording that the City Council arranged to be recorded of that 12/14/17 public hearing as I schooled Mr. Johnson and New York City Councilwoman Vanessa Gibson about due process that the City Council's personnel had been required by _Goldberg v. Kelly_ to accord to me during that hearing that it hadn't as I summarized the key findings about due process in that court decision for them.



38.     On 11/18/19, the City Council's personnel again didn't make any arrangements to enable me to be able to present video recordings in conjunction with the testimony that I gave during the public hearing that the City Council's Committee on Public Safety conducted on that date in the

Committee Room in City Hall that I briefly discussed earlier. On a related note, what follows shows remarks that are attributable to testimony that I gave during that 11/18/18 public hearing and appear between lines 11 and 16 on page 164 of the written transcript that the City Council arranged to be prepared from that hearing as New York City Councilman Donovan Richards spoke to me and referred to a request that I had made to have City Council personnel grant me a reasonable accommodation that would enable me to present video recordings in conjunction with the testimony that I would present during that hearing to enable the entire audience for that hearing to watch and hear those videos in real-time. Mr. Richards confirmed then that City Council personnel had erred by having not done anything to grant me such a reasonable accommodation for that hearing.

> "Mr. Towaki, I heard that we—we messed up a little bit, Mr. Towaki. Mr. Towaki, I heard we messed up. We didn't get your--your email or I didn't get your email. I'm not sure. I heard we messed up on getting you your opportunity to—yeah. So I apologize for that in advance."

39.     Mr. Richards is heard as he began making the preceding remarks to me in the video recording that the City Council arranged to be recorded of that 11/18/19 hearing at the elapsed time of 3 hours, 8 minutes, and 21 seconds. That video recording is available on the Internet at https://councilnyc.viebit.com/player.php?hash=TIVMdHNgqbV5. On a related note, what follows are remarks that correspond to testimony that I gave during that hearing and appear between lines 17 and 20 on page 172 of the written transcript of that hearing. Through those remarks, I sought an honest and candid answer about what proper arrangements hadn't been made by City Council personnel to enable me to present video recordings as I testified in that hearing in a manner that would enable the entire audience for that hearing in that room to be able to view and hear it from computer monitors in real-time:

> ""And I guess the other thing is with regards to preparations for today's meeting is there

any reason why arrangements were not made?

40.     The next screenshot is from the elapsed time of 3 hours, 18 minutes, and 19 seconds in the video recording that the City Council arranged to be recorded of that hearing and shows me as I asked Mr. Richards the preceding question.



41.     When I asked Mr. Richards the preceding question, I expected him to be deceitful as he responded to it and he proved me right by saying the following in response that corresponds to line 21 thru 22 on page 172 in the transcript of that hearing:

"I didn't get the direct email so I apologize"

42.     Just 5 days prior to that hearing, I talked with Mr. Richards during the town hall meeting that he conducted with the Mayor and other government personnel in Queens and recorded my conversation with him on video at 6:46 pm on 11/13/19. I thereafter recorded my playback of that video recording as I showed information about the **a)** name of the filename for that video, **b)** date and time when I recorded the video of my conversation with Mr. Richards during that town hall, and **c)** approximate location of where I was as I recorded that video of our conversation. The video recording of my playback of that earlier video is available on the Internet at:

https://drive.google.com/open?id=1fD76t7XZpf9TB7Q-DqFOm7fCMtjPhEvH. My conversation

with Mr. Richards in that video begins at the elapsed time of 23 seconds from its beginning. At

the elapsed time of 27 seconds in that video, I'm clearly heard asking him about how it could be

arranged for me to be able to present video recordings in conjunction with the testimony that I

intended to give during the public hearing that the City Council's Committee on Public Safety

would conduct on 11/18/19 in City Hall. Mr. Richards was then the Chairman of that committee

and controlled how that hearing would be conducted. At the elapsed time of 32 seconds in that

video, Mr. Richards is clearly heard telling me to contact that committee to ask to have things

setup to enable me to present video recordings in conjunction with my testimony during that

hearing. Mr. Richards even said to me the following about that then:

       "As always, contact the committee. Yes, and we will do it."

43.     After he said that to me, I then immediately asked him if it would be possible for me to

pre-test whatever equipment would be setup to enable me to testify in that way during that

hearing before that hearing began to try to minimize the possibility that a technical problem

would arise that would prevent me from being able to present video recordings in conjunction

with my testimony. He then told me that he wasn't sure if such pre-testing could be arranged.

The next screenshot is from the elapsed time of 23 seconds in that video and shows Mr. Richards

as he and I were in the gym of the school that hosted that town hall meeting.



44.     What follows shows the e-mail message that I sent to Mr. Richards on 11/8/19 at 5:39 pm to have proper arrangements made by the City Council to facilitate my ability to present video recordings in conjunction with the testimony that I would give on 11/18/19 during the public hearing that the City Council's Committee on Public Safety was then scheduled to conduct on 11/18/19 in the main chamber of City Hall. I clearly also used that e-mail message to ask him to cause those who testified in that hearing to be able to do so in the order in which they signed-up to testify and to also cause all of the members of the City Council who were members of that committee to attend that hearing for the duration of that hearing in order to accord everyone who would testify in it proper due process as they testified in that hearing. Mr. Richards acted in contravention of everything that I requested in that e-mail message partly because those who testified in that hearing didn't do so in the order in which they signed-up to do so and the members of that committee besides him weren't in attendance at that hearing when I testified in that hearing.

**From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
**Subject:** Re: Arrangements for showing video while testifying during Public Safety public hearing on 11/18/19
**Date:** November 8, 2019 at 5:39:06 PM EST
**To:** drichards@council.nyc.gov

Mr. Richards,

Please make arrangements with the New York City Council's staff to ensure that people who testify on 11/18/19 during the public hearing that will be held by the New York City Council's Public Safety committee will be able to present video recordings that are related to their testimony.

I intend to be among those who testify during that public hearing.

Also, please ensure that all members of that committee who are present during that public hearing remain there throughout that entire hearing to ensure that everyone who testifies during it will be accorded their due process right to be heard in compliance with their equal protection rights under the U.S. Constitution's 14th Amendment instead of being subjected to treatment by members of that committee that likely constitutes patently illegal viewpoint discrimination.

Furthermore, please ensure that the scheduling of those who testify during that public hearing will be in the order in which people register to testify during that public hearing instead of some other manner that likely violates due process.

This e-mail message is being composed in a very formal manner for legal reasons.


In closing, please reply to this e-mail message prior to the close of business on 11/12/19 to apprise me as to whether the public hearing on 11/18/19 that is discussed in this e-mail will be conducted in the manner that I have requested. Also, please arrange for me to test the video equipment on 11/18/19 prior to the start of that public hearing to ensure that there will be no problems with playing video with it, since I previously encountered a problem doing so during an earlier public hearing.


From,

Towaki Komatsu

45.   The preceding discussion showcases the fact that Mr. Richards clearly engaged in a

material act of deception during the public hearing that he conducted on 11/18/19 for the City

Council's Committee on Public Safety in which I testified. He was deceitful then by fraudulently

concealing the material fact that he knew on 11/13/19 that I sought to have the City Council's

personnel to make arrangements that would enable me to present video recordings in conjunction

with my testimony in that hearing and that I didn't need to contact that committee for that

purpose prior to that hearing because he was the Chairman of it. Hindsight sufficiently confirms

that Mr. Richards subjected me to witness tampering in violation of NYPL §215.10 in regards to

my inability to present video recordings as I testified on 11/18/19 in the public hearing that he

conducted as the Chairman of the City Council's Committee on Public Safety in a manner that

would cause them to be able to be watched by everyone who attended that hearing in real-time

by having City Council personnel setup computer monitors on my behalf and that of that entire

audience in the Committee Room in City Hall. When that occurred, Mr. Richards was trying to

become elected as the Queens Borough President. It's objectively reasonable to infer that his

illegal acts and omissions against me in regards to my ability to testify in that manner in that

11/18/19 hearing were partly motivated to minimize criticism of him by me during that hearing

that I could widely broadcast by playing back video recordings in conjunction with my testimony

of earlier public hearings in which I testified to him and asked for his assistance about very

important matters prior to getting none in response. If I'm correct about that, Mr. Richards also

violated the Hatch Act through his acts and omissions against me in regards to my 11/18/19

testimony in that hearing that constituted voter suppression by impeding my ability to use that

testimony and video recordings that I would have presented during it to broadcast my views

about precisely why he was unqualified to be considered as a candidate for the Queens Borough

President job. Moreover, his actions and omissions against me then also violated NYPL §195.00,

New York City Charter §1116, New York General Business Law §349, New York State's Open

Meetings Law, and his constitutional oath of office as an employee of the City of New York in which he had been required to pledge to perform his duties as such to the best of his abilities and uphold the U.S. Constitution. On a related note, though the following text appears on lines 24 and 25 on page 172 of the transcript that was prepared from the public hearing that the City Council's Committee on Public Safety conducted on 11/18/19 and corresponds to remarks that transcript claims I stated to Mr. Richards at the end of that hearing, I certainly did not make those remarks nor thank him for patently obvious reasons:

"Thank you Chair Richards."

46.     The remark that I made then was "Thank you Judge Schofield" as I referred to U.S. District Judge Lorna Schofield to whom I was addressing my testimony for use in the ongoing case of *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) to which she has tragically continued to be assigned like a cancer and plague.

47.     Furthermore, I also testified to Mr. Richard on 3/4/20 during the public hearing that the City Council's Committee on Public Safety conducted in the main chamber in City Hall. The City Council arranged for a written transcript to be prepared from that hearing as a PDF file that is available on the Internet at

https://legistar.council.nyc.gov/View.ashx?M=F&ID=8225051&GUID=3CF9CD7C-F63B-4DA2-AEB6-DA70AC18CEAA. The next screenshot corresponds to what appears between lines 2 and 9 on page 178 in that transcript and reflects testimony that I gave to Mr. Richards. This screenshot confirms that I pointed out to Mr. Richards that though I had sent him an e-mail message prior to that hearing to have appropriate arrangements made by members of the City Council before I testified in that hearing to enable me to present video recordings in conjunction with my testimony to enable those in the audience at that hearing to watch such video recordings

as I testified, no arrangements were made for that.

```
2        TOWAKI KOMATSU:  My name is Towaki Komatsu.  We
3    had a conversation prior to the start of today's
4    hearing.  I sent you an email last week asking if I
5    could present video in conjunction with today's
6    testimony.  There has been no preparations made
7    whatsoever to have that done.  There's no laptop on
8    the table that would allow me to present that video
9    recording for the benefit of the audience.
```

48.    The following shows an e-mail message that I sent to Mr. Richards, Daneil Ades of the

City Council, and Jordan Gibbons of the City Council to have the City Council's personnel make

arrangements to enable me to present video recordings to the audience at that 3/4/20 public

hearing in conjunction with testimony that I would present at that hearing:

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Re: Arrangements for showing video while testifying during Public Safety
> public hearing on 3/4/20
> **Date:** February 27, 2020 at 3:50:08 PM EST
> **To:** "Ades, Daniel" <DAdes@council.nyc.gov>
> **Cc:** drichards@council.nyc.gov, "Gibbons, Jordan" <jgibbons@council.nyc.gov>
>
> Mr. Ades and Mr. Gibbsons,
>
> Please make arrangements with the New York City Council's staff to ensure that people
> who testify on 3/4/20 during the public hearing that will be held by the New York City
> Council's Public Safety committee will be able to present video recordings that are
> related to their testimony by using **a)** a laptop and **b)** one or more external computer
> monitors or TV screens that will both be made available for that purpose by the New
> York City Council's I.T. team.
>
> I intend to be among those who testify during that public hearing.

Also, please ensure that all members of that committee who are present during that public hearing remain there throughout its entirety instead of violating the due process rights of those who testify in it to be heard to the same extent as everyone else who testifies in it in defiance of fundamental First Amendment and Fourteenth Amendment rights.

Furthermore, please ensure that the scheduling of those who testify during that public hearing will be in the order in which people register to testify during that public hearing instead of some other manner that likely violates due process.

Lastly, please urge the members of the NYPD who testify in that hearing to remain there until that hearing ends largely to enable members of the public to rebut remarks that are made by members of the NYPD who testify in it.

This e-mail message is being composed in a very formal manner for legal reasons.

In closing, please reply to this e-mail message prior to the close of business tomorrow to apprise me as to whether the public hearing on 3/4/20 that is discussed in this e-mail will be conducted in the manner that I have requested.

From,

Towaki Komatsu

49.     I neither received a response to that e-mail message nor cooperation from anyone who worked for the City Counsel in relation to what I requested in that e-mail message in defiance of my due process and equal protection rights.

- **Violations of the City Council's legal duty pursuant to New York City Charter §1063 as well as my First Amendment and Fourteenth Amendment rights to have the video recordings of the public hearings conducted by City Council committees available on the Internet for the public to be able to watch no later than 3 days after such hearings ended:**

50.     The next screenshot is from the elapsed time of 3 hours, 16 minutes, and 43 seconds in the video recording that the City Council arranged to be recorded of the public hearing that Donovan Richards conducted as the chairman of the City Council's Committee on Public Safety

on 11/18/19 in which I testified. Information in the lower-left corner in that screenshot confirms that the City Council illegally waited until 1/7/20 to have that video recording on the Internet for the public to watch in flagrant violation of New York City Charter §1063 as well as my First Amendment as a speaker who testified in that hearing to be able to have testimony available to the public to watch on video within 3 days after that hearing ended and my Fourteenth Amendment due process and equal protection rights to have that occur with respect to other instances in which I and others testified in other public hearings that the City Council conducted in which the video recordings that the City Council arranged to be recorded of them were posted on the Internet for the public to be able to watch within 3 days after those hearings ended. This screenshot shows me as I was playing back a video recording on my laptop that was recorded on 12/26/17 by the NYPD body-camera that NYPD mobster Saquoi Harris (shield number: 2350) used as he criminally stalked, stopped, seized, assaulted, injured, and harassed me on 12/26/17 in a public area that was equivalent to a public sidewalk while I was conducting myself in an entirely lawful manner in contrast to him and his fellow NYPD mobster Steven Perez (shield number: 23485).



51.     The next screenshot is from a video recording that I recorded of my playback of a video recording that I recorded on 12/16/19 at 10:15 am as I talked with Defendant Perez in the main chamber in City Hall about the fact that **a)** the video recording that the City Council arranged to be recorded of the public hearing that the City Council's Committee on Public Safety conducted on 11/18/19 still wasn't available on the Internet for the public to watch in violation of New York City Charter §1063, **b)** that was the second instance in which a video recording that the City Council arranged to be recorded of a public hearing in which I testified that a City Council committee conducted illegally wasn't available on the Internet within 3 days after that hearing for the public to be able to watch, and **c)** he illegally caused the room assignment for the room in which the public hearing that the City Council's Committee on Public Safety conducted on 11/18/19 to be changed at the last minute in violation of my due process rights that caused that hearing to instead be conducted in the Committee Room in City Hall.

52.     The video recording that I recorded of my playback of that video shows information

about the **a)** filename for the video recording that I recorded on 12/16/19 at 10:15 am of my conversation with Mr. Perez, **b)** date and time when I recorded the video of my conversation with Mr. Perez then, and **c)** approximate location of where I was as I recorded that video of our conversation. The video recording of my playback of that earlier video is available on the Internet at: https://drive.google.com/open?id=1Hcx8KCPy5Y2bkp4VXIuLJjMlxGFRGnl7. My conversation with Mr. Perez about the missing 11/18/19 video for that hearing begins at the elapsed time of 9 seconds from the beginning of that video of my conversation with him. At the elapsed time of 30 seconds in that video, I'm also clearly heard asking him why he changed the room assignment at the last minute for the room in which the City Council's Committee on Public Safety conducted its 11/18/19 public hearing. He answered that question with a response in which he implicitly indicated that it's acceptable for him to wait until the last minute to make such changes without regard to the First Amendment and Fourteenth Amendment rights of those who testify in such public hearings. If not for Mr. Perez's decision to have changed that room assignment for that 11/18/19 public hearing, it is highly likely that the video recording that the City Council would have otherwise arranged to be recorded of it while that hearing would have instead been conducted in the main chamber in City Hall would have been posted on the Internet within 3 days after that 11/18/19 hearing ended.



53.     What follows shows a set of e-mail messages that I sent to and received from Daniel Ades of the City Council on 11/26/19 and 11/27/19. He works for City Council as an attorney and attended the public hearing that the City Council's Committee on Public Safety conducted on 11/18/19. In short, though I clearly and timely apprised him of the fact that the video recording that the City Council arranged to be recorded of that public hearing wasn't available on the Internet within 3 days after that hearing ended, that video recording illegally still wasn't posted on the Internet for the public to be able to watch it until 1/7/20. I also reminded Mr. Ades in those e-mail messages of a conversation that he and I had on 11/18/19 about the fact that

Defendant Torres illegally caused me to be coerced to leave the public hearing that Mr. Torres

conducted on 11/13/19 as the chairman of the City Council's Committee on Oversight and

Investigations in retaliation for First Amendment expression that I lawfully engaged in during

that hearing as I criticized Mr. Torres while testifying in that hearing. Those e-mail messages

also confirm that I included New York City Public Advocate Jumaane Williams as a courtesy

copy recipient as I sent them before I didn't receive any response from Mr. Williams that further

establishes the fact that he really isn't a public advocate in much the same way that his

predecessor (Letitia James) in that job wasn't and continues to not be one either.

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Re: The video for the 11/18/19 City Council Public Safety public hearing
> **Date:** November 27, 2019 at 2:11:10 PM EST
> **To:** "Ades, Daniel" <DAdes@council.nyc.gov>
>
> Hi Mr. Ades,
>
> Thanks for the information.
>
> Any idea why the City Council's Public Safety Committee doesn't just conduct that
> public hearing again, particularly since I played back a CCRB audio recording and
> NYPD body-camera recording in conjunction with the testimony that I gave during that
> hearing that can't be adequately reflected in the written transcript you referred to?
>
> Also, shortly before that hearing on the 18th, you and I talked in the chamber in City
> Hall. During that chat, you told me that you didn't think that Ritchie Torres should have
> caused me to have been kicked out of the public hearing that the City Council's
> Committee on Oversight and Investigations conducted on November 13th due to my
> having told Mr. Torres as I testified to him in that hearing that I had reason to believe that
> he had previously lied to me.
>
> After we talked, I recently asked another member of the City Council to clarify what
> specific part of the New York City Charter or the New York City Council's rules I
> violated as I testified to Mr. Torres on the 13th. While asking about that, I was asking
> about provisions that pertain to disorderly or disruptive behavior that apply to members
> of the public who attend public hearings. In response, the member of the City Council I
> asked about that told me that he didn't know and that he wasn't too familiar with the City
> Charter and the City Council's rules.

Do you have any idea about what specific provisions with the New York City Charter and/or New York City Council's rules apply to disorderly and/or disruptive behavior by members of the public who attend public hearings that the City Council conducts? I've looked pretty thoroughly in both of them and haven't found anything about. Instead, the provisions that I have found about disorderly and/or disruptive behavior within them are strictly applicable to members of the City Council.

Regards,

Towaki

On Nov 27, 2019, at 12:14 PM, Ades, Daniel <DAdes@council.nyc.gov> wrote:

Hi Mr. Komatsu,
My understanding is that because of the room change there was a mistake in saving the recording correctly. The transcript should be available soon.

Have a nice Thanksgiving.

**From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
**Sent:** Tuesday, November 26, 2019 5:55 PM
**To:** Ades, Daniel <DAdes@council.nyc.gov>
**Cc:** jwilliams@pubadvocate.nyc.gov
**Subject:** The video for the 11/18/19 City Council Public Safety public hearing

Hi Mr. Ades,

Good afternoon.

Do you know who to contact to find out why the video recording that was required by New York City Charter section 1063 to have been both **a)** recorded of the public hearing that was conducted by the City Council's Committee on Public Safety inside of the Committee Room on 11/18/19 at 10 am and b) uploaded on the Internet within 3 days after that hearing ended still hasn't been made available to the general public in that way in flagrant violation of both New York State Penal Code section 175.25 and my First Amendment rights as a whistleblower who testified in that hearing?

This is the second instance in which I've testified in a public hearing that was conducted by a New York City Council committee's public hearing and then not had the video from it made available within 3 days thereafter. When it first happened, it was on 3/25/19 and the video wasn't made available on the Internet until 5/31/19.

From,

Towaki Komatsu

54.     What follows shows an e-mail message that I sent on 11/26/19 at 4:52 pm to Mr. Ades,

New York City Councilman Corey Johnson, Jumaane Williams, Donovan Richards, and an

assistant for Mr. Richards named Jordan Gibbons while he also worked for the City Council. In

short, I clearly and timely apprised all of them as well about the fact that the video recording that

the City Council arranged to be recorded of the public hearing that the City Council's Committee

on Public Safety conducted on 11/18/19 still wasn't available on the Internet for the public to be

able to view. I also apprised them that something similar happened that involved the video

recording that the City Council arranged to be recorded of a public hearing that a City Council

committee conducted on 3/25/19 that caused that video recording to illegally not be posted on

the Internet until 5/31/19 for the public to be able to watch it. I didn't receive any response to

that e-mail message from Mr. Johnson, Mr. Williams, Mr. Richards, nor Mr. Gibbons.

**From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
**Subject:** The video for the 11/18/19 City Council Public Safety public hearing
**Date:** November 26, 2019 at 4:52:31 PM EST
**To:** ddades@council.nyc.gov
**Cc:** "Gibbons, Jordan" <jgibbons@council.nyc.gov>, drichards@council.nyc.gov,
SpeakerJohnson@council.nyc.gov, Jwilliams@council.nyc.gov

Hi Mr. Ades,

Good afternoon.

Do you know who to contact to find out why the video recording that was required by
New York City Charter section 1063 to have been both **a)** recorded of the public hearing
that was conducted by the City Council's Committee on Public Safety inside of the
Committee Room on 11/18/19 at 10 am and b) uploaded on the Internet within 3 days
after that hearing ended still hasn't been made available to the general public in that way
in flagrant violation of both New York State Penal Code section 175.25 and my First
Amendment rights as a whistleblower who testified in that hearing?

This is the second instance in which I've testified in a public hearing that was conducted
by a New York City Council committee's public hearing and then not had the video from
it made available within 3 days thereafter. When it first happened, it was on 3/25/19 and
the video wasn't made available on the Internet until 5/31/19.

From,

Towaki Komatsu

55.     In addition to having contacted personnel of the City Council between 11/18/19 and
11/7/20 about the video recording that the City Council arranged to be recorded of the public
hearing that the City Council's Committee on Public Safety conducted on 11/18/19 having
illegally not been posted on the Internet within 3 days after that hearing, I also visited DOI's
offices during that period and reported and entirely valid complaint about that missing video
recording. However, hindsight confirms that visit accomplished nothing because that video
recording continued to thereafter not be available on the Internet for the public to watch.
Although I don't currently recall the date when I visited DOI's offices for that purpose, DOI
likely has a record of that visit partly because there are video security cameras located in the area
where I talked with its personnel about that matter then.

56.     The next screenshot is from the elapsed time of 7 hours, 40 minutes, and 55 seconds in
the video recording that the City Council arranged to be recorded of the public hearing that New
York City Councilman conducted as the chairman of the City Council's Committee on General
Welfare on 3/25/19 as I testified in it. Information in the lower-left corner in that screenshot
confirms that the City Council illegally waited until 5/31/19 to have that entire video recording
posted on the Internet for the public to be able to watch it. That video recording is available on
the Internet at https://councilnyc.viebit.com/player.php?hash=poUr8soKY686. By not having
that video recording on the Internet within 3 calendar days after that hearing ended, the City
Council flagrantly violated New York City Charter §1063 as well as my First Amendment and
Fourteenth Amendment rights. This screenshot shows me as I was playing back an audio

recording that I legally recorded on 8/29/17 of a witness of mine named Larry Kayatt as he told me then about incriminating remarks that someone named Ronald Sullivan made to him on 7/2/16 as Mr. Sullivan fled from the building in which I reside shortly after having criminally and viciously assaulted me in the living room of the apartment that we then shared. The primary reason why I was able to be assaulted then was because of fraud, forgery, and negligence by HRA and Urban that had them jointly and criminally subject me to a bait-and-switch fraud and forgery concerning a binding apartment lease agreement that I signed on 2/16/16 to be issued a private apartment in the building in which I reside that was for apartment 4C. Due to that bait-and-switch, I was illegally assigned to apartment 4B instead and assigned Mr. Sullivan as a time bomb and roommate that was waiting to explode against me that I certainly foresaw and took timely steps to undo by pushing to be issued possession of the specific apartment for which I had signed that lease. However, I was illegally deprived of that apartment instead.



NYCC-PV-CH-CHA_19032

Date Created: May 31, 2019

57.     What follows shows an e-mail message that I sent on 4/11/19 at 1:55 pm to New York

City Councilman Stephen Levin in which I clearly and timely apprised him about the fact that

the video recording that the City Council arranged to be recorded of the public hearing that the

City Council's Committee on General Welfare conducted on 3/25/19 still wasn't available on the

Internet for the public to be able to view. I didn't receive any response to that e-mail message.

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Re: Missing video of 3/25/19 General Welfare Committee hearing
> **Date:** April 11, 2019 at 1:55:41 PM EDT
> **To:** slevin@council.nyc.gov

Mr. Levin,

The video of the 3/25/19 General Welfare Committee public hearing you conducted is missing for the time period for while you conducted it in the Committee Room in City Hall after you began it in its main chamber.

Section 1063 of the New York City Charter required the entirety of the video recording for that public hearing in which I testified in the Committee Room to be available to the general public within 3 days following that hearing.

This needs to be immediately resolved. I also require the identities of all who have concealed that video recording from the general public.

Regards,

Towaki Komatsu

- **Arbitrary and capricious scheduling of testimony that I give to City Council committees during public hearings to have that occur toward the very end of such hearings in violation of my First Amendment and Fourteenth Amendment rights as standardless discretion, First Amendment retaliation, and viewpoint discrimination:**

58.    A thoughtful examination of the written transcripts that have been prepared from the City Council public hearings in which I have testified as a result of arrangements that the City Council made to have those transcripts prepared confirms that my testimony in many of those hearings has been toward the end of those hearings in spite of the fact that the precise order in which I signed-up to testify in them strongly suggests that the scheduling of my testimony in those hearings should have mirrored that order. That caused me harm partly in the following material and meaningful ways in flagrant violation of my First Amendment and Fourteenth Amendment rights as an abuse of process, illegal prior restraint of my freedom of expression, flagrant violation of my due process and equal protection rights, viewpoint discrimination, and standardless discretion:

a.      It minimized and marginalized the potential reach and impact that my testimony would otherwise have had as a result of the fact that a significant percentage of the audience members comprised of ordinary members of the public and press as well as government officials left the rooms in which I testified by the time that my testimony began and were therefore unable to hear it fully partly by virtue of the fact that they couldn't possibly see body language that I communicated as well as video recordings that I presented in conjunction with my testimony as well and as timely that they otherwise would have if they were still in the rooms in which I testified as I testified.

b.      It impeded my ability to engage in expressive association and networking with those who attended such hearings in which I testified after I testified in them in accordance with my First Amendment right to try to do so.

c.      That caused me to suffer various opportunity costs – such as taking care of various errands - because I had to instead use that time to forego engaging in other activities in order to wait in those hearings to testify in them.

59.   The next screenshot corresponds to the elapsed time of 7 minutes and 19 seconds in 2/14/19 right aerial video and shows me towards the bottom near its horizontal center as I leaned over a table and completed a sign-up form to register to testify in the public hearing that the City Council's Committee on General Welfare conducted on 2/4/19 in the main chamber in City Hall. Ms. Headley hadn't arrived to that chamber yet and hadn't signed-up to testify in that hearing yet either. A television screen or other type of video monitor is clearly shown toward the top of that screenshot near its horizontal center in the immediate area of where people sit as they testify in public hearings that are conducted in that chamber. That television screen or monitor is periodically used during such public hearings to allow those who testify in them to be able to use

it to project presentations and reports on its screen as they testify.



60.     The next screenshot is an enlargement of the area in the preceding one in which I'm shown.



61.     The next screenshot is from a scanned copy of the sign-up form that I completed to testify in that 2/4/19 public hearing. This screenshot was created from the scanned copy of that form that appears on page 124 within the PDF file named "Hearing Testimony.pdf" that is available

on the City Council's web site at

https://legistar.council.nyc.gov/View.ashx?M=F&ID=7034004&GUID=6755756A-5677-45C3-AA0E-FCFEBD3AFF3A and includes scanned images of other sign-up forms that were

completed by those who testified in that hearing. Those forms do not appear in that PDF file in

the order in which they were filled out by those who testified in that hearing and given to City

Council personnel.



62.     The next screenshot corresponds to the elapsed time of 7 minutes and 19 seconds in a

video recording the NYPD provided to me in response to a FOIL demand that I submitted to it.

That video recording was recorded by another video security camera that the NYPD controls that

was installed in the main chamber in City Hall on 2/4/19. That video recording has the filename

of "2-4-19_CITYHALL-C055-2nd FL-City Council Chambers NE (25140).mp4". The duration

of that video recording is one hour and the beginning of it corresponds to the time of 12:59:59

pm on 2/4/19. I will hereinafter refer to it as "2/4/19 left aerial video". I'm shown me towards the bottom near its horizontal center as I leaned over a table and completed a sign-up form to register to testify in the public hearing that the City Council's Committee on General Welfare conducted on 2/4/19 in the main chamber in City Hall. Ms. Headley hadn't arrived to that chamber yet. The first door on the left that is located below a clock shown in this screenshot leads to the Committee Room in City Hall. The door shown on the far-right is a side entrance to the main chamber in City Hall that is typically off-limits to members of the public.



63.     The next screenshot is from an enlarged version of the preceding screenshot and shows me as I signed-up to testify in that hearing.



64.     The next screenshot corresponds to the elapsed time of 27 minutes and 51 seconds in that same video. The significance of what appears in this screenshot is that it shows Jazmine Headley as she entered the main chamber in City Hall through the side entrance to the main chamber that I just discussed and confirms that she was receiving special treatment at that hearing in violation of my Fourteenth Amendment due process and equal protection rights partly as a result of the fact that she was permitted to use that entrance to gain access to the main chamber in City Hall.



65.     The next screenshot is from an enlarged version of the preceding screenshot and shows

Ms. Headley as she wore a white top and stood in the doorway of that entrance.



66.     The next screenshot corresponds to the elapsed time of 29 minutes and 50 seconds in that

same video. The significance of what appears in this screenshot is that it shows Jazmine Headley

as she was about to sit down at a table on the right to begin her testimony in that hearing in spite

of the fact that that video recording confirms that she never completed a sign-up form after she

entered that chamber to testify in that hearing in flagrant violation of my Fourteenth Amendment

due process and equal protection rights that corresponds to the following excerpt from *Housing*

*Works, Inc. v. Turner*, 00 Civ. 1122 (LAK)(JCF) (S.D.N.Y. Sept. 15, 2004):

> "To prove an Olech-type equal protection claim, the plaintiff must show that there was "no
> rational basis" for the differential treatment it suffered. Wantanabe, 315 F. Supp. 2d at 396."



67.     When I testified in that 2/4/19 public hearing, I did so between the elapsed times of **a)** 4

hours, 27 minutes and 56 seconds and **b)** 4 hours, 33 minutes, and 44 seconds in the video that

was recorded of that hearing as a result of arrangements that the City Council made. This means

that my testimony during that hearing lasted for less than 6 minutes and that I had to wait for

nearly 4.5 hours after that hearing began to testify in it. As I testified in that hearing, time limits

were imposed on my testimony by the City Council.

68.     In contrast, Ms. Headley's testimony in that hearing is shown in that same video between

the elapsed times of **a)** 21 minutes and 30 seconds and **b)** 38 minutes and 23 seconds. This

means that her testimony then lasted for nearly 3 times as long as my testimony in that hearing.

When she testified in that hearing, no time limit was imposed on her testimony by the City

Council in violation of my Fourteenth Amendment due process and equal protection rights.

69.     The custom and practice by members of the City Council of arbitrarily and capriciously

scheduling my testimony in public hearings that City Council committees conduct to cause my

testimony to begin toward the very end of such hearings has been very frequent discrimination,

abuse of process, and selective-enforcement as that has flagrantly violated my due process and equal protection rights as well as my First Amendment rights.

- **Illegal viewpoint discrimination, First Amendment retaliation, and standardless discretion by members of the City Council who boycotts testimony that I present during public hearings that City Council committees conduct by abandoning such hearings before my testimony begins in them and otherwise not being present as I testify in them:**

70.     When City Council committees conduct public hearings in which the public can testify, those are opportunities for those who testify in them partly about anyone who is in attendance at such hearings. While I realize that government officials don't have a legal duty to listen to what I have to express, they still have a legal duty to allow me to exercise my First Amendment right to communicate directly to them. This means that if members of the City Council are members of City Council committees that conduct public hearings in which I testify as I do so and such members of the City Council attend part of such hearings, they need an objectively valid reason to not be in attendance at such hearings as I testify in them to have a valid reason for violating my First Amendment right to communicate directly to them during those hearings as well as a Fourteenth Amendment due process and equal protection right to have them in attendance as I testify in those hearings partly to enable me to have the option to talk about them as I testify in those hearings.

71.     Despite this clear legal requirement, many members of the City Council consistently leave public hearings that City Council committees conduct in which I testify before my testimony begins in them. They do so in spite of the fact that they're members of those

committees as I testify in them. Members of the City Council who have violated my Fourteenth

Amendment due process and equal protection rights as well as my First Amendment rights

include, but aren't limited to the following people:

Ritchie Torres, Robert Holden, Helen Rosenthal, Chaim Deutsch

72.      As I attended the public hearing that the City Council's Committee on General Welfare

conducted on 2/4/19 in the main chamber of City Hall, I was recording notes about the extent to

which due process was and wasn't being accorded to the members of the public who testified in

that hearing. According to those notes, the following 16 members of the City Council were in

attendance at that hearing at 1:45 pm on 2/4/19:

Chaim Deutsch, Alicka Samuel, Vanessa Gibson, Helen Rosenthal, Stephen Levin,
Corey Johnson, Laurie Cumbo, Barry Grodenchik, Diana Ayala, Adrienne Adams,
Rafael Salamanca, Jr., Brad Lander, Antonio Reynoso, Mark Gjonad, Mark Treyger,
Jumaane Williams

73.      Those notes also indicate that Jillian Jorgensen and Yoav Gonen were among members of

the press who then attended that hearing. However, those notes indicated that Vanessa Gibson

and Stephen Levin were the only New York City Councilmen and New York City

Councilwomen who were in attendance at that hearing at 5:23 pm. Also, no members of the press

were then present at that hearing. This means that just 12.5% of the number of New York City

Councilmen and New York City Councilwomen who were in attendance at that hearing at 1:45

pm during it were in attendance during it at 5:23 pm. A better way to look at that fact is by

recognizing that New York City Councilmen and New York City Councilwomen caused a sharp

plunge of 87.5% to occur during that hearing that prejudiced the First Amendment and

Fourteenth Amendment rights of those who testified in that hearing at 5:23 pm and thereafter by

the time that they testified in it partly by violating their right to petition government officials for

redress, receive information from them, engage in expressive association, be accorded proper due process and equal protection during that hearing instead of being subjected to discrimination and an unlawful prior restraint on their First Amendment freedoms during it as well as being subjected to an abuse of process during that hearing. That sharp plunge is consistent with illegal viewpoint discrimination and First Amendment retaliation against me by the government officials who abandoned that public hearing before I testified in it.

74.      When I testified in that hearing, I partly did so about the fact that vast majority of the members of the City Council who had been in attendance as Ms. Headley testified in it were no longer present in violation of my due process rights. Concerning this point, _Kittay v. Giuliani,_ _112 F. Supp. 2d 342 (S.D.N.Y. 2000)_ confirms that my First Amendment right to petition government officials includes the right to "communicate directly to government officials". Similarly, the following findings from _Elrod v Burns,_ 427 US 347 (1976) confirm that Defendant Torres caused irreparable harm to my First Amendment rights by leaving that 2/4/19 public hearing before I was given a chance to testify in it:

   a.      "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

   b.      "The timeliness of political speech is particularly important. See _Carroll v. Princess Anne,_ 393 U. S. 175, 182 (1968); Wood v. Georgia, 370 U. S. 375, 391- 392 (1962)."

75.      This helps to explain why I sought to be provided all of the video recordings that were recorded in that chamber by video security cameras that the NYPD controls on 2/14/19 during that hearing. In short, I sought to be able to better identify those who violated my constitutional rights by leaving that hearing before I testified in it as well as all of the members of the City Council who illegally used their cell phones during that hearing. In regards to this point, testifying in public hearings isn't just about the sum and substance of the testimony that is

presented during them. Instead, it's also about the ability that those who testify in them have in being able to evaluate **a)** the extent to which their testimony is received by their intended audiences and **b)** how effectively their testimony is received by those audiences. That fact was sufficient grounds for me to have been provided the entirety of the video recordings that I directed the NYPD to provide to me that were recorded on 2/4/19 in the main chamber in City Hall during the public hearing that the City Council's Committee on General Welfare conducted as well as additional video recordings that were recorded by NYPD video security cameras in the rooms in which I testified to City Council committees on all other dates during which I did so. If I had been provided all of those video recordings, I could have certainly conducted such an evaluation about the testimony that I and others presented during those hearings and shared those video recordings with voters and political rivals of politicians largely to clearly, objectively, and decisively identity the extent to which specific members of the New York City Council were unworthy of receiving votes because they had chosen to boycott fundamental due process, equal protection and First Amendment rights in furtherance of engaging in viewpoint discrimination, First Amendment retaliation, an abuse of process among other things as they flagrantly violated their constitutional oath of office, NYPL §195.00, and New York City Charter §1116.

76.     On a related note, the following is a link to an audio recording that has the filename of "11-18-19_1_34 pm chat with a member of the NYC Council's security team during the  NYC Council's Committee on Public Safety public hearing_20191118 133459.m4a" that I recorded on 11/18/19 at 1:34 pm while I was in the Committee Room in City Hall shortly after I testified in the public hearing that the City Council's Committee on Public Safety conducted while the vast majority of that committee were not present:

        https://drive.google.com/open?id=1Ayxsyl0dymh6eZVTaF0qlS9LyWeuuoNc

77.      I'm clearly heard in that audio recording as I talked with a man who then worked for the City Council as one of its security personnel. In my remarks to him then, I'm clearly heard pointing out the fact that I largely testified to empty seats in front of me instead of having testified to more members of that committee because they were absent from that hearing as I testified. I also began to ask a question to him during those remarks about having him and his security team compel New York City Councilmen and New York City Councilwomen to attend public hearings that the City Council conducted as I testified in them. He erroneously claimed that that wasn't his job and that it was instead he job of people who worked as counsel for City Council committees to cause the members of those committees to attend such public hearings as I testified in them. My remarks to him about those matters are heard in that audio recording beginning at the elapsed time of 24 seconds.

78.      What follows is an additional long excerpt from the written transcript of that 2/4/19 public hearing as I testified in that hearing. That information corresponds to what appears between line 11 on page 229 and line 17 on page 230. As I testified then, I went out of my way to identify some of the members of the City Council who illegally abandoned that hearing in violation of my due process rights as New York City Councilwoman Vanessa Gibson remained at that hearing, but violated both my due process rights and applicable rules that the City Council established by using her cell phone as I testified in that hearing instead of properly paying attention to my testimony in that hearing. Also, I testified about my having been viciously assaulted on 7/2/16 in the living room of where I reside as a result of negligence by both HRA and Urban before Banks lied to me about that on 12/14/17 and stonewalled me during a conversation that I had with him one week prior to testifying in that 2/4/19 public hearing.

Prior to coming here today I also talked to Darren Martin from Mr. Banks team, he essentially stonewalled me at a public resource fair meeting that the, the Mayor held last week in the Bronx unfortunately Vanessa Gibson is too preoccupied with violating our due process rights to give us time of day so she's lying unfortunately she's not under oath so with regards to due process what I see all around me are empty seats. When this meeting began there were about ten people from your panel in chairs in this room, right now if you look around there is Miss Gibson, there's you but where is Adrienne Adams, where is Laurie Cumbo, where is Jumaane Williams, where is Mr. Grodenchik. So, with regards to the public's right to due process and also if you look at the ceiling, if you actually take heart of what it says, where the hell is due process when I have to go home tonight there aren't repairs being made in my building, I got 15 f###ing… sorry, I got 15 punches to my left temple after there was an attempted assault on May 12th, I've been in contact… I was in contact with HRA as early as March 10th of 2016 about a bait and switch that I talked to you about so Mr. Banks's response to me on December 14th of 2017 was that HRA is not responsible for a crime even when people put them on notice that there's a mentally unstable guy who's about six foot two or six foot four trying to kick your… kick you or something in your living room and you ask for a good reason for that person to be evicted so that you won't be taking those 15 punches to your head, where's the oversight?

79.     As I testified during that 2/4/19 public hearing, I also I testified on Mr. Vargas' behalf. While doing so, I testified largely to Mr. Banks as he sat within roughly feet from where I then was. I testified to him then after I testified to Defendant Torres on 3/26/18 during a public

hearing that the City Council's Committee on Oversight and Investigations conducted as Mr.

Torres lied to my face by suggesting that he would follow-up with HPD to have necessary

repairs made in the building in which I reside. Prior to testifying in that 2/4/19 hearing, I

recorded a video of a conversation that I had with Mr. Vargas on 2/4/19 as he told me that he still

needed repairs to be made in his apartment. Prior to talking with him then, I took photographs in

his apartment on 5/24/17 to use to advocate on his behalf at public town hall meetings and public

resource fair meetings that the Mayor conducted to try to exert pressure on the Mayor, Mr.

Banks, and HPD both to have necessary repairs t made throughout the building in which I reside

and to have Urban's contracts with the City of New York terminated. I was also in contact via e-

mail with a whistleblower news censor in journalism named Yoav Gonen in December of 2016

as I engaged in advocacy for Mr. Vargas' needs as I sought to have Mr. Gonen properly engage

in reporting about the fact that **a)** Urban and HRA were neglecting Mr. Vargas' needs and those

of other military veterans who reside in the building in which I reside and **b)** Urban had

subjected me to an illegal bait-and-switch fraud concerning the binding and fully-enforceable

apartment lease agreement that I signed on 2/16/16 with Lisa Lombardi of Urban in HRA's

offices. The next table pertains to what I just discussed about Mr. Gonen and Mr. Vargas. The

text from the body of the e-mail message that I sent to Mr. Gonen at [ygonen@nypost.com](mailto:ygonen@nypost.com) at 9:13

pm on 12/28/16 appears in the first column and the text from an e-mail message that he sent to

me on 12/21/16 at 10:59 am about that same matter appears in the second column. My remarks

in that table about someone who was disabled referred to Mr. Vargas.

| | |
|---|---|
| Sorry for getting back to you so late. I sure do have both leases. Not all of the apartments in the building are shared. At least 2 people living on the 1st floor have their own apartments. One of those people is disabled and has diabetes. Despite that, Urban Pathways has been neglecting making proper repairs in his apartment. He told | Sorry for the delay, it's been busy at City Hall. Do you have a copy of the 2 different leases? Are all of the apartments |

| | |
|---|---|
| me that he fell a couple of times in his apartment because of that. I've encouraged him to withhold making rent payments to Urban Pathways on account of that, but he has chosen to keep making them for some reason.<br><br>In my case, I have a restraining order against my former roommate in place now as a result of his 7/2/16 assault on me in our apartment's living room.<br><br>I should also point out that there is no restroom in our apartment building for Urban Pathways' workers to use there and there were at least two shootings outside of our building in the last 6 months that took place less than 2 blocks away. This means that if one of those workers needs to use a restroom while they are on-duty, they have to leave our building where they work and go to another building nearby while hoping that there isn't further shootings taking place. Did I mention that the Better Business Bureau's web site lists the compensation of Fredrick Shack as being over $200,000. He runs Urban Pathways.<br><br>In any event, before I share the leases with you, can I get your assurances that you won't disclose my identity in any reporting you may choose to do?<br><br>Thanks for looking into this. | shared in the building? |

80.     My testimony about Mr. Vargas during that 2/4/19 City Council public hearing begins at the elapsed time of 4 hours, 29 minutes, and 12 seconds in the video recording that was recorded of it as a result of arrangements that the City Council made. The next screenshot is from that video and shows me as I played a video recording from my laptop in conjunction with my testimony. The image from the video recording that is shown on the left side of my laptop's screen was of Mr. Vargas from my conversation with him earlier that day near the building in which I reside. The person for whom I'm shown in that screen as having turned my laptop to allow him to see what was shown on its screen was Mr. Banks.



81.     The long excerpt from the transcript of that hearing that is shown next corresponds to what appears in lines 5 thru 18 on page 228 as I testified in that hearing. My remarks in that excerpt partly concerned testimony that I gave to Defendant Torres on 3/28/18 about repairs in the building in which I reside and negligence by HRA and Urban.

> "Earlier today prior to coming to this hearing I talked to a disabled military veteran who resides in my building, I also testified on his behalf in this room previously. I had a conversation with Mr. Banks in Brooklyn in August of last in regard to having repairs made in that building by Urban Pathways which is the, the landlord, I have specifically asked Mr. Banks repeatedly to terminate HRA's contract with Urban Pathways on the grounds that it has defaulted on that contract. Sorry, one second… so let me play, I'll turn

> this around, here's the disabled military veteran that I had the conversation with earlier today."

82.     As I testified in that 2/4/19 public hearing, I was justifiably furious partly about the fact that I was illegally and deliberately forced to be the second to last person who testified in that hearing in order to minimize my ability to have my testimony reach its intended audience. Prior to testifying in that hearing, I intended for my testimony to be observed by **a)** all of the members of the public as well as all government officials and members of the press who attended that hearing at the start of the period during which testimony from members of the public began in it and **b)** those who were then watching the live video broadcast of that hearing and would otherwise thereafter watch that video. I sought for that to occur largely to offset rampant censorship of whistleblowing information that I sought to widely broadcast to the public and government officials and agencies by people who then worked in journalism as whistleblower news censors. Such censors of me then included and continue to be Rich Calder, Matthew Chayes, Brendan Cheney, Bobby Cuza, Erin Durkin, Gabrielle Fonrouge, Michael Gartland, Mara Gay, Yoav Gonen, J. David Goodman, Courtney Gross, Jillian Jorgensen, Errol Louis, Julia Marsh, Ben Max, Jeff C. Mays, Laura Nahmias, Gloria Pazmino, Grace Rauh, Graham Rayman, John Riley, Greg Smith, Nikita Stewart, Madina Toure, and Benjamin Weiser. Mr. Cheney and Ms. Rauh no longer work in journalism.

83.     On 3/4/20, I testified in the public hearing that the City Council's Committee on Public Safety conducted in the main chamber in City Hall. While doing so, I testified to New York City Councilman Donovan Richards and a lot of empty seats instead of members of the City Council who had attended that hearing earlier. While testifying in that hearing, I lawfully expressed by frustration about the fact that Mr. Richards' colleagues in that committee had the audacity to

violate my Fourteenth Amendment due process and equal protection rights that encompassed my

First Amendment rights as well as I bluntly asked him the following question while referring to

his colleagues in that committee as I deliberately didn't try to soften my question:

Where in the hell are they?

84.     The video recording that the City Council arranged to be recorded of that hearing is

available on the Internet at https://councilnyc.viebit.com/player.php?hash=MK7PzQGE2xmt.

The following screenshot shows me as I asked Mr. Richards the preceding question at the

elapsed time of roughly 3 hours, 47 minutes, and 54 seconds in that video as I lawfully testified

to him and his colleagues in that committee were violating my constitutional by not being

present at that hearing:



85.     On a related note, though New York City Charter §45 confirms that security personnel

who work for the City Council who have the job title of Sergeant-at-arms are authorized to

compel the attendance of absent New York City Councilmen and New York City Councilwomen

at public hearings that City Council committees conduct, they have always refused to do so

during conversations that I have had with them about that. New York City Charter §45 also authorizes such security personnel to punish New York City Councilmen and New York City Councilwomen for disorderly behavior. Despite having the power to punish such members of the City Council for being disorderly, such security personnel have never punished them for being disorderly towards me partly by **a)** illegally boycotting my testimony during public hearings in which I have testified and **b)** illegally causing my testimony to abruptly end after just a few seconds that Defendant Torres did on 11/13/19 as First Amendment retaliation. Moreover, New York City Charter §45 also requires the City Council to have complete transcripts prepared of every public hearing that it conducts and to make them available for free. That requires the City Council to have those transcripts to be entirely accurate. However, they certainly are not.

- **Past and ongoing viewpoint discrimination by Ritchie Torres, Donovan Richards, Chaim Deutsch, and Barry Grodenchik of the New York City Council by being denied access to public forums that were established on the Internet through the use of Twitter accounts registered to them in violation of _Knight First Amendment Inst. Columbia v. Trump_, 928 F.3d 226 (2d Cir. 2019):**

86.     Currently, a Twitter account that is registered to me is being denied access to public forums that were and continue to be established on the Internet by how Twitter accounts have been and continue to be used that are registered to New York City Councilmen to Donovan Richards and Chaim Deutsch. This is because someone who has used those Twitter accounts that are registered to Mr. Richards and Mr. Deutsch has blocked a Twitter account that is registered to me while never according me any due process in regards to that blocking and denial of access to a public forum. That has deprived me of being able to ascertain why that occurred. I also don't

know when exactly that blocking began. Similarly, a Twitter account that is registered to Ritchie

Torres previously blocked a Twitter account that is registered to me. That also caused me to be

denied access to a public forum that was established on the Internet by how that Twitter account

was used. The next table identifies the Twitter accounts registered to Mr. Torres, Mr. Richards,

and Mr. Deutsch that have blocked a Twitter account that is registered to me in violation of the

findings in _Knight First Amendment Inst. Columbia v. Trump_, 928 F.3d 226 (2d Cir. 2019).

| # | New York City Councilman | Twitter account username |
|---|---|---|
| 1 | Ritchie Torres | @RitchieTorres |
| 2 | Donovan Richards | @DRichards13 |
| 3 | Chaim Deutsch | @ChaimDeutsch |

87.     By allowing a Twitter account that is registered to me to be blocked by Twitter accounts

that are registered to them from being able to access public forums that have been established on

the Internet through how Twitter accounts that are registered to them have been used, Defendant

Torres as well as Mr. Richards, and Mr. Deutsch violated my First Amendment rights that entitle

me to have access to public forums, receive information, express myself, engage in expressive

association, and petition for redress. That denial of access to a public forum also violated my

Fourteenth Amendment due process and equal protection rights and violated New York City

Charter 1116 and NYPL 195.00. In doing so, that practice also prevented me from having access

to an alternate time, place, and manner in which to criticize those New York City Councilmen

and otherwise try to engage in communications to them that they were entitled to ignore, but not

to block and prevent others from viewing on the Internet.

88.     What follows are screenshots that I recorded that confirm that Twitter accounts that are

registered to Mr. Torres, Mr. Richards, and Mr. Deutsch have blocked a Twitter account that is

registered to me. I don't need to publicly disclose one or more Twitter accounts that have been

registered to me and been blocked by Twitter accounts that are registered to them. I also don't need to identify others who may possibly have used such Twitter accounts that have been registered to me.



89.     The next screenshot is a cropped version of the preceding one that better shows the text in it.







90.     Incidentally, it's objectively reasonable to infer from what appears in the preceding

screenshot that Mr. Deutsch is a supporter of the very same NYPD criminal mob that is being

sued by the NYCLU and the Legal Aid Society in response to terrorism by the NYPD since May of 2020 that occurred in relation to peaceful demonstrations in May of 2020 and thereafter that New Yorkers participated in across New York City. That lawsuit is discussed in a news article that was written by Jake Offenhartz and is entitled "Civil Rights Groups Sue De Blasio, NYPD Leaders For "Deliberately Violent" Response To Protests" that was published on the Internet on 10/26/17 at https://gothamist.com/news/civil-rights-groups-sue-de-blasio-nypd-leaders-deliberately-violent-response-protests by a news organization named Gothamist.

**Violations of my Fourteenth Amendment equal protection and due process rights that occurred as a result of unequal treatment that people received while protesting inside of New York City Hall:**

- **Protests in City Hall on 12/12/18 during which due process was accorded to protesters instead of immediate ejection from a public hearing that the New York City Council conducted:**

91.     On 12/12/18, Spectrum News published a news report on the Internet at https://www.ny1.com/nyc/all-boroughs/news/2018/12/12/city-council-holds-first-amazon-hq2-hearing that is entitled "Amazon Met with the City Council About the HQ2 Deal. Here's What Went Down". That report was prepared by someone named Grace Rauh while she was a whistleblower news censor in journalism in regards to me. That report includes images from Twitter postings that were posted on the Internet on that date by a Twitter account that is registered to Ms. Rauh that has the username of "@gracerauh". That report discussed the fact that the City Council conducted a public hearing on that date in the main chamber in City Hall that was interrupted by people who were opposed to having a government deal issued to Amazon to help it to setup new offices in New York City. The following are several relevant excerpts

from that report that concern the fact that protesters interrupted that hearing and were accorded

proper due process in response by New York City Councilman Corey Johnson as he apprised

them about what the specific consequences would be if they continued to interrupt that hearing:

a.  New York City Council members grilled Amazon executives about the company's plan to build a secondary headquarters in New York during a contentious hearing Wednesday that was interrupted several times by jeering protesters.

b.  The City Council chamber was mostly packed with people who did not support the Amazon deal. Protesters slammed it, particularly the city and New York state offering Amazon up to $2.8 billion in tax breaks and grants to build the new headquarters in the Long Island City neighborhood of Queens.

c.  The demonstrators interrupted the proceedings at times, leading to City Council Speaker Corey Johnson eventually saying he would clear the balcony if interjections continued.

92.  Among the Twitter postings that were posted on the Internet on that date by the Twitter

account has has the username of "@gracerauh" was one that was posted on the Internet at 10:31

am. That Twitter posting includes a video recording that shows that public hearing in City Hall's

main chamber as it was being interrupted by protesters who were gathered in the balcony section

that chamber. At the elapsed time of 34 seconds in that video recording, New York City

Councilman Corey Johnson is heard issuing a warning to those who interrupted that hearing as

he told them that he would arrange for the entire balcony section in that chamber to be cleared of

people that would cause them to have to leave that chamber if they interrupted that hearing

again. This point is clearly relevant to my claims in this action that concern 11/13/19 because I

wasn't accorded any comparable due process by anyone and I absolutely was required to have

been accorded such equal due process then prior to being subjected to adverse treatment. In

contrast to the fact that those protesters on 12/12/18 didn't have a legal right to disrupt that City

Council public hearing, I had a clear First Amendment legal right to testify in the public hearing

that the City Council's Committee on Oversight and Investigations conducted on 11/13/19 that I

was illegally coerced to leave after Ritchie Torres illegally caused my testimony in that hearing

to end after just a few seconds as he subjected me to viewpoint discrimination and First

Amendment retaliation. I also thereafter had a First Amendment and Fourteenth Amendment

right with respect to those 12/18/18 protesters to have been able to enter City Hall thereafter on

11/13/19 instead of having been subjected to an abuse of process, selective-enforcement,

discrimination, and standardless discretion by having been illegally prevented from doing so by

Defendants Perez and Lin in violation of my Fourth Amendment, First Amendment, and

Fourteenth Amendment rights.

- **Protests in City Hall on 12/12/18 during which protesters blocked doors and passageways on the first floor in that building while trying to be arrested for that without success:**

93.     On 12/12/18, the New York Daily News published a news article on the Internet at

https://www.nydailynews.com/news/politics/ny-pol-city-hall-protest-no-arrests-20181211-story.html that is entitled "Police are Hands-Off at City Hall Sit-In Protest Demanding Housing

for the Homeless". That report was prepared by someone named Jillian Jorgensen while she was

a whistleblower news censor in journalism in regards to me. The following is a relevant excerpt

from that article:

> "What's a city councilman have to do to get arrested in this town?
>
> City Council members and advocates for the homeless demonstrated for more than an hour at City Hall Tuesday, blocking doorways in an effort to be arrested that was ultimately unsuccessful."

94.     The next screenshot is from a photograph that was included in that article that shows

protesters as they blocked passageways on the first floor in a public area inside of City Hall that

is located near the entrance to that building.



95.    The next screenshot is from a Twitter posting that was posted on the Internet on 12/11/18

at 2:45 pm by a Twitter account that has the username of "@katie_honan" that is registered to a

journalist named Katie Honan. That Twitter posting is available on the Internet at

https://twitter.com/katie_honan/status/1072578252479348739 and includes a video recording

that shows NYPD Detective Raymond Gerola in it near people who were then conducting a sit-in

protest as they blocked passageways in public areas on the first floor in City Hall. Mr. Gerola is a

member of the Mayor's NYPD security detail and has repeatedly and illegally violated my

constitutional rights in relation to my efforts to have lawfully attended public town hall meetings

and public resource fair meetings within the rooms in which they were conducted as they were conducted by the Mayor with others as public forums. While that video was being recorded, Mr. Gerola was violating his legal duty as a police officer to clear obstructions in public areas in City Hall by issuing a dispersal order to those protesters.



96.    The next screenshot is from a Twitter posting that was posted on the Internet on 12/11/18 at 2:47 pm by a Twitter account that has the username of "@Jill_Jorgensen" that is registered to Jillian Jorgensen. That Twitter posting is available on the Internet at

https://twitter.com/Jill_Jorgensen/status/1072578562274795523 and includes a photograph that also shows people who were then conducting a sit-in protest as they blocked one of the main entrances to City Hall's building. When that photograph was taken, it's objectively reasonable to believe that members of the NYPD were nearby and were violating their legal duty as police officers to clear obstructions in public areas in City Hall by issuing a dispersal order to those protesters.



- **The length of time that protesters were allowed to engage in a protest in City Hall's main chamber on 1/21/20 during the public hearing that the City Council's Committees on General Welfare and Public Safety jointly conducted:**

97.     On 1/21/20, the City Council's Committees on General Welfare and Public Safety jointly conducted a public hearing in the main chamber of City Hall that was interrupted by protesters. The City Council arranged for that hearing to be recorded on video that is available on the Internet at https://councilnyc.viebit.com/player.php?hash=c9D6WbFuVmHn. That video recording shows that protest taking place between the elapsed times of **a)** 15 minutes and 17 seconds and **b)** 16 minutes and 55 seconds. The next screenshot is from the elapsed time of 16 and 12 seconds in that video. It shows protesters as they interrupted that hearing in the immediate presence of a male member of the City Council's security team as he didn't immediately try to cause those protesters to stop interrupting that hearing and leave that room. Instead, he and New York City Councilmen and New York City Councilwomen tolerated that interruption for 1 minute and 36 seconds before those protesters were forced to leave that room.



98.     This means that I had a clear Fourteenth Amendment due process and equal protection

right to testified in the public hearing that Ritchie Torres conducted on 11/13/19 for the City

Council's Committee on Oversight and Investigations without being interrupted by him on

account of the fact that those who engaged in protesting on 1/21/20 in City Hall's main chamber

during the public hearing that I just discussed had their behavior tolerated in spite of the fact tha

it disrupted that hearing and occurred at a time during that hearing when it certainly wasn't their

turn to testify in it. The period of time that lasted for 1 minute and 38 seconds during which those

protesters engaged in a demonstration in City Hall's main chamber on 1/21/20 clearly exceeded

the length of time in which I was permitted to testify on 11/13/19 in the public hearing that

Ritchie Torres conducted for the City Council's committee on Oversight and Investigations

before he illegally engaged in witness tampering, viewpoint discrimination, and First

Amendment retaliation by arbitrarily and capriciously interrupting my testimony in that hearing

and causing me to be coerced by Defendant Sgt. Bradley to exit the room in which I lawfully

was testifying while not disrupting that hearing primarily because I was the last person to testify

in that hearing in which just Margaret Garnettt of DOI and I testified.

**<u>My conversations with Ritchie Torres on 3/26/18, 3/18/19, 3/26/19</u>:**

99.     On 3/26/18, I testified in the public hearing that the City Council's Committee on

Oversight and Investigations conducted that the City Council arranged to be recorded on video

that is available on the Internet at

https://councilnyc.viebit.com/player.php?hash=1diWh0EurD71. While I testified in that hearing,

I talked with Defendants Torres and Yeger. Before I testified in that hearing, Mr. Torres didn't

try to antagonize me by subjecting me to illegal selective-enforcement in violation of my

Fourteenth Amendment due process and equal protection rights that include prohibitions against

discrimination in a public forum. What I'm referring to by this is the fact that he didn't make any remarks to me during that hearing before I testified in it to subject my testimony to a prior restraint. Such a remark to me then would have violated my First Amendment rights. When I thereafter testified to him on 11/13/19, I had a Fourteenth Amendment right for him to have properly shut up instead of having flagrantly antagonized me by making a remark at the beginning of my testimony in which he subjected me to an illegal prior restraint that he hadn't also subjected DOI's Commissioner to earlier in that hearing at the start of her testimony. Mr. Torres' antagonism of me during that 11/13/19 hearing set the tone and tenor for my opening statement in that hearing in which I lawfully exercised my First Amendment right to criticize him in a matter-of-fact and totally calm fashion.

100.    The City Council also arranged for a written transcript of that 3/26/18 hearing to be prepared as a PDF file that is available on the Internet at

https://legistar.council.nyc.gov/View.ashx?M=AO&ID=65676&GUID=076c7950-ab22-406f-ba13-a19b46d888b0&N=SGVhcmluZyBUcmFuc2NyaXB0 That written transcript is incredibly and inexcusably inaccurate. For example, the next screenshot is from page 131 in that transcript and corresponds a conversation that I then had with Defendants Torres and Yeger as I testified in that hearing while Mark Peters (the former commissioner of DOI) and New York City Councilman Rafael Salamanca, Jr. whose names appear in that screenshot weren't in that room and certainly weren't people that I was then talking with.

```
7    waste your time.  The reason why I'm here is I live

8    in Housing for Veterans by Katona Park.  The

9    landlord did a bade and switch.  They're using tax

10   payer money.  Uhm, they are going to have a fund

11   raiser in May and they're not [inaudible 2:41:02].

12   They don't have the building registered with HPD or

13   HRA and HPD.  They are not doing a darn thing, so

14   can you?

15        COMMISSIONER PETERS:  I'll have my staff get

16   your information and then we can follow up with HPD

17   absolutely.

18        MR. KOMATSU:  Thank you. No, he is the person

19   who assaulted me on July 2$^{nd}$.

20        COUNCIL MEMBER SALAMANCA:  Is it your testimony

21   that you were stopped by the police from going to

22   testify at a hearing at the blue room, then several
```

101.   The remarks that appear in lines 15 and 20 on that page in that transcript were instead remarks that were then made to me by Defendants Torres and Yeger, respectively. The next screenshot is from elapsed time of 2 hours, 41 minutes, and 20 seconds within the video that the City Council arranged to be recorded of that 3/26/18 public hearing.



102.    The preceding screenshot corresponds to the beginning of the remarks that I made in that

hearing that appear in line 7 within the screenshot that I just presented before this one.

Corrections in the transcript that corresponds to that earlier screenshot are shown in the

following table:

| Line Number | Transcript Error | Correction Needed |
|---|---|---|
| 8 | Katona | Crotona |
| 9 | [inaudible 2:41:02] | making repairs |
| 13 | They are not | They're not |

103.    As far as I'm aware, the City Council lacks a process by which those who testify in

public hearings that its committees conduct are able to have the City Council have corrections

made to such written transcripts for a variety of entirely legitimate purposes that include befitting

the public's First Amendment right to receive accurate information from those who testify in

those hearings partly through such searchable written transcripts. I seek for this Court to grant

me relief through this complaint that will order the City of New York to immediately rectify that

shortcoming that violates First Amendment rights by ordering this City of New York to immediately establish and fully implement a process by which those who testify in public hearings that the City Council conducts can have the City Council arrange to have all necessary corrections made within 3 calendar days to written transcripts that are prepared from public hearings that its committees conduct and to have those corrected written transcripts available on the Internet for the public to access within such a 72-hour timeframe.

104.    The next screenshot is from elapsed time of 2 hours, 41 minutes, and 50 seconds within the video that the City Council arranged to be recorded of that 3/26/18 public hearing. It clearly shows the facial expression that Mr. Torres exhibited immediately after he had just stated to me, "I'll have my staff get your information and then we can follow up with HPD. Absolutely. Absolutely."



105.    Hindsight strongly suggests that the facial expression that Mr. Torres then exhibited in

which he smirked, grinned or otherwise smiled in a sarcastic manner in the direction of Mr.

Yeger meant that he was acting as a con artist by being totally disingenuous as he just told me

that he and his staff could follow-up with HPD about deficiencies in the building in which I

reside that I had just apprised him and everyone else who was then in that room and watching the

live video broadcast of that hearing. I should have immediately recognized Mr. Torres' deceit

toward me and publicly called him out for that to immediately hold him properly accountable as

I continued my testimony by immediately and very pointedly directing him to explain to me and

other military veterans what exactly he felt was funny about what I just discussed with him. I

instead waited until 11/13/19 to hold him accountable for that through the remarks that I made as

I testified to him during the public hearing that the City Council's Committee on Oversight and

Investigations conducted largely to communicate to countless others through the live video

broadcast of that hearing that Mr. Torres was a liar who couldn't be trusted and wasn't worthy of

anyone's vote. I sought to do so then as Mr. Torres was attempting to break his commitment to

those who voted for him in the 2017 New York City government elections to continue to be a

public servant as a member of the City Council for the entire four-year period that would

thereafter follow. Mr. Torres was then attempting to abandon that commitment for the selfish

goal of trying to win an election to become a member of the U.S. Congress.

106.    The next screenshot is from elapsed time of 2 hours, 40 minutes, and 52 seconds within

the video that the City Council arranged to be recorded of that 3/26/18 public hearing. In short, it

reflects testimony that I then gave in that hearing about the fact that I was illegally prevented

from attending the public town hall meeting that Mr. Torres jointly conducted with the Mayor

and other government officials on 10/4/17 in the Bronx near Fordham Law School while I was a

whistleblower against the Mayor's administration and the NYPD and was seeking to exercise my

constitutional rights to have lawfully attended that public forum within the room in which it was

conducted. The beginning of my remarks then correspond to what appears in line 19 on page 130

of the written transcript that the City Council arranged to be prepared from that hearing.



107.    Instead of properly demonstrating leadership and outrage about the fact that my

constitutional rights to attend the public town hall meeting that he moderated on 10/4/17 were

flagrantly violated, the fact that Mr. Torres didn't exhibit any reaction whatsoever about that part

of my testimony suggests that he outrageously condoned the fact that I was illegally prevented

from attending that town hall meeting. As I continued to testify in that hearing, I pointed out at

the elapsed time of 2 hours, 41 minutes, and 6 seconds in the video recording of that hearing that

the practice of illegally barring me from public town hall meetings that the Mayor conducted in

2017 was an illegal practice that was used against me to repeatedly prevent me from attending

public forums that the Mayor conducted.

108.    The following is a link to the video recording that the City Council arranged to be

recorded of the public hearing that the City Council's Committee on Oversight and

Investigations conducted on 3/26/19 in the Committee Room in City Hall during which I

testified to Mr. Torres:

https://councilnyc.viebit.com/player.php?hash=PVKea3TdHUTv

109.    My testimony in that hearing begins at the elapsed time of 39 minutes and 35 seconds in

that video and lasted until the elapsed time of 43 minutes and 33 seconds. The City Council also

arranged for a written transcript to be prepared from that hearing. That transcript is available as a

searchable PDF file on the Internet at

https://legistar.council.nyc.gov/View.ashx?M=F&ID=7189617&GUID=E3FC059B-C068-4649-

8E04-C41D34ED75C1. My name is misspelled in that transcript as "Talaki Kamatsu" and that

circumstance prevents people from being able to easily search for my testimony in it.

110.    The following facts are entirely true and accurate about the testimony that I gave as I

testified in that 3/26/19 public hearing by the City Council's Committee on Oversight and

Investigations:

    a.    My testimony in that hearing was largely addressed to U.S. District Judge Lorna

          Schofield who is assigned to entirely valid litigation that I commenced against the

          City of New York and others. That lawsuit corresponds to the ongoing case of

          *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.).

    b.    I played back a relevant video from my laptop's small screen and rotated my

          laptop to have it face Mr. Torres. As I was about to play that video recording, Mr.

          Torres inexplicably asked me if there was any profanity or anything else that

          would be objectionable that would be heard or seen in that video while he had no

          reason to believe that there would be. By merely asking me that question, he tried

to arbitrarily and capriciously subject me to an illegal prior restraint on my First Amendment rights. He asked me that after I previously played back video recordings on 2/4/19 as I testified to the City Council's Committee on General Welfare in the main chamber in City Hall that is located directly next to the Committee Room in City Hall. I wasn't asked a similar question about the content of those video recordings before I played them. Although Mr. Vargas was heard saying the word "shit" in one of those video recordings that I played back on 2/4/19 during that earlier hearing, he certainly did so then in the context of complaining about the fact that New York City government personnel were negligently not causing repairs to be made in his apartment. As a result, his speech in that video that included his use of a profanity was protected speech that I didn't need to censor as I played back that video in conjunction with my testimony on 2/4/19. On a related note, a news organization named Gothamist published a news article on the Internet on 6/10/20 at

https://gothamist.com/news/the-nypd-mayors-office-were-mia-at-a-police-oversight-hearing-so-new-yorkers-turned-it-into-a-space-of-shared-grief-and-rage

that was written by a journalist named Nick Pinto and is entitled, "The NYPD & Mayor's Office Were MIA at a Police Oversight Hearing, So New Yorkers Turned it into a Space of Shared Grief and Rage." That article discussed a public hearing that the City Council's Committee on Public Safety conducted remotely on 6/10/20 in which others and I testified largely about unchecked terrorism by the NYPD. Some of those who testified in that hearing used profanity while doing so and their use of it then was both largely understood, condoned, and relished in

spite of objections about that that some people had. The acceptance of the profanity that was used in that hearing by people that included Donovan Richards in his capacity as the Chairman of the City Council's Committee on Public Safety sufficiently established that it was retroactively and prospectively permissible for me to express profanity while testifying in public hearings that committees of the City Council conducted on account of Fourteenth Amendment due process and equal protection grounds as well as First Amendment grounds.

c.    The video recording that I played back on 3/26/19 as I testified in the City Council's Committee on Oversight and Investigations was about my having been illegally assaulted and ejected on 3/18/19 from the public hearing that the Mayor conducted in the Blue Room in City Hall. That occurred as the Mayor and a member of his NYPD security detail illegally and jointly subjected me to First Amendment retaliation, viewpoint discrimination, and standardless discretion as I briefly and lawfully testified and otherwise conducted myself in that room. The video recording that I played on 3/26/19 during that public hearing by the City Council's Committee on Oversight and Investigations also showed me being illegally coerced by members of the NYPD to leave City Hall's grounds after I was illegally ejected from the Blue Room on City Hall. As I played that video then, Mr. Torres oddly remained stoic and that suggested that he condoned that abuse instead of supporting fundamental constitutional rights.

d.    I reminded Mr. Torres that he and I talked on 3/18/19 shortly after I was illegally coerced to leave City Hall's grounds after I was illegally ejected from the Blue Room in City Hall. We talked on 3/18/19 as we happened to cross paths near the

Broadway entrance to City Hall after 5 pm on 3/18/19. I talked with him then about the fact that I was illegally ejected from the Blue Room on that date before I was then illegally coerced to leave City Hall's grounds. He told me during that conversation that he wouldn't get involved in individual matters such as that because he was focused on systemic matters in spite of the fact that the illegal acts and omissions that were perpetrated against me by the Mayor and members of the NYPD were part of a larger systemic issue that Mr. Torres ignored and condoned.

e.     I pointed out that I visited the offices of DOI one week earlier to submit a valid complaint in response to my having been illegally **a)** ejected from the Blue Room in City Hall on 3/18/19 as I testified to the Mayor and **b)** immediately thereafter coerced to leave City Hall's grounds.

f.     I pointed out to him at the elapsed time of 40 minutes and 49 seconds in the video recording of that 3/26/19 hearing that he had my written testimony for that hearing that I had submitted earlier. That material included my contact information in it that he talked about at the end of that hearing.

g.     I reminded him about some of what I previously testified to him about on 3/26/18 during the public hearing that the City Council's Committee on Oversight and Investigations conducted as I told him back that I had repeatedly and illegally been prevented from attending public town hall meetings and public resource fair meetings that the Mayor conducted. On a related note, I also apprised him on 3/26/19 during that hearing that the 2nd Circuit had conducted an oral arguments hearing earlier that day in the landmark case of _Knight First Amendment Inst. Columbia v. Trump_, 928 F.3d 226 (2d Cir. 2019) that concerned viewpoint

discrimination by government officials as that pertained to public forums.

h.     I told him that HRA was illegally refusing to comply with FOIL demands that I

submitted to it by refusing to provide me public records that I sought. I then

clearly asked Mr. Torres for his assistance with causing HRA to fully comply

with those FOIL. Mr. Torres then responded quite rudely and deceitfully by

fraudulently suggesting that I was not permitted to ask him a question to petition

for redress as I then testified in a public hearing. He instead suggested that

between him and me then, only he had the right to ask questions during that

hearing. He then engaged in dilatory behavior by telling me that if I had a

concern, I could relay it to his staff instead of asking him directly and he and his

team could then follow-up. I then promptly and lawfully challenged that assertion

by him by reminding him that he was the Chairman of the City Council's

Committee on Oversight and Investigations to discreetly point out that it was his

duty to allow me to then petition for redress which was exactly what I was then

doing during that hearing as he was engaging in stonewalling tactics. I thereafter

never received any assistance from Mr. Torres nor his staff in regards to FOIL

matters that I apprised him about during that hearing.

111.    Prior to that 3/26/19 public hearing, I testified to New York City Councilman Ben Kallos

as a whistleblower on 6/27/17 during the public hearing that he conducted for the City Council's

Committee on General Welfare. The City Council arranged to have that hearing recorded on

video and to have a written transcript prepared as a PDF file of that hearing. That video

recording is available on the Internet at

https://councilnyc.viebit.com/player.php?hash=5dKD0m59T0oF. The transcript of that hearing is

available on the Internet at

https://legistar.council.nyc.gov/View.ashx?M=F&ID=5330143&GUID=50EFB308-18C4-4FBC-9DDC-5B5E1C70B187. The next screenshot is from page 259 in that transcript and reflects

remarks that Mr. Kallos then stated to me after I had just been engaging in protected

whistleblowing partly against HRA as I testified to him in that hearing. The significance of Mr.

Kallos' remarks in this screenshot is that he acknowledged a duty that members of the City

Council had to "pay attention to where things are going wrong" that are reported to them.

```
19              COUNCIL MEMBER KALLOS: So, first, thank

20    you for participating in the process.  I think that

21    we as elected officials and also as residents have a

22    duty to pay attention to where things are going

23    wrong, and there are places where I wish I could roll

24    up my sleeves and get down to figuring out what

25    happened. One of those places was Rivington [sp?].
```

112.     Concerning what I just discussed, Ritchie Torres and other members of the City Council

can't possibly "pay attention to where things are going wrong" insofar as that concerns

information that is reported by people who testify in public hearings that the City Council

conducts while Mr. Torres and other members of the City Council **a)** use cell phones during

those hearings while attending them as people testify to them in those hearings instead of paying

proper attention to such testimony, **b)** aren't otherwise present in the rooms in which such

testimony is presented as it's presented, and **c)** refuse to engage in brief question-and-answer

exchanges with those who testify in such hearings that are initiated by those who testify in them.

**Ritchie Torres' attempt to violate the First Amendment and Fourteenth Amendment rights of New Yorkers by discriminating against them through a subversive proposal he had about FOIL that would benefit whistleblower news censors in journalism:**

113.    On 5/11/18, a news organization published a news article on the Internet at

https://observer.com/2018/05/new-york-city-journalism-public-records/ that is entitled "In NYC,

Push to Prioritize Journalists for Public Records Requests Draws Mixed Views" that was written

by a whistleblower news censor in journalism named Madina Toure. That article discussed an

attempt by Ritchie Torres to violate the First Amendment and Fourteenth Amendment rights of

members of the public by illegally discriminating against them to benefit whistleblower news

censors in journalism such as Ms. Toure and actual journalists by requiring government agencies

to fulfill FOIL demands that they received from those in journalism that include whistleblower

news censors faster than such demands that they received from others. The following is a

relevant excerpt from that article:

> "Torres' office told Observer that Council lawyers reviewed legal precedents and
> opinions and determined that they have the authority to enact the bill. The office also said
> the bill standardizes the process of prioritization."

## LEGAL STANDARDS

1.    I incorporate by reference the statements that I made in all of the preceding paragraphs as

though fully set forth herein.

2.    The following excerpt from the U.S. Supreme Court decision in *Houchins v. KQED, Inc.*,

438 U.S. 1, 98 S. Ct. 2588, 57 L. Ed. 2d 553 (1978) clearly confirms that Ritchie Torres' idiotic

proposal to illegally discriminate against ordinary members of the public by giving those in

journalism an advantage over members of the public in having FOIL demands fulfilled by

government agencies stood no chance of surviving a legal challenge:

"the Constitution provides the press with no greater right of access to information than that possessed by the public at large"

3.      The following are pertinent excerpts from the landmark case of Use <u>Elrod v Burns,</u> 427 <u>US 347 (1976)</u>:

      a.      "The timeliness of political speech is particularly important. See <u>Carroll v. Princess Anne</u>, 393 U. S. 175, 182 (1968); <u>Wood v. Georgia</u>, 370 U. S. 375, 391-392 (1962)."

      b.      "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

4.      The following are relevant excerpts from the landmark U.S. Supreme Court decision of <u>Goldberg v. Kelly</u>, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970) that addressed what is required of due process:

      a.      "The fundamental requisite of due process of law is the opportunity to be heard."

      b.      "The hearing must be "at a meaningful time and in a meaningful manner."

      c.      "The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard."

      d.      A pre-deprivation hearing needs to be granted to people in instances in which a post-deprivation hearing would not be adequate.

5.      The excerpt that follows and is from the seminal case of <u>Police Dept. of Chicago v. Mosley</u>, 408 U.S. 92, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972) pertains to the fact that Defendant Torres allowed Margaret Garnett to present an opening statement as she testified immediately before me during the public hearing that he conducted for the City Council's Committee on Oversight and Investigations as she arguably made irrelevant remarks about DOI's function that is well-known and wasn't relevant to the specific agenda for that hearing. Similar to how Ms. Garnett's irrelevant remarks about DOI's function during that hearing pertained to the fitness as an investigative agency, I had a Fourteenth Amendment due process and equal protection right as well as a First Amendment right to make remarks in an opening statement for my testimony in

that hearing to present my views about why I believed that Mr. Torres' deceit and

untrustworthiness caused him to be entirely unfit to be the chairman of the City Council's

Committee on Oversight and Investigation before he proved by his conduct toward me during

that hearing that I was completely right about that:

> "Necessarily, then, under the Equal Protection Clause, not to mention the First
> Amendment itself, government may not grant the use of a forum to people whose views it
> finds acceptable, but deny use to those wishing to express less favored or more
> controversial views. And it may not select which issues are worth discussing or debating
> in public facilities. There is an "equality of status in the field of ideas,"[4] and government
> must afford all points of view an equal opportunity to be heard. Once a forum is opened
> up to assembly or speaking by some groups, government may not prohibit others from
> assembling or speaking on the basis of what they intend to say. Selective exclusions from
> a public forum may not be based on content alone, and may not be justified by reference
> to content alone."

6.      Findings from *Dolan v. Connolly*, No. 13 Civ. 5726 (GBD)(GWG) (S.D.N.Y. Mar. 2,

2017) confirm that this Court may adopt relevant findings from other court decisions that have

been issued in this district and other districts that foreshadow a ruling about particular matters.

7.      The excerpt shown next from *Del Gallo v. Parent*, 545 F. Supp. 2d 162 (D. Mass. 2008)

are key findings from it that pertain to an unequal playing field for First Amendment expression

that amounts to viewpoint discrimination and is relevant about the fact that Defendant Torres

didn't try to impose a prior restraint on the content of the testimony that Margaret Garnett

presented on 11/13/19 during the public hearing that he conducted for the City Council's

Committee on Oversight and Investigations in which I testified right after her and after Mr.

Torres flagrantly discriminated against me while violating my due process and equal protection

rights by making remarks to me to impose a prior restraint on my testimony in that same hearing

as he also unlawfully didn't extend me the same latitude that he accorded to Ms. Garnett to make

a short opening statement for my testimony without interruption by him at a time that he was

then running for election to become a member of the U.S. Congress while I sought to use that

hearing for the dual purpose of presenting testimony that was directly relevant to the agenda of

that hearing and to showcase the fact that Mr. Torres was clearly unfit to be a member of the City

Council and the U.S. Congress.

- **Excerpt from _Del Gallo v. Parent_**:

  "The essence of a viewpoint discrimination claim is that the government has
  `intentionally tilt[ed] the playing field for speech.'" _Ridley v. Mass. Bay Transp.
  Auth.,_ 390 F.3d 65, 88 (1st Cir.2004). As the Supreme Court has noted, the government
  may not "license one side of a debate to fight freestyle, while requiring the other to
  follow Marquis of Queensberry rules." _R.A.V. v. City of St. Paul,_ 505 U.S. 377, 392, 112
  S.Ct. 2538, 120 L.Ed.2d 305 (1992).

  In addition to demonstrating "a pattern of unlawful favoritism," _Thomas v. Chi. Park
  Dist.,_ 534 U.S. 316, 325, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002), a plaintiff alleging
  viewpoint discrimination in this circuit must show invidious intent on the part of the
  relevant government officials. _See McGuire v. Reilly,_ 386 F.3d 45, 63 (1st Cir.2004).[23]
  Ultimately, such a challenge depends "on the factual evidence provided as to how the
  statutory scheme has in fact operated vis-á-vis the plaintiff[ ]." _Id._

8.      The following are relevant excerpts from _Piesco v. City of New York, Dept. of Personnel,_

933 F.2d 1149 (2d Cir. 1991):

  a.      "A court is required to accept as true a plaintiff's allegation that retaliatory actions
          by the City of New York were precipitated by prior testimony he or she gave to a
          committee."

  b.      "Summary "judgment is inappropriate when `questions of motive predominate in
          the inquiry about how big a role" "protected behavior played in" causing an
          adverse action to occur.""

  c.      "Without a searching inquiry into these motives, those intent on punishing the
          exercise of constitutional rights could easily mask their behavior behind a
          complex web of post hoc rationalizations.

  d.      "The Supreme Court has recognized that one of the critical purposes of the first
          amendment is to provide society with a basis to make informed decisions about
          the government."

  e.      The "first amendment guarantees that debate on public issues is "`uninhibited,
          robust, and wide open'".

  f.      "Whatever differences may exist about interpretations of the First Amendment,

there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated*, and all such matters relating to political processes."

g.    Speech "on matters of public concern is that speech which lies `at the heart of the First Amendment's protection'".

9.    The excerpt that follows that is from *Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) confirms that First Amendment protections apply to anonymous expression and points out that a speaker's message and reach can be amplified and extended in a variety of ways that include through the use of Internet chat rooms. Another way that a speaker's message can be amplified and extended is by testifying in public hearings that are recorded on video that is broadcast over the Internet and by attending town hall meetings that are also recorded on video that is broadcast over the Internet.

- **_Excerpt from Arista Records, LLC v. Doe 3_:**

    The relevant First Amendment principles are also well established. The Supreme Court has recognized that the First Amendment provides protection for anonymous speech. *See, e.g., Buckley v. American Constitutional Law Foundation, Inc.,* 525 U.S. 182, 199-200, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999); *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 341-342, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995); *see also NAACP v. Alabama,* 357 U.S. 449, 462, 466, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (compelled disclosure of membership list would impinge on First Amendment right of association). In the context of political speech, the Supreme Court has recognized that "[a]nonymity is a shield from the tyranny of the majority," *McIntyre,* 514 U.S. at 357, 115 S.Ct. 1511. The Court has also recognized that the Internet is a valuable forum for the exchange of ideas. *See, e.g., Reno v. ACLU,* 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox.").

10.   The following excerpt from *McCutcheon v. Federal Election Com'n*, 134 S. Ct. 1434, 572 U.S. 185, 188 L. Ed. 2d 468 (2014) emphasizes the importance of First Amendment rights that correspond to individuals that include critics and whistleblowers who testify in public hearings

and attempt to attend public town hall meetings and public resource fair meetings to speak out

publicly about matters of both public and private concern at times that lead up to government

elections and at other times as well:

> "The First Amendment "is designed and intended to remove governmental
> restraints from the arena of public discussion, putting the decision as to what
> views shall be voiced largely into the hands of each of us, ... in the belief that no
> other approach would comport with the premise of individual dignity and choice
> upon which our political system rests." _Cohen v. California,_ 403 U.S. 15, 24, 91
> S.Ct. 1780, 29 L.Ed.2d 284 (1971). As relevant here, the First Amendment
> safeguards an individual's right to participate in the public debate through political
> expression and political association. See _Buckley,_ 424 U.S., at 15, 96 S.Ct. 612.
> When an individual contributes money to a candidate, he exercises both of those
> rights: The contribution "serves as a general expression of support for the
> candidate and his views" and "serves to affiliate a person with a candidate." _Id.,_ at
> 21-22, 96 S.Ct. 612.
>
> Those First Amendment rights are important regardless whether the individual is,
> on the one hand, a "lone pamphleteer[] or street corner orator[] in the Tom Paine
> mold," or is, on the other, someone who spends "substantial amounts of money in
> order to communicate [his] political ideas through sophisticated" means. _National
> Conservative Political Action Comm.,_ 470 U.S., at 493, 105 S.Ct. 1459. Either
> way, he is participating in an electoral debate that we have recognized is "integral
> to the operation of the system of government established by our
> Constitution." _Buckley, supra,_ at 14, 96 S.Ct. 612."

11.     The following excerpt from _In re Kaiser,_ 722 F.2d 1574 (2d Cir. 1983) about mendacity

and a fraudulent pretext is particularly applicable to my claims in this action that concern Ritchie

Torres' grounds for interrupting the testimony that I presented during the public hearing that he

conducted for the City Council's Committee on Oversight and Investigations, terminating my

testimony without according me proper due process, and causing me to be coerced to leave that

room as that meeting continued while Mr. Torres illegally turned off a microphone in front of

him as he made remarks to his colleagues in that room that were required by the New York City

Charter and New York State's Open Meetings Law to have been properly recorded and

transcribed in writing:

"the cumulative effect of all the falsehoods together evidences a pattern of reckless and cavalier disregard for the truth serious enough to supply the necessary fraudulent intent required"

12.    The following excerpt from *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) further discusses mendacity in the context of discriminatory intent:

"The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination,[4] and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is *required,* " 970 F. 2d, at 493 (emphasis added). But the Court of Appeals' holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff disregards the fundamental principle of Rule 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the "ultimate burden of persuasion.""

13.    The following is a pertinent excerpt from *Regional Economic Community v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002) that concerns discriminatory intent and how it may be inferred:

"Discriminatory intent may be inferred from the totality of the circumstances, including ... the historical background of the decision ...; the specific sequence of events leading up to the challenged decision ...; [and] contemporary statements by members of the decision-making body...." *LeBlanc,* 67 F.3d at 425 (citations and internal quotation marks omitted)."

14.    The following excerpt from the U.S. Supreme Court's decision in *Buckley v. American Constitutional Law Foundation, Inc.,* 525 U.S. 182, 119 S. Ct. 636, 142 L. Ed. 2d 599 (1999) addresses the public's interest in government accountability and transparency that Defendants Torres, Perez, and Lin all flagrantly violated on 11/13/19 in regards to me:

"[a] public armed with information . . . is better able to detect" wrongdoing. See *id.,* at 67; see also *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250 (1936) (observing that an "informed public opinion is the most potent of all restraints upon misgovernment"). "'Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is

said to be the best of disinfectants; electric light the most efficient policeman.' " *Buckley v. Valeo, supra,* at 67, and n. 80 (quoting L. Brandeis, Other People's Money 62 (1933))."

15.    The following additional excerpt from *Piesco v. City of New York*, Dept. of Personnel

showcases the fact a remark that Defendant Torres blatantly lied to me during the public hearing

that he conducted on 11/13/19 for the City Council's Committee on Oversight and Investigations

by fraudulently telling me that I didn't have a legal right to testify to the City Council:

> "In *Patteson v. Johnson*, 721 F.2d 228, 231-33 (8 Cir.1983), a case factually analogous to
> the instant one, the court recognized the plaintiff's interest in testifying about pending
> legislation before a legislative committee and in responding to questions posed by state
> senators. Concluding that testimony before a legislative committee touched upon issues
> of significant public concern, the court directed that "special attention" be given to the
> nature of plaintiff's speech on remand. Id. at 232-33. The court articulated the proper
> balancing of interests when a public employee testifies before a legislative committee:
> "the disruptive effect of [plaintiff's] legislative testimony upon the employment
> relationship [should be weighed] against **[plaintiff's] right to testify upon pending
> legislation**, his obligation to respond truthfully to legislative questioning, the public
> interest relating to the matter in controversy, and whether or not it was essential that
> [plaintiff] speak out ... without fear of retaliatory dismissal." *Id*. at 233. Applying these
> factors on remand, the district court concluded that the plaintiff's interest in testifying
> before the legislative committee outweighed the state's countervailing interest. *Patteson
> v. Johnson*, 787 F.2d 1245, 1248 (8 Cir.) (discussing district court's opinion with
> approval), *cert. denied*, 479 U.S. 828 (1986). The district court reasoned that "`[a]s a
> citizen ... [plaintiff] had a legitimate and substantial interest in speaking his support for
> the proposed legislation and to speak truthfully in direct response to questions....'" *Id*.
> (quoting district court's memorandum decision). The district court added that plaintiff's
> testimony was "a matter of substantial public concern.""

(boldface formatting added for emphasis)

16.    On a related note, *Kittay v. Giuliani*, 112 F. Supp. 2d 342 (S.D.N.Y. 2000) confirms that

"individuals have a right to communicate directly to government officials".

17.    Similarly, *Doe v. City of New York*, No. 18-cv-670 (ARR)(JO) (E.D.N.Y. Jan. 9, 2020)

confirms that "[t]he right to criticize public officials is at the heart of the First Amendment's right

of free speech" and that a corresponding right exists to do so "without reprisal".

18.    In *McCutcheon v. Federal Election Com'n*, 134 S. Ct. 1434, 572 U.S. 185, 188 L. Ed. 2d

468 (2014), the U.S. Supreme Court issued the following key ruling against governmental

restraints on First Amendment expression:

> "The First Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, ... in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." Cohen v. California, 403 U.S. 15, 24, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). As relevant here, the First Amendment safeguards an individual's right to participate in the public debate through political expression and political association. See Buckley, 424 U.S., at 15, 96 S.Ct. 612."

19.     In Hoefer v. Board of Education of the Enlarged City School District Of Middletown, No.

10 Civ. 3244 (ER) (S.D.N.Y. June 6, 2017), U.S. District Judge Edgardo Ramos stated the

following about viewpoint discrimination:

> ""[s]uspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own." Nat'l Council of Arab Americans, Act Now to Stop War & End Racism Coal. v. City of N.Y., 478 F. Supp. 2d 480, 491 (S.D.N.Y. 2007) (quoting Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 86 (1st Cir. 2004))."

20.     The following excerpt from Dayton v. City of Marco Island, No. 2: 20-cv-307-FtM-

38MRM (M.D. Fla. May 26, 2020) directly applies to my claims against Defendant Torres in this

action that pertain to First Amendment retaliation and viewpoint discrimination that he subjected

me to as I testified to him on 11/13/19 during the public hearing that the City Council's

Committee on Oversight and Investigations conducted:

> "the Complaint alleges it is common for Citizens' Comments to remark on city councilors. During that session, Plaintiffs sought to criticize the Councilor's conduct, which was allegedly relevant to the city council and presumably not on the agenda. The Rules appear to allow for such comments so long as the citizen exercises decorum. And Plaintiffs allege they were "peaceful" and did not intend "to incite or attack anyone." (Doc. 3 at 4). Yet when Plaintiffs started speaking, Brechnitz prevented any speech about the Councilor and limited all comment to "policy issues." (Doc. 3 at 3). Later, Brechnitz admitted he violated the Rules by not allowing Plaintiffs to speak. Those allegations plausibly support the inference that the reason Plaintiffs were prevented from speaking was unconstitutional viewpoint discrimination."

21.     The following are relevant excerpts from *Mnyofu v. Board of Education of Rich Township High School District 227*, No. 15 C 8884 (N.D. Ill. Apr. 5, 2016) that also directly correspond to my claims against Mr. Torres in this action that pertain to First Amendment retaliation and viewpoint discrimination that he subjected me to as I testified to him on 11/13/19 during the public hearing that the City Council's Committee on Oversight and Investigations conducted:

    a.  "Mnyofu submitted with his motion for a preliminary injunction an audio-visual recording of the board meeting at which he alleges Defendants violated his First Amendment rights. The recording shows that Mnyofu began speaking at time 2:06:51. About two minutes and 44 second later, at time 2:09:35, Mnyofu began to criticize certain individuals by name. At that point, Board President Bass asked for the microphone to be turned off, for the security guard to stop Mnyofu from speaking, and for the police to be called. Mnyofu continued to speak for about another three minutes, until time 2:12:31, at which point he left the meeting."

    b.  "Mnyofu has moved for a preliminary injunction, R. 7, and Defendants have moved to dismiss Mnyofu's claims. R. 21."

    c.  "Mnyofu's allegation and the evidence on the recording establish a reasonable likelihood that the Board meetings are designated public forums and Defendants restriction of Mnyofu's speech was content-based. Any final determination of these questions requires addressing facts regarding the circumstances of the meetings, which are questions that cannot be settled based on Mnyofu's allegations and the recording alone. *See Ovadal,* 416 F.3d at 538; *see also Galena v. Leone,* 638 F.3d at 203; *Boardley,* 615 F.3d at 515. Since there is a reasonable likelihood that Mnyofu can show that Defendants' policy will not withstand scrutiny under the First Amendent, his motion for a preliminary injunction is granted."

22.     The following excerpt from *Endemann v. City of Oneida*, No. 5: 19-CV-1444 (MAD/ATB) (N.D.N.Y. Apr. 6, 2020) is also relevant for my claims against Defendant Torres:

    "While the Council was permitted to exclude certain types of speech, once expressive activities of a certain genre were allowed, others of the same genre could not be prohibited. *See Hotel Emps.,* 311 F.3d at 545-46. Making all reasonable inferences in Plaintiffs' favor, as the Court must, it is reasonably likely that the Council had let other members of the public speak on a variety of issues before preventing Plaintiff Kyle Endemann from speaking. Additionally, it is worth noting that only after Plaintiff Endemann began to speak was the statement prohibiting discussion of 214

Driftwood Drive read. *See* Dkt. No. 2 at ¶ 96. This alleged prohibition, however, would not have prohibited Plaintiff Kyle Endemann from voicing concern about the conduct of city officials, as was his intent. *See id.* at ¶ 98. Such speech, which addresses public issues and political matters, could be considered the type that "lies at the heart of protected speech." *Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999).

The Court finds Plaintiffs have plausibly alleged that Defendants City and Chamberlain selectively denied Plaintiff Kyle Endemann the opportunity to engage in protected speech after allowing speech of a similar genre. *See Hotel Emps.,* 311 F.3d at 545-46. Accordingly, Defendants' motion to dismiss Plaintiff Kyle Endemann's First Amendment claim is denied as to Defendants City and Chamberlain."

23.  *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187 (D. Conn. 2005) is a court decision by former Second Circuit judge Christopher Droney while he was a U.S. District Court judge. The following findings in it that address the right members of the public had to comment "on possible unethical conduct of a high level town employee during the unrestricted "public comment" portion of a regularly scheduled meeting" applies to my claims against Defendant Torres:

> "Although the chair of a public meeting is permitted to ensure that comments be relevant to the topic at hand, *see, e.g., Zapach v. Dismuke,* 134 F.Supp.2d 682, and there are circumstances where privacy interests may require not identifying particular persons subject to the public comment, *see, e.g., Schuloff v. Murphy,* 159 F.3d 1348, 1998 WL 536394 (2d Cir.1998), vague references to a collective bargaining agreement or a state freedom of information law likely would not justify stopping a member of the public from commenting on possible unethical conduct of a high level town employee during the unrestricted "public comment" portion of a regularly scheduled meeting of a town's board of selectmen. Accordingly, to the extent the motion for summary judgment is directed at Piscottano's claim that her right to free speech was violated, it is denied."

24.  *Hansen v. Harris*, 619 F.2d 942 (2d Cir. 1980) addresses government estoppel and is relevant to the fact that before I testified on 11/13/19 in the public hearing that Mr. Torres conducted for the City Council's Committee on Oversight and Investigations, Mr. Torres and other New York City Councilmen and New York City Councilwomen violated rules that the City Council established as well as provisions of the New York City Charter that I sufficiently

identified, discussed in detail earlier in this complaint, and substantiated through the use of video recordings. In short, Mr. Torres was equitably barred from being able to object to how I conducted myself that includes the sum and substance of the remarks that I made as I testified in the public hearing that he conducted for the City Council's Committee on Oversight and Investigations, This is largely because he previously, repeatedly, and flagrantly violated rules that the City Council established as I testified to him on 3/26/19 during the public hearing that he conducted for City Council's Committee on Oversight and Investigations.

> "The Government may sometimes be estopped from enforcing its rules, based on the conduct of its agents."

25.     On a related note, the following findings from _Capitol Records, Inc. v. Thomas-Rasset, 692 F.3d 899 (8th Cir. 2012)_ confirm that a court has the power to enjoin certain otherwise lawful conduct that is certainly appropriate relief for me to be granted insofar as my claims in this action are concerned:

> "a district court has authority to issue a broad injunction in cases where "a proclivity for unlawful conduct has been shown." _See McComb v. Jacksonville Paper Co., 336 U.S. 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949)_. The district court is even permitted to "enjoin certain otherwise lawful conduct" where "the defendant's conduct has demonstrated that prohibiting only unlawful conduct would not effectively protect the plaintiff's rights against future encroachment." _Russian Media Grp., LLC v. Cable America, Inc., 598 F.3d 302, 307 (7th Cir.2010)_ (citing authorities). If a party has violated the governing statute, then a court may in appropriate circumstances enjoin conduct that allowed the prohibited actions to occur, even if that conduct "standing alone, would have been unassailable." _EEOC v. Wilson Metal Casket Co., 24 F.3d 836, 842 (6th Cir.1994)_ (internal quotation omitted)."

26.     What follows is a long excerpt from _Karem v. Trump_, No. 19-CV-5255 (D.C. Cir. June 5, 2020) that addressed what is required of due process in the context of depriving people of their First Amendment, Fourth Amendment, and Fourteenth Amendment rights. This excerpt is very relevant to my claims in this action that pertain to having been illegally denied due process by having not been told **a)** specifically why Mr. Torres believed testimony that I presented during

the public hearing that he conducted on 11/13/19 for the City Council's Committee on Oversight and Investigations wasn't relevant to that hearing's agenda, **b)** why he refused to allow me to give a short opening statement for that testimony without interruption to accord me the same due process he accorded to Margaret Garnett immediately before I testified in that hearing, **c)** about the specific rule of the City Council that Mr. Torres contended I violated during that hearing, **d)** about any sanction that would be imposed upon me before it was imposed let alone what the magnitude of that sanction would be, **e)** why Mr. Torres urged me to keep my testimony focused on the agenda of that hearing to antagonize me right before I testified in it and why he hadn't treated Ms. Garnett in such a rude manner during that hearing before she testified in it by urging her to do the same. Additionally, this excerpt certainly pertains to my claims in this action that concern having been illegally barred from entering City Hall's grounds on 11/13/19 because I was never warned that I would possibly be subjected to that before I was illegally barred from entering City Hall's grounds by both Defendants Perez and Lin.

- **Excerpt from _Karem v. Trump_:**

  "A fundamental principle in our legal system," the Supreme Court observed in _FCC v. Fox Television Stations, Inc._, 567 U.S. 239 (2012), "is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." _Id_. at 253. Such "[e]lementary notions of fairness," the Court explained in _BMW of North America, Inc. v. Gore_, 517 U.S. 559 (1996), "dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that [the government] may impose." _Id_. at 574. "This requirement of clarity[,] . . . essential to the protections provided by the Due Process Clause of the Fifth Amendment," _Fox Television_, 567 U.S. at 253, "is implicated" whenever the government imposes "civil penalties," _Gore_, 517 U.S. at 574 n.22 (emphasis omitted). Where such penalties "threaten[] to inhibit the exercise of constitutionally protected rights[,] . . . a more stringent vagueness [and fair-notice] test should apply." _Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc._, 455 U.S. 489, 498–99 (1982).

  That "essential . . . protection[]" of fair notice applies here. _Fox Television_, 567 U.S. at 253. As we explained in _Sherrill_, "the interest of a bona fide Washington correspondent in obtaining a White House press pass . . . undoubtedly qualifies as [a]

liberty [interest] which may not be denied without due process of law under the fifth amendment." 569 F.2d at 130–131. And because "any deprivation" of a protected liberty interest must "be effected pursuant to constitutionally adequate procedures," *Brandon v. District of Columbia Board of Parole*, 823 F.2d 644, 648 (D.C. Cir. 1987), a duly issued hard pass may not be suspended without due process. Accordingly, "[e]lementary notions of fairness" required that Karem "receive fair notice not only of the conduct that [would] subject him to punishment, but also of the . . . magnitude of the sanction that [the White House] might impose." *Gore*, 517 U.S. at 574. Furthermore, because the suspension of a hard pass, like the denial of a hard pass, "implicate[s]" "important first amendment rights," *Sherrill*, 569 F.2d at 130, we evaluate Karem's suspension under a particularly "stringent vagueness [and fair-notice] test," *Village of Hoffman Estates*, 455 U.S. at 498–99.

Applying that test, we think Karem's due process claim is likely to succeed because, on this record, nothing put him on notice of "the magnitude of the sanction"—a month-long loss of his White House access, an eon in today's news business—that the White House "might impose" for his purportedly unprofessional conduct at the non-press-conference event. *Gore*, 517 U.S. at 574.

27.    The decision that the Second Circuit issued in <u>*Knight First Amendment Inst. Columbia v.*</u> <u>*Trump*, 928 F.3d 226 (2d Cir. 2019)</u> confirms that government officials are prohibited from using Twitter accounts that are registered to the to block people from them when such government officials use such accounts to establish public forums on the Internet. However, Ritchie Torres, Donovan Richards, and Chaim Deutsch illegally continued to block a Twitter account that is registered to me after that decision was issued as they subjected me to viewpoint discrimination, First Amendment retaliation, and standardless discretion by doing so while depriving me of al alternate time, place, and manner to petition for redress and criticize them by doing so. Currently, the Knight First Amendment Institute at Columbia University is opposing Donald Trump's efforts to avoid losing a legal fight at the U.S. Supreme Court in which he is trying to have the Second Circuit's decision in that case reversed.  While opposing him in that fight, the Knight First Amendment Institute at Columbia University has filed an opposition brief with the U.S. Supreme Court that is available on the Internet that is available from the U.S. Supreme Court's web site at <u>https://www.supremecourt.gov/DocketPDF/20/20-</u>

197/154505/20200921141934655_20-197 BIO.pdf. The following are a pair of excerpts from

that opposition brief that is dated 9/21/20 and corresponds to the case number of 20-197 that are

relevant to my claims in this action:

    a.    "But the courts have never suggested that a city councilor, for example, may eject her critics from a public meeting because as a private citizen she has the right to eject her critics from a backyard barbecue."

    b.    "A government official may be expressing a viewpoint by barring a critic from a town hall or city council meeting, but this does not mean that the act is properly characterized as government speech. If the space is a public forum, the First Amendment protects the right of the critic to criticize."

28.    The following is a pertinent excerpt from _Hershey v. Kansas City Kansas Community College_, No. 2: 16-cv-2251-JTM (D. Kan. Feb. 17, 2017) that addresses standardless discretion

and confirms that plaintiffs aren't required to allege that they were subjected to discrimination

because of the content of their views and expression:

> As plaintiff points out, he has alleged that he was denied access to a public forum "for unstated reasons, in accordance with no policy, and at the absolute discretion of College officials." Dkt. 1, ¶ 50. He alleges that the College "has no policy to specify any standards by which College officials approve or deny requests," and that the College "vests absolute, standardless discretion in College officials" to allow or deny requests to use facilities for expressive activities. _Id._ ¶¶ 41, 42. Additionally, he alleges that the Board of Trustees and defendants Long and Wynn were acting as policymakers for the College at all relevant times. Finally, plaintiff has spelled out how a municipal policy or custom — in this instance, the _absence_ of any standards governing exercise of discretion on requests to use College facilities — caused the deprivation of First Amendment rights alleged in the complaint.
>
> **Because plaintiff has alleged that access to the public forum is based on "standardless discretion" of College officials, he need not show that he was discriminated against based on the content of his materials.** "A government regulation that allows arbitrary application is `inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" _Forsyth Cty., Ga. v. Nationalist Movement,_ 505 U.S. 123, 130 (1992) (cite omitted). Government regulation of access to a public forum must have definite standards because "if the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of ... First Amendment freedoms is too great to be permitted." _Id._ at 131

(internal quotation marks and citations omitted); *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 649 (1981) (awarding space on a first-come, first-served basis "is not open to the kind of arbitrary application that this Court has condemned as inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.")

Plaintiff has also adequately alleged the existence of a municipal policy or custom giving rise to liability under 42 U.S.C. § 1983. A municipal policy may be shown by an informal custom amounting to a widespread practice that is so permanent and well settled as to constitute a custom or usage. *See Bryson v. City of Okla. City,* 627 F.3d 784, 788 (10th Cir. 2010). To withstand a motion to dismiss on such a theory, a plaintiff must allege: 1) the existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the municipality's employees; 2) deliberate indifference to or tacit approval of such misconduct by the municipality's policymaking officials after notice to the officials of that particular misconduct; and 3) that the plaintiff was injured by virtue of the unconstitutional acts pursuant to the custom, with the custom being the "moving force" behind the acts. *Gates v. Unif. Sch. Dist. No. 449,* 996 F.2d 1035, 1041 (10th Cir. 1993). Viewed in the light most favorable to plaintiff, the complaint alleges the existence of a persistent custom of vesting absolute discretion in College officials to grant or deny access to the public forum, knowledge of and tacit approval of the impermissible practice by College policymakers, and injury to plaintiff caused by the custom. Defendants' motion to dismiss the claim against the College is therefore denied.

(boldface formatting added for emphasis)

29.    The following are relevant excerpts from *Housing Works, Inc. v. Turner*, 00 Civ. 1122 (LAK)(JCF) (S.D.N.Y. Sept. 15, 2004) that address proving retaliation and violations of equal protection and are relevant to my claims in this action that concern First Amendment retaliation, viewpoint discrimination, and violations of my Fourth Amendment equal protection and due process rights as well as prohibitions against **a)** selective-enforcement that corresponds to the class-of-one legal theory that is predicated upon an illegitimate animus and **b)** discrimination through unequal treatment at public forums in furtherance of a campaign of retaliation and harassment against me by New York City government personnel.

a.    "A plaintiff's circumstantial evidence of retaliation could include the timing of the defendant's actions, such as when the alleged retaliation closely follows the plaintiff's speech. Morris, 196 F.3d at 110; McCullough v. Wyandanch Union

Free School District, 187 F.3d 272, 280 (2d Cir. 1999). The plaintiff can also proffer evidence of unequal treatment, or an ongoing campaign of retaliation. Hampton Bays Connections, Inc. v. Duffy, 127 F. Supp. 2d 364, 374 (E.D.N.Y. 2001); Economic Opportunity Commission of Nassau County, Inc. v. County of Nassau, 106 F. Supp. 2d 433, 437 (E.D.N.Y. 2000) (citing Gagliardi v. Village of Pawling, 18 F.3d 188, 195 (2d Cir. 1994))."

b.   "To prove an Olech-type equal protection claim, the plaintiff must show that there was "no rational basis" for the differential treatment it suffered. Wantanabe, 315 F. Supp. 2d at 396. The Second Circuit has not decided whether an Olech claim also requires a showing a illicit motive or intent on the part of the defendant."

30.   The following excerpt from Robar v. Village of Potsdam Board of Trustees, No. 8: 20-CV-0972 (LEK/DJS) (N.D.N.Y. Sept. 21, 2020) concerns a case in which the plaintiff was able to be granted a preliminary injunction in response to violations of his or her First Amendment rights and is relevant to relief that I seek to be granted in this action:

""Violations of the First Amendment are presumed irreparable." Tunick v. Safir, 209 F.3d 67, 70 (2d Cir. 2000). The Supreme Court has declared that "the loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Bery, 97 F.3d at 693 ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction."); Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984) (noting that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," and collecting cases)."

31.   The following is a relevant excerpt from Walsh v. Enge, 154 F. Supp. 3d 1113 (D. Or. 2015) that makes it clear that the judge who issued it refused to accept the practice of prospectively barring someone from public forums without proper due process first being accorded to such a person:

"This case requires the Court to decide whether the First Amendment allows a Mayor or his or her designee, acting pursuant to a city ordinance, to exclude a person, potentially indefinitely, from attending future City Council meetings to which the public is otherwise invited to attend and present their opinions simply because the person has been disruptive at previous meetings. The First Amendment protects, among other things, "freedom of speech" and "petitioning for a governmental redress of grievances." U.S. Const. amend. I. The First Amendment is incorporated into the Fourteenth Amendment and thus applies to

the states and local governmental bodies. *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). No appellate opinion of which this Court is aware has ever held that the First Amendment permits prospective exclusion orders from otherwise public city council meetings. A presiding officer may remove a disruptive individual from any particular meeting, and a sufficiently disruptive person may even be prosecuted for such conduct if public law permits. But no matter how many meetings of a city council a person disrupts, he or she does not forfeit or lose the future ability to exercise constitutional rights and may not be prospectively barred from attending future meetings. Our democratic republic is not so fragile, and our First Amendment is not so weak."

32.    The following are relevant excerpts from *Frain v. Baron*, 307 F. Supp. 27 (E.D.N.Y. 1969) that pertains to my claims in this action:

   a.    "Fear of disorder, which the City cites to justify its policy, has been ruled out as a ground for limiting peaceful exercise of First Amendment rights. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963)."

   b.    "Supreme Court decisions involving the exercise of First Amendment rights in non-school contexts support plaintiffs' position here. In Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966), involving a sit-in in a segregated public library, the court stated that the right of free speech is not confined to verbal expression but includes

      "the right in a peaceable and orderly manner to protest by silent and reproachful presence, *in a place where the protestant has every right to be."* (Emphasis added.)"

33.    New York City Charter §45 includes the terms that are shown next that confirm that eery

second of the public hearing that Ritchie Torres conducted on 11/13/19 for the City Council's

Committee on Oversight and Investigations was required to have been fully transcribed and that

the written transcript that would be prepared from that entire hearing as a result of arrangements

that the City Council needed to be made available for public inspection for free within 60 days

after that hearing:

- **Excerpt from New York City Charter §45**:

   "shall keep a public journal of its proceedings; shall make a complete transcript of each of its meetings and committee hearings available for public inspection free of charge within sixty days after such meeting or hearing"

34.     New York State's Open Meetings Law is comprised of sections of New York State's

Public Officers Law that include New York State's Public Officers Law §100, 102, 103, 104,

and 107.

35.     New York State's Public Officers Law §100 is a legislative declaration and states the

following:

> "It is essential to the maintenance of a democratic society that the public business
> be performed in an open and public manner and that the citizens of this state be
> fully aware of and able to observe the performance of public officials and attend
> and listen to the deliberations and decisions that go into the making of public
> policy. The people must be able to remain informed if they are to retain control
> over those who are their public servants. It is the only climate under which the
> commonweal will prosper and enable the governmental process to operate for the
> benefit of those who created it."

36.     New York State's Public Officers Law §102 concern definitions and includes the

following relevant terms the following:

> "As used in this article: 1. "Meeting" means the official convening of a public
> body for the purpose of conducting public business, including the use of
> videoconferencing for attendance and participation by the members of the public
> body.
>
> 2. "Public body" means any entity, for which a quorum is required in order to
> conduct public business and which consists of two or more members, performing
> a governmental function for the state or for an agency or department thereof, or
> for a public corporation as defined in section sixty-six of the general construction
> law, or committee or subcommittee or other similar body of such public body."

37.     New York State's Public Officers Law §103 includes the following relevant terms:

> (a) Every meeting of a public body shall be open to the general public, except that
> an executive session of such body may be called and business transacted thereat
> in accordance with section ninety-five of this article.
>
> (b) Public bodies shall make or cause to be made all reasonable efforts to ensure
> that meetings are held in facilities that permit barrier-free physical access to the
> physically handicapped, as defined in subdivision five of section fifty of the
> public buildings law.

(c) A public body that uses videoconferencing to conduct its meetings shall provide an opportunity for the public to attend, listen and observe at any site at which a member participates.

* (d) Public bodies shall make or cause to be made all reasonable efforts to ensure that meetings are held in an appropriate facility which can adequately accommodate members of the public who wish to attend such meetings.

* NB There are 2 sub (d)'s

(d)      1. Any meeting of a public body that is open to the public shall be open to being photographed, broadcast, webcast, or otherwise recorded and/or transmitted by audio or video means. As used herein the term "broadcast" shall also include the transmission of signals by cable.

           2. A public body may adopt rules, consistent with recommendations from the committee on open government, reasonably governing the location of equipment and personnel used to photograph, broadcast, webcast, or otherwise record a meeting so as to conduct its proceedings in an orderly manner. Such rules shall be conspicuously posted during meetings and written copies shall be provided upon request to those in attendance.

38.     New York State's Public Officers Law §104 states the following:

1. Public notice of the time and place of a meeting scheduled at least one week prior thereto shall be given or electronically transmitted to the news media and shall be conspicuously posted in one or more designated public locations at least seventy-two hours before such meeting.

2. Public notice of the time and place of every other meeting shall be given or electronically transmitted, to the extent practicable, to the news media and shall be conspicuously posted in one or more designated public locations at a reasonable time prior thereto.

3. The public notice provided for by this section shall not be construed to require publication as a legal notice.

4. If videoconferencing is used to conduct a meeting, the public notice for the meeting shall inform the public that videoconferencing will be used, identify the locations for the meeting, and state that the public has the right to attend the meeting at any of the locations.

5. If a meeting will be streamed live over the internet, the public notice for the meeting shall inform the public of the internet address of the website streaming such meeting.

6. When a public body has the ability to do so, notice of the time and place of a meeting given in accordance with subdivision one or two of this section, shall also be conspicuously posted on the public body's internet website.

39.     New York State's Public Officers Law §107 includes the following terms that focus on a court's power to void public meetings that were conducted in violation of New York State's Open Meetings Law:

   1. Any aggrieved person shall have standing to enforce the provisions of this article against a public body by the commencement of a proceeding pursuant to article seventy-eight of the civil practice law and rules, or an action for declaratory judgment and injunctive relief. In any such action or proceeding, if a court determines that a public body failed to comply with this article, the court shall have the power, in its discretion, upon good cause shown, to declare that the public body violated this article and/or declare the action taken in relation to such violation void, in whole or in part, without prejudice to reconsideration in compliance with this article. If the court determines that a public body has violated this article, the court may require the members of the public body to participate in a training session concerning the obligations imposed by this article conducted by the staff of the committee on open government.

   2. In any proceeding brought pursuant to this section, costs and reasonable attorney fees may be awarded by the court, in its discretion, to the successful party. If a court determines that a vote was taken in material violation of this article, or that substantial deliberations relating thereto occurred in private prior to such vote, the court shall award costs and reasonable attorney's fees to the successful petitioner, unless there was a reasonable basis for a public body to believe that a closed session could properly have been held.

40.     New York State's Public Officers Law §110 addresses a construction of New York State's Open Meetings Law with other laws and states the following:

   1. Any provision of a charter, administrative code, local law, ordinance, or rule or regulation affecting a public body which is more restrictive with respect to public access than this article shall be deemed superseded hereby to the extent that such provision is more restrictive than this article.

   2. Any provision of general, special or local law or charter, administrative code, ordinance, or rule or regulation less restrictive with respect to public access than this article shall not be deemed superseded hereby.

   3. Notwithstanding any provision of this article to the contrary, a public body may

adopt provisions less restrictive with respect to public access than this article.

41.   New York City Charter §1116 states the following:

a.      a. Any council member or other officer or employee of the city who shall wilfully violate or evade any provision of law relating to such officer's office or employment, or commit any fraud upon the city, or convert any of the public property to such officer's own use, or knowingly permit any other person so to convert it or by gross or culpable neglect of duty allow the same to be lost to the city, shall be deemed guilty of a misdemeanor and in addition to the penalties imposed by law and on conviction shall forfeit such office or employment, and be excluded forever after from receiving or holding any office or employment under the city government.

b.      Any officer or employee of the city or of any city agency who shall knowingly make a false or deceptive report or statement in the course of duty shall be guilty of a misdemeanor and, upon conviction, forfeit such office or employment.

42.   New York City Charter §1063(d) states the following:

"Each city agency, committee, commission and task force and the council shall record or cause to be recorded in digital video format its meetings and hearings, or portions thereof, that are required to be public pursuant to article seven of the public officers law, provided that this section shall not apply to community boards or local school boards. Such recordings shall be webcast live, where practicable, and **shall be** archived and **made available to the public on the city's website or on the website of such agency, committee, commission, task force, or council, not more than seventy-two hours after adjournment of the meeting or hearing recorded**."

(boldface formatting added for emphasis)

43.   42 USC §1986 includes the following relevant terms:

"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action"

44.   NYPL §195.00 concerns official misconduct and includes the following relevant terms:

A public servant is guilty of official misconduct when, with intent to obtain a benefit or deprive another person of a benefit:

1. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized; or

2. He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.

Official misconduct is a class A misdemeanor.

## STATEMENT OF FACTS

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      In this section, I will refer to video recordings that are listed in the following table that includes links to copies of them on the Internet in support of my claims in this action:

| # | Filename | Date & Time Created | Internet Link |
|---|----------|--------------------|--------------| 
| 1 | IMG_1376.MOV | 11/13/19 a 10:18 am | https://drive.google.com/file/d/1mH14Ap-JyKD9bcp2FtR7ZkbxInCsy4fP/view?usp=sharing |
| 2 | IMG_1377.MOV | 11/13/19 a 10:53 am | https://drive.google.com/file/d/1slFHA-LnEVn0gWD55fAojrhi_96Y-kQP/view?usp=sharing |
| 3 | IMG_1378.mov | 11/13/19 a 10:57 am | https://drive.google.com/file/d/1n_Xyfdva2Qq7JH6frCMveslPkQR-fP2z/view?usp=sharing |
| 4 | IMG_1379.MOV | 11/13/19 a 11:01 am | https://drive.google.com/file/d/1885pdliXY-q61ALzDqa3gHeXnRT3MsKR/view?usp=sharing |
| 5 | IMG_1380.MOV | 11/13/19 a 11:08 am | https://drive.google.com/file/d/1iUHdQM5PGHH5kYU2OfXBAeflP-qPA_ee/view?usp=sharing |

3.      The illegal acts and omissions that were committed against me on 11/13/19 **a)** in the room in which the City Council's Committee on Oversight and Investigations conducted a public hearing at 250 Broadway in Manhattan and **b)** by the Broadway entrance to City Hall were a microcosm of a much larger, pervasive, systemic, and longstanding campaign and pattern of

illegal customs, practices, and policies that included flagrant violations of my First Amendment and Fourteenth Amendment rights that were jointly devised, coordinated, implemented, executed, and condoned by senior members of the City Council who were policy-making personnel that include Defendants Ritchie Torres and Rafael Perez. Such acts and omissions against me were in relation to my efforts to lawfully **c)** attend and testify in the public hearing that the City Council's Committee on Oversight and Investigations conducted on 11/13/19 and **d)** access City Hall's grounds and enter City Hall's building on 11/13/19 after 11 am and lawfully exercise the entirety of my constitutional rights while doing so.

4.      Prior to 11/13/19, the City Council published a report as a single PDF file that is available from its web site at

https://legistar.council.nyc.gov/View.ashx?M=A&ID=735560&GUID=0CBE62D1-630C-4203-BC6B-496892ABDEDC that described the agenda for the public hearing that Ritchie Torres conducted on 11/13/19 for the City Council's Committee on Oversight and Investigations in which I briefly testified. The next screenshot is from that PDF file that shows how that agenda was described:

| T2019-5346 | Oversight - Tracking Agency Cooperation with Investigations |
| Int 1440-2019 | A Local Law to amend the administrative code of the city of New York, in relation to requiring the department of investigation to create a web application to track and assess agency cooperation and compliance with investigations and recommendations |

5.      Prior to, during, and after that hearing, I was actively involved in conducting investigations of HRA, the NYPD, and other New York City government agencies while they were mostly refusing to fully cooperate with me. While conducting such investigations, I sought

assistance from Ritchie Torres on 3/26/19 as I talked with him while testifying to him during the public hearing that he conducted in the Committee Room in City Hall.  Testimony that I began to present and would have otherwise continued to present on 11/13/19 during the public hearing that Mr. Torres conducted for the City Council's Committee on Oversight and Investigations partly concerned deceitful remarks that he made to me on 3/26/19 as I testified to him and entirely valid complaints that I previously reported to DOI against HRA, Urban, the NYPD, and others that DOI didn't bother to investigate and instead referred to HRA and otherwise didn't adequately investigate. This sufficiently establishes that such testimony that I presented on 11/13/19 during the public hearing that Mr. Torres conducted for the City Council's Committee on Oversight and Investigations was relevant because the sum and substance of such testimony concerned the fact that Mr. Torres and DOI had both proven that they were untrustworthy, unreliable, complacent, incompetent, and apathetic about abuse by New York City government agencies, New York City government personnel, and business partners of New York City government agencies that allowed problems caused by them to persist and worsen due to non-existent or otherwise grossly inadequate and untimely oversight. In short, it was my intent to present a short opening statement on 11/13/19 during that City Council hearing as I testified in it that I would use to publicize the incompetence and untrustworthiness of Torres and DOI before moving on to other testimony that would focus on the technical requirements for an application that would track and assess cooperation and compliance by New York City government agencies with investigations that DOI was supposed to conduct and couldn't be trusted to conduct and otherwise do so properly.

6.      Although the following members of the City Council were members of the City Council's Committee on Oversight and Investigations on 11/13/19, they didn't bother to attend

that hearing in defiance of my First Amendment and Fourteenth Amendment due process and equal protection right to testify to them that other members of the public have when those members of the City Council have bothered to attend other public hearings that committee conducted:

Rory Lancman, Carlina Rivera, Rafael Salamanca, Jr.

7.      While I attended the public hearing that the City Council's Committee on Oversight and Investigations conducted on 11/13/19, two whistleblower news censors in journalism named Rich Lamb and Samar Khurshid also attended it. Mr. Khurshid continued to attend that hearing as I briefly testified in it. Neither Mr. Lamb nor Mr. Khurshid nor the organizations that then employed them reported anything in the news about my presence at that hearing. Mr. Lamb then worked for and organization named WCBS880 and Mr. Khurshid then worked for an organization named Gotham Gazette. The next table shows images of them at the elapsed times in the video recording that has the filename of "IMG_1376.mov" that I recorded on 11/13/19 at 10:18 am in the room in which Ritchie Torres conducted the public hearing for the City Council's Committee on Oversight and Investigations in which I testified.

| | Image | Elapsed Time |
|---|---|---|
| Rich Lamb |  | 29 seconds |

| Samar Khurshid |  | 16 seconds |
|---|---|---|

8.      The elapsed time of 10 seconds in the video recording that I just discussed also recorded an image of the first page of the order that U.S. District Judge Lorna Schofield issued on 9/30/19 in the ongoing and related case of _Komatsu v. City of New York_, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) in which I'm the plaintiff that I was then looking at as I was considering incorporating information in that court decision in the testimony that I would present by sarcastically asking Mr. Torres how soon and precisely how I could use the application that DOI would design to track New York City government agency cooperation with investigations that DOI conducted to read about how it likely irresponsibly didn't properly investigate entirely valid complaints that I reported to both him and DOI against HRA, the NYPD, and others. The case of _Komatsu v. City of New York_, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) concerns a public town hall meeting that the Mayor conducted on 4/27/17 with New York City Councilman Jimmy Van Bramer in Long Island City in Queens at which I was criminally assaulted by a member of the NYPD on a nearly empty public sidewalk as members of the Mayor's NYPD security detail witnessed and condoned that as that occurred after the head of the Mayor's NYPD security detail (NYPD Inspector Howard Redmond) and members of the Mayor's staff illegally prevented me from exercising my constitutional right to attend that town hall meeting in retaliation for entirely valid litigation that I commenced in January of 2017 that was filed with the New York State Supreme Court in Manhattan against HRA that continued to be ongoing on 4/27/17 as well as protected whistleblowing that I otherwise engaged in against HRA, HRA

Commissioner Steven Banks, business partners of HRA, and others. The illegal acts and omissions that were committed against me on 4/27/17 that caused me to be prevented from attending that town hall meeting amounted to voter suppression, voter fraud, and whistleblower retaliation as the Mayor used that town hall meeting as a campaign event to attract publicity and goodwill from the public to boost his re-election prospects for the 2017 New York City government elections. Following that date, I continued to be illegally barred from attending additional public forums that the Mayor conducted with members of the City Council and others as the Mayor and others mostly continued to use them as campaign events and violate the Hatch Act and my constitutional rights by barring me from attending them and otherwise restricting my attendance to overflow rooms that were used by them to try to prevent me from being able to lawfully directly, indirectly, and widely communicate my views against the Mayor and his administration as well as the Mayor's NYPD security detail and HRA and its business partners to voters, potential voters, and political rivals of the Mayor and others who attended those public forums and otherwise watched the video recordings that were recorded of them from within the rooms in which they were conducted as they were conducted. One of those public forums was the public town hall meeting that Ritchie Torres conducted on 10/4/17 with the Mayor in the Bronx while I greatly intensified and expanded the scope of both **a)** such whistleblowing to have it cover illegal acts and omissions that were committed against me at public forums that the Mayor conducted with others and **b)** my claims in my lawsuit against HRA that continued to be ongoing to have it cover claims about my illegal exclusion from such public forums. I personally apprised Mr. Torres on 3/26/18, 3/18/19, and 3/26/19 that I was illegally barred and ejected from public forums that the Mayor conducted. I also apprised DOI about that prior to 11/13/19.

9.      The next screenshot is from the elapsed time of 36 minutes and 53 seconds of the video

recording that the City Council arranged to be recorded of the public hearing that was conducted on 11/13/19 by its Committee on Oversight and Investigations in which I briefly testified. Mr. Torres is shown in this screenshot as he was then making a series of very odd facial expressions that were comprised of bizarre jaw and lip movements he was making while he wasn't speaking that hindsight and a totality of the circumstances strongly suggests were indications of anxiety he then felt about the sum and substance of the testimony that I was about to lawfully present at his expense during that hearing.



10.     Concerning this point, unspoken body language that people exhibit that include smirks, eye-twitching, rolling one's eyes, glaring at someone, sarcastic smiles, crossing one's arms, crossing fingers and otherwise raising a middle finger behind one's back, etc. certainly reveals a lot about how people truly feel about various matters while often betraying verbal remarks that they make.

**Violations of my constitutional rights on 11/13/19 as I testified in the public hearing that the New York City Council's Committee on Oversight and Investigations conducted:**

11.     At the elapsed time of 37 minutes and 1 seconds in the video recording that the City

Council arranged to be recorded of the public hearing that was conducted on 11/13/19 by its

Committee on Oversight and Investigations in which I briefly testified, Mr. Torres is clearly

heard making the following remark to me that I immediately regarded as antagonistic an

unwarranted on account of the fact that he hadn't made a similar remark to Margaret Garnett

during that hearing as she was about to testify in it right before me:

        "and I would urge you to remain on topic to the extent that you can"

12.     By urging me in the specific manner in which he did so right before I testified in that

hearing, Mr. Torres didn't explicitly nor implicitly indicate that I couldn't discuss matters that

were not related to that hearing's agenda. His remark instead clearly meant that most of my

testimony during that hearing should be directly related to the agenda for that hearing. If Mr.

Torres had complied with my legal right to have testified I that hearing without interference by

anyone, he would have learned that the overwhelming majority of my testimony in that hearing

would have been directly relevant to that hearing's agenda.

13.     In response to Mr. Torres having discriminated against me during that hearing by trying

to impose a prior restraint on it through the remark he made to me that I just discussed that he

didn't utter to Ms. Garnett during that hearing, I immediately responded to that harassment by

him by saying the following to him:

        "I always am, unlike you."

14.     When I made that remark, I was largely referring to the fact that he repeatedly violated

my due process rights as I testified during the public hearing that he conducted on 3/26/19 for the

City Council's Committee on Oversight and Investigations by using a cell phone instead of

paying proper attention to my testimony then. By doing so then, he wasn't remaining on topic to

the detriment of my due process right to be heard and my First Amendment right to petition for

redress.

15.      The following shows the remarks that I made next beginning at the elapsed time of 37

minutes and 7 seconds in that video as I testified in that hearing before Mr. Torres interrupted me

at the elapsed time of 37 minutes and 17 seconds in that video:

> "After testifying to you on March 26, 2018 and March 26, 2019 and otherwise talking
> with you outside of City Hall, I have every reason to believe that you lied to me about
> commitments you made in relation to my testimony and otherwise...

16.      Just 10 seconds was the length of time that Mr. Torres gave me to testify in that hearing

before decided to engage in witness tampering in violation of NYPL §215.10, First Amendment

and whistleblower retaliation, viewpoint discrimination, standardless discretion, abuse of

process, and an illegal prior restraint on my First Amendment rights in violation of New York

City Charter §1116, NYPL §195.00, Mr. Torres' constitutional oath as an employee of the City

of New York, my First Amendment and Fourteenth Amendment due process and equal

protection rights, the Fourteenth Amendment's prohibitions against selective-enforcement and

discrimination, New York State's Open Meetings Law, and 5 U.S.C. §1502(a)(1) as he used a

fraudulent pretext for that purpose by lying to me as he fraudulently stated the following:

> "Sir, your testimony is irrelevant to the subject of the hearing."

17.      Although I heard him say that, I immediately knew that he was lying and that I had a

legal right pursuant to the First Amendment, Fourteenth Amendment, and New York State's

Open Meetings Law to ignore him, remain where I was, and continue with my testimony. As a

result, I did exactly that by picking up where I left off with my testimony as I stated the

following at the elapsed time of 37 and 19 seconds in the video recording of that hearing before

Mr. Torres again immediately engaged in witness tampering by interrupting me as he rhetorically

asked Defendant Sgt. Bradley to remove me from that room in violation of NYPL §215.10, New York City Charter §1116, NYPL §195.00, Mr. Torres' constitutional oath as an employee of the City of New York, my First Amendment and Fourteenth Amendment due process and equal protection rights, the Fourteenth Amendment's prohibitions against selective-enforcement and discrimination, New York State's Open Meetings Law, 5 U.S.C. §1502(a)(1), NYPL §240.20, 18 U.S.C. §245(b)(5), 42 U.S.C. §1985, 18 U.S.C. §241, NYPL §240.26, NYPL §240.65, NYPL §1116 as he continued to illegally subject me to First Amendment and whistleblower retaliation, viewpoint discrimination, standardless discretion, abuse of process, and an illegal prior restraint on my First Amendment rights while I was continuing to conduct myself in an entirely lawful manner in contrast to him:

> "Legal and ethical…"

18.     Although I heard him say that, for the same reasons that I discussed above, I knew that I had a constitutional right to ignore Mr. Torres, remain exactly where I was, and continue to lawfully present my testimony. As a result, I did exactly that by picking up where I left off with my testimony as I stated the following at the elapsed time of 37 and 20 seconds in the video recording of that hearing until the elapsed time of 37 minutes and 28 seconds in that video as Mr. Torres was heard continuing to make remarks to illegally interrupt my testimony:

> responsibilities and having not intervened on my behalf and those of other military veterans and New Yorkers whose interest in my conversations with you have also been…

19.     At the elapsed time of 37 minutes and 28 seconds in that video, Defendant Sgt. Bradley is shown as he stood in front of where I sat as he began to illegally coerce me to leave that room by telling me that I needed to leave that room while I was conducting myself in an entirely lawful manner in contrast to Mr. Torres. At that same time, Mr. Torres is heard lying in that video by

stating the following to me:

> "Sir, your testimony is irrelevant to the subject of the hearing."

20.     Through that remark to me then, Mr. Torres was again using a fraudulent pretext as he again engaged in witness tampering against me in violation of NYPL §215.10, First Amendment and whistleblower retaliation, viewpoint discrimination, standardless discretion, abuse of process, and an illegal prior restraint on my First Amendment rights in violation of New York City Charter §1116, NYPL §195.00, Mr. Torres' constitutional oath as an employee of the City of New York, my First Amendment and Fourteenth Amendment due process and equal protection rights, the Fourteenth Amendment's prohibitions against selective-enforcement and discrimination, New York State's Open Meetings Law, and 5 U.S.C. §1502(a)(1).

21.     At the elapsed time of 37 minutes and 30 seconds in that video, I'm heard stating the following to Mr. Torres in response to his fraudulent claim that my testimony wasn't relevant to the subject of that hearing:

> "It Is. Excuse me, I have a First Amendment right to testify and you are violating that."

22.     At the elapsed time of 37 minutes and 34 seconds in that video, Mr. Torres lied by stating the following as he fraudulently claimed that I didn't have a legal right to testify to the City Council:

> "You have no right to testify before the City Council. That's not. You have a right to speak wherever you want, but this Council has rules and if you refuse to comply with those rules, then we're done here. Thank you."

23.     The next screenshot is from the elapsed time of 37 minutes and 36 seconds as Mr. Torres made the preceding remarks and was smiling as he did so and contradicted himself about my First Amendment right to speak where I wanted to. That discredited his own claim in which he

fraudulently claimed that I didn't have a legal right to testify to the City Council. He also never

identified a specific rule that he was then fraudulently claiming I was violating by how I

conducted myself during that hearing.



24.    Defendant Jane Doe 11/13/19 is shown in the preceding screenshot as she made a point

of holding her head with her right hand while flagrantly violating 42 USC §1986 and New York

City Charter §1116 with Defendants Sgt. Bradley, Keith Powers, Kalman Yeger, and Diana

Ayala by not making any attempt to get Mr. Torres to immediately stop interrupting my

testimony in that hearing to enable me to finish my testimony and decisively prove that the

remainder of it was certainly directly relevant to that hearing's agenda.

25.    The next screenshot is from the elapsed time of 37 minutes and 45 seconds and shows

Defendant Sgt. Bradley as he stood in front of where I sat and made it perfectly clear through his

words to me and his presence that he would arrange for me to be forcibly removed from that

room if I didn't immediately exit it. That coerced me to reluctantly leave that room on my own

and lawfully wait directly outside of it to confront Mr. Torres and other members of the City

Council as they exited it to demand an immediate, detailed, and credible explanation about why

Mr. Torres interrupted my testimony, terminated it, and directed Defendant Sgt. Bradley to have

me removed from that room. By having cooperated with Mr. Torres to illegally coerce me to exit

that room instead of having properly punished Mr. Torres for flagrantly and repeatedly violating

my constitutional right to attend and testify in that hearing without interruption, Defendant Sgt.

Bradley did so without any immunity and violated NYPL §215.10, New York City Charter

§1116, his constitutional oath as an employee of the City of New York if he is one instead of a

contractor, my First Amendment and Fourteenth Amendment due process and equal protection

rights, my Fourth Amendment rights by using coercion through a show of authority to force me

to leave that room, the Fourteenth Amendment's prohibitions against selective-enforcement and

discrimination, New York State's Open Meetings Law, NYPL §240.20, 18 U.S.C. 245(b)(5), 42

U.S.C. §1985, 42 U.S.C. §1986, 18 U.S.C. §241, NYPL §240.26, NYPL §240.65, as he

continued to illegally subject me to First Amendment and whistleblower retaliation, standardless

discretion, abuse of process, and an illegal prior restraint on my First Amendment rights while I

was continuing to conduct myself in an entirely lawful manner in contrast to him and Mr. Torres.

26.      As I walked out of that room, Mr. Torres illegally turned off the microphone in front of

him at the elapsed time of roughly 37 minutes and 57 seconds in spite of the fact that hearing

was still continuing and was required to have been recorded on video and fully transcribed. By

doing so, he violated all of the following:

    a.      My First Amendment and Fourteenth Amendment due process and equal

            protection right to receive information that would have otherwise been recorded

            by the video recording of that hearing and the written transcript that was prepared

from it.

b.      5 U.S.C. §1502(a) and New York State's Open Meetings Law.

c.      NYPL §175.25, NYPL §240.65, 18 U.S.C. §1512, 18 U.S.C. §1519, NYPL
        §240.26, New York City Charter §1116, NYPL §195.00, 42 U.S.C. §1985, 18
        U.S.C. §241.

d.      Spoliation of evidence pertaining to the remarks that he and his colleagues were
        then making throughout the duration of that hearing that didn't end until the
        elapsed time of 38 minutes and 57 seconds in the video recording of that hearing
        at which point Mr. Torres announced that hearing was adjourned and struck a
        gavel to signify that point that is reflected in the following screenshot from that
        video:



27.      At the elapsed time of 38 minutes and 47 seconds in that video, Mr. Torres is heard

making a remark about a mental health program that is known as "Thrive NYC" while the

microphone in front of him continued to be turned off. It is objectively reasonable to infer from

the totality of the circumstances that he was mocking me by that remark in spite of the fact that

he thereafter made remarks following the conclusion of that hearing on a different date as he

claimed to have mental health problems that included suicidal tendencies as well as substance

abuse problems. I'm referring to remarks that he made for a news article that is entitled "He's

About to Be the First Openly Gay Black Member of Congress — and He's Talking About

Mental Health Like Few Politicians Ever Have" that was written by Addy Baird and published

on the Internet on 10/27/20 at https://www.buzzfeednews.com/article/addybaird/ritchie-torres-

congress-democrats-mental-health-coronavirus by a news organization named Buzzfeed.

28.      At the elapsed time of 39 minutes and 18 seconds in that video, Mr. Torres is heard

making another remark about the program that is known as "Thrive NYC" that the Mayor's wife

lead. As he made that remark, he did so near a microphone that was turned on. The following

was the remark that he made then as it's objectively reasonable to infer from the totality of the

circumstances that he did so to try to subject me to stigma-plus defamation to cause me

reputational harm as he was likely then referring to me by that remark:

         "This demonstrates the fairy of Thrive NYC."

29.      That remark caused at least one other unknown person who stood near Mr. Torres then to

laugh in response.

30.      At the elapsed time of 39 minutes and 34 seconds in that video, Mr. Torres is heard

saying the following to someone about Mr. Torres' efforts then to become a member of the U.S.

Congress while they weren't shown in that video:

"One of my opponent's plan…"

31.   At the elapsed time of 39 minutes and 36 seconds in that video, someone who I believe

was Defendant Yeger is heard saying the following to Mr. Torres in response while they weren't

shown in that video:

"You don't have opponents."

32.   The discussion that follows concerns what is shown and heard in the video recording that

has the filename of "IMG_1377.MOV" that I recorded as I stood just outside of the room in

which I briefly testified during the public hearing that the City Council's Committee on

Oversight and Investigations conducted on 11/13/19. That video begins as Defendant Sgt.

Bradley stood directly in front of me and the entrance to that room as I provided narration for

that video that I addressed to U.S. District Judge Lorna Schofield as I stated the following to

describe what just happened as I testified during that public hearing:

"Judge Schofield, this is Towaki Komatsu. I just tried testifying to Ritchie Torres in
there. Um…he illegally violated my First Amendment right to testify in a public
hearing. Um…this was an oversight committee hearing. I conducted myself
lawfully."

33.   As I continued to record that video, I asked Defendant Sgt. Bradley his name at the

elapsed time of 17 seconds. However, he ignored my question. I then followed up that question

to him by telling him that he directed me to leave that hearing and that I sought to get his name

in order to continue to comply with his order. He still ignored my request for his name in

response and told me at the elapsed time of 29 seconds that I could talk with his supervisor

instead.

34.   At the elapsed time of 33 seconds in that video, I'm heard asking Defendant Ayala the

following as she exited that room:

"Ms. Ayala, could you please explain to me which rule I violated?"

35.     In response, she is shown and heard at the elapsed time of 36 seconds in that video as she said the following to me and laughed before walking away:

        "I'm sorry. I have no idea what just happened"

36.     At the elapsed time of 39 seconds in that video, I'm heard asking Mr. Torres the following as he exited that room:

        "So yeah, Ritchie…what did I do? What did I do wrong?"

37.     He didn't say anything to me in response and instead smiled mischievously in a manner as he walked away. That smile clearly suggested malice on his part toward me during that hearing. The next screenshot is from the elapsed time of 41 seconds in that video and shows how he then smiled as he exited that room.



38.     At the elapsed time of 42 seconds in that video, I'm heard asking Defendant Powers the

following as he exited that room:

        "Mr. Powers, do you want to explain that to me?"

39.     In response, he told me that he wasn't the chairman of the City Council's Committee on

Oversight and Investigations and walked away.

40.     At the elapsed time of 46 seconds in that video, I'm heard asking Defendant Yeger the following as he exited that room:

> "But Kalman, if I was testifying lawfully, why was I…why was I kicked out?"

41.     In response, he initially said the following to me at the elapsed time of 53 seconds:

> "What's the question? "

42.     At the elapsed time of 54 seconds in that video, I began to repeat the question that I just asked him as I stated the following:

> "If I was just testifying from prepared testimony…"

43.     In response, Mr. Yeger said the following to me at the elapsed time of 57 seconds:

> "The committee…"

44.     As Mr. Yeger began to make his remarks to me then, the video that I was recording then recorded Mr. Torres at the elapsed time of 59 seconds as he again clearly flashed me a mischievous smile that suggested malice on his part toward me during that public hearing. He smiled at me then as he was about to enter an elevator. The next screenshot shows that smile by Mr. Torres and is an enlarged version of what appears in that video.



45.     At the elapsed time of 57 seconds in that video, Mr. Yeger continued to respond to my

question to him by stating the following:

>    "The committee is…conducts business on germane topics… topics that are germane
>    to…"

46.     As he responded to my question, I interrupted him a few times to respond to his remarks.

I responded to the preceding remark by pointing out that the topic for the public hearing in which

I just testified was about oversight. Mr. Yeger then continued his remarks to me by stating the

following:

>    "Today…today's issue was specific to DOI."

47.     In response to those remarks, I again interrupted him by pointing out to him that the issue

that the hearing in which I just testified that was specific to DOI was about oversight matters.

48.     Mr. Yeger then continued his remarks to me at the elapsed time of 1 minute and 6

seconds in that video by stating the following:

>    "And you came in and you were talking about that Ritchie lied to you and this that…"

49.     In response to those remarks, I again interrupted him by pointing out to him that had been

testifying in that hearing about the fact that Mr. Torres lied to me about oversight matters.

50.     Mr. Yeger then continued his remarks to me by stating the following:

>    "It doesn't…I understand your point, but that's not what today's business was.
>    Today's business was not about oversight in general. Today's business was specific
>    to DOI…"

51.     In response to those remarks, I again interrupted him by pointing out to him that the

agenda for the hearing in which I just testified had been about oversight insofar as that concerned

cooperation between New York City government agencies and DOI.

52.     In response to my having interrupted him yet again, Mr. Yeger rhetorically asked if I had

a question for him and I apologized for interrupting him. He then resumed responding to my

question by stating the following at the elapsed time of 1 minute and 24 seconds in that video:

> "Today's topic was specific to a bill that was being heard and if you had written testimony, you wanted to submit, that's fine. But, you came in and were like, 'Ritchie lied, Ritchie lied'. That's not…that's not the way the Council works…the way any government body works."

53.    In response to those remarks, I again interrupted him by telling him that he was incorrect about that by saying, 'It is" as I was referring to the fact that I had a First Amendment right to testify about the untrustworthiness of Mr. Torres that corresponded to my view that he had no business being the Chairman of the City Council's Committee on Oversight and Investigations due to a lack of character and integrity on his part that should have disqualified him from being able to continue to be its chairman.

54.    Mr. Yeger then responded to my remark by stating the following at the elapsed time of 1 minute and 37 seconds in that video:

> "I'm a straight-shooter. Everyone who knows me knows I'm a straight-shooter ."

55.    In response to those remarks, I again interrupted him by telling him that I was aware he was a straight-shooter before I said the following to him about Mr. Torres as I was referring to the fact that Mr. Torres broke commitments that he made to me prior to 11/13/19 that fueled my criticism of Mr. Torres as I testified during that 11/13/19 public hearing:

> "But, I mean if someone makes a commitment to you…"

56.    Mr. Yeger then cut off my remark by stating the following:

> "If you want to come to the Council and talk about a specific bill and how this bill would be better or worse…"

57.    In response to those remarks, I again interrupted him by telling him that I would have presented such feedback during that 11/13/19 public hearing at a later point in my testimony. I then again apologized for interrupting him as I told him that I had a really bad habit of doing so

and that I would try to shut up as he spoke.

58.     Mr. Yeger then responded by saying the following to me as he referred to Mr. Torres as the chairman of the committee in which I just briefly testified:

> "It's cool. We can talk about…I'm saying that if you want to do it, it's fine. He's a very reasonable Chair."

59.     In response to his claim that Mr. Torres was reasonable, I promptly interrupted him by telling him that Mr. Torres wasn't so. I then again apologized for interrupting him and told him that I would shut up.

60.     Mr. Yeger then responded by saying the following to me:

> "But if you come in and….you don't have to shut up. I would never tell you that. But, if you come in and you're like…you're starting off…your starting point is that Ritchie lied…the other thing…not…that's not the way you're going to…"

61.     In response to his remarks, I interrupted him again by telling him that Mr. Torres was trying to be elected to become a member of the U.S. Congress.

62.     Mr. Yeger then responded by saying the following to me about the possibility that I was then recording our conversation on video:

> "I don't know if you're recording. Let me say hello. You want me to just say hello?"

63.     The next screenshot is from the elapsed time of 2 minutes and 16 seconds in that video as Mr. Yeger waved to my cell phone's camera to express hello to whoever would watch the video recording that I was recording.



64.     Mr. Yeger then continued his remarks to me by saying the following:

        "Hi. You can talk to me without recording, all right? "

65.     I then promptly ended that video recording in response to Mr. Yeger's objections to it as

we then continued to talk for a short time.

66.     The discussion that follows concerns what is shown and heard in the video recording that

has the filename of "IMG_1378.MOV" that I recorded as I talked with Defendant Perez as we

left the building located at 250 Broadway in Manhattan in which I just briefly testified to the

City Council's Committee on Oversight and Investigations conducted on 11/13/19. That video

begins as he and I were in an elevator:

        "So, where do I get a copy of the rules that explain why I'm being escorted out of the
        building and why…"

67.     Mr. Perez was shown on the right side in that video as I asked him that and he interrupted

me at the elapsed time of 6 seconds in that video by stating the following to me:

> "There's no rule. You were asked to be sent out because the Chairman is saying – you
> can't go here (he said that in response to my having nearly exited that elevator on the
> wrong floor by mistake) "

68.     I then responded to his remarks at the elapsed time of 11 seconds by beginning to ask him

a question as follows before he interrupted me:

> "If I'm testifying in a hearing, um…how do I find out… "

69.     Mr. Perez interrupted me then by stating the following to me in response:

> "If you're testifying at a hearing and you're asked to leave because of whatever took
> place at the hearing…it's in the City Charter. "

70.     I responded to his remarks by telling him that he was wrong about what he was claiming

because that information wasn't in the City Charter.

71.     Mr. Perez then insisted that the information to which he was referring was in the City

Charter as he stated the following about his claim:

> "The Chairman will determine… if the room needs to be cleared…if somebody needs
> to be removed."

72.     I responded to his remarks by telling him the following:

> "But I'm saying if he arbitrarily makes that decision without any basis."

73.     Mr. Perez then responded to my remarks by saying the following:

> "You can check the Charter."

74.     At the elapsed time of 35 seconds in that video, I asked Mr. Perez to remind me of his

name. He told me it in response.

**Violations of my constitutional rights on 11/13/19 to access New York City Hall's property after Ritchie Torres terminated my ability to testify in the public hearing that the New York City Council's Committee on Oversight and Investigations conducted:**

75.    The discussion that follows concerns what is shown and heard in the video recording that has the filename of "IMG_1379.MOV" that I recorded as I talked with Defendants Perez and Lin as we stood in front of the Broadway entrance to City Hall. That video begins as Mr. Perez is shown while he stood in front of me and was illegally refusing to allow me to lawfully enter City Hall's grounds. In short, the following are pertinent facts about the sum and substance of what is heard and seen in that video:

   a.    I provided narration to Judge Schofield in remarks that I made in that video as I talked with Mr. Perez and otherwise about how he was then treating me.

   b.    Mr. Perez told me that I was done for that day in terms of being able to exercise my constitutional right to attend other public hearings that the City Council was conducting.

   c.    At the elapsed time of 17 seconds, Mr. Perez illegally interfered with my ability and legal right to strike up a conversation with Defendant Lin who stood nearby to apprise him that Mr. Perez was illegally preventing me from entering City Hall's grounds through a show of authority that constituted an unlawful unofficial arrest of my ability to freely move about in violation of my rights pursuant to the First Amendment, Fourth Amendment, and Fourteenth Amendment rights as well as NYPL §240.20 and other applicable laws.

   d.    At the elapsed time of 56 seconds, I'm heard asking Mr. Perez what would happen in the event that I tried to exercise my First Amendment right to walk past him to City Hall's property to talk with reporters among other things. In response,

he told me that he would order Defendant Lin to remove me from there. I told him in response that he didn't have jurisdiction over the specific area where he and I then stood as I pointed out that his jurisdiction was inside of building in which the City Council operates instead of outside of them.

e.      Mr. Perez confirmed that he was preventing me from entering City Hall's property and based his decision strictly on the his claim that Defendant Torres had directed me to end testimony that I was presenting and leave the room in which I was testifying to the City Council's Committee on Oversight and Investigations on that date before I refused to comply with that.

f.      I told Mr. Perez that he hadn't been inside of the room in which I testified to the City Council's Committee on Oversight and Investigations on that date as I testified in it mainly to establish that he didn't personally witness my interactions with Mr. Torres as I testified.

g.      He illegally impeded my First Amendment right to walk past him to have a face-to-face conversation with Dustin Ridener of the Mayor's staff from a normal distance apart from him that was about efforts that I was making to lawfully attend the public town hall meeting that the Mayor conducted on that date.

h.      At the elapsed time of 2 minutes and 53 seconds, Mr. Perez is heard telling Defendant Lin that I was not to be allowed to enter City Hall's grounds on that date.

i.      At the elapsed time of 3 minutes and 42 seconds, Mr. Perez is heard fraudulently claiming that he enforces rules in spite of the fact that I have clearly established in this complaint that he violates them instead and allows New York City

Councilmen and New York City Councilmen to do so too during public hearings that City Council committees conduct. He made that claim as he, Defendant Lin, and I stood near the NYPD guardhouse located just inside of the Broadway entrance to City Hall as I was asking Mr. Lin to arrange to have Mr. Perez' supervisor come to where all of us then were to properly sort things out on account of the fact that Mr. Perez was being irrational and Mr. Lin illegally wasn't performing his Fourteenth Amendment affirmative legal duty to intervene on my behalf against Mr. Perez to uphold my constitutional right of access to public forums with respect to City Hall's grounds and City Hall's building.

j.    He lied by claiming that I was removed from a meeting on that date instead of being accurate about that by acknowledging the fact that I exited the public hearing on my own in which I briefly testified to the City Council's Committee on Oversight and Investigations on that date in spite of the fact that I was coerced to exit that hearing.

76.    The discussion that follows concerns what is shown and heard in the video recording that has the filename of "IMG_1380.MOV" that I recorded as I talked with Defendants Perez and Lin as we stood in front of the Broadway entrance to City Hall. That video begins as Mr. Lin is shown in it while he stood next to the NYPD guardhouse that is located just inside of the entrance to City Hall by its Broadway entrance. In short, the following are pertinent facts about the sum and substance of what is heard and seen in that video:

a.    The next screenshot is from the elapsed time of 4 seconds in that video and shows Defendant Lin's NYPD shield that has the identification number of 25714. That screenshot also shows the top part of a NYPD body-camera that he was then

using. The red indicator shown in the upper-right corner of that body-camera strongly suggests that it was then recording a video of our interactions and may have also recorded the interactions that I had with him and Mr. Perez a short time earlier on that date.



## CAUSES OF ACTION

1.    I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

Page 170 of 198

**CLAIM #1:**    Violations of the First Amendment right of access to a public forum, to protest in a public forum, to record audio and video recordings in a public forum, to take photographs in a public forum, to receive information in a public forum, to have the opportunity to talk with journalists in a public forum, to distribute whistleblowing literature in a public forum, to engage in lawful assembly in a public forum, to engage in freedom of expression in a public forum, to otherwise engage in whistleblowing and criticism of government officials in a public forum, to engage in expressive association, and to petition government officials in a public forum for redress of grievances

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe 11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      I also incorporate by reference as though fully set forth herein the decision that was issued on 5/19/20 in *Dunn v. City of Fort Valley,* No. 19-cv-287(TES) (M.D. Ga. May 19, 2020) due to relevant findings it contains about First Amendment rights in public forums, supervisory liability, and other pertinent things.

3.      My right to lawfully testify in a public forum in a critical manner that doesn't disrupt how that public forum is conducted while valid time, place, and manner restrictions do not exist to prohibit such testimony in a public forum was acknowledged the following remark that Judge Schofield expressed in the decision that she issued in *Gonzalez v. City of New York*, No. 14 Civ. 7721 (LGS) (S.D.N.Y. Sept. 29, 2016):

> "Two branches of First Amendment claims are relevant to the present case: (a) interference with the right to protest in a public forum and (b) retaliation for exercising First Amendment rights."

4.      More importantly, my right to lawfully testify in a public forum in a critical manner that doesn't disrupt how that public forum is conducted while valid time, place, and manner restrictions do not exist to prohibit such testimony in a public forum was confirmed by the following excerpt from *Occupy Nashville v. Haslam*, 949 F. Supp. 2d 777 (M.D. Tenn. 2013):

"a state may not restrict First Amendment rights, absent valid time, place, or manner restriction. *See Dean,* 354 F.3d at 551; *Galvin v. Hay,* 374 F.3d 739, 751 (9th Cir.2004) (**"As speakers may generally control the presentation of their message by choosing a location for its importance to the meaning of their speech, speakers may ordinarily— absent a valid time, place and manner restriction—do so in a public forum.");** *Childs v. Dekalb Cnty., Ga.,* 286 Fed.Appx. 687, 693-94 (11th Cir.2008) (denying qualified immunity and stating that, based on Supreme Court precedent, "police officers have known for decades that protestors present on public property have a First Amendment right to peacefully express their view, in the absence of narrowly tailored ordinances restricting the time, place, or manner of the speech")."

(boldface formatting added for emphasis)

5.    Due to the facts and circumstances that I have discussed at length and with sufficient specificity in this pleading, I have decisively established that the Defendants identified above that this claim concerns were personally involved in having willfully, callously, and wantonly illegally violated my First Amendment rights in relation to my efforts to have **a)** testified completely in the public hearing on 11/13/19 in which I briefly testified to the City Council's Committee on Oversight and Investigations and **b)** thereafter accessed City Hall's grounds and areas inside of City Hall's building on 11/13/19.

6.    I have further established that Ritchie Torres or someone acting on his behalf violated my First Amendment right of access to a public forum that was established on Twitter through the use of a Twitter account registered to him by virtue of the fact that a Twitter account that was registered to me was blocked by that Twitter account. By doing so, that violated my First Amendment right to receive information, communicate information, and engage in expressive association with others by being unable to use a Twitter account that was registered to me to see tweets that were posted by that Twitter account registered to Mr. Torres, tweets that were posted by others as replies to information shown on that Twitter account registered to Mr. Torres, and reply to tweets posted by the Twitter account registered to Mr. Torres as well as tweets posted by others that were replies to tweets by that Twitter account.

7.      I have also established that Defendant Torres violated my First Amendment right to receive information by not having the microphones turned on in the room in which I testified to the City Council's Committee on Oversight and Investigations on 11/13/19 after I was coerced to leave that room after I briefly testified in it and while that hearing continued to be conducted. That circumstance prevented me from being able to clearly hear all that he and his colleagues talked about for the remainder of that hearing.

8.      I have also established that I was illegally prevented from being able to petition for redress on 11/13/19 by not being given an opportunity to talk with Mr. Perez' supervisor by the Broadway entrance to City Hall to report valid complaints against Mr. Perez, Mr. Torres, and Sgt. Bradley.

**CLAIM #2:      First Amendment Retaliation, Viewpoint Discrimination, and Standardless Discretion in Denying Access to a Public Forum**

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez,)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #3:            Violations of the Fourth Amendment**

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #4:**                    <u>**Violations of the Fifth Amendment**</u>

      (<u>A</u>gainst Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #5:**                    <u>**Violations of the Fourteenth Amendment**</u>
                      <u>**Substantive Due Process Rights**</u>

      (<u>A</u>gainst Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe
      11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

3.      Defendants Jane Doe 11/13/19, Powers, Yeger, and Ayala are liable for this claim

because they shirked their duty pursuant to 42 USC §1986 to have tried to intervene on my

behalf against Defendant Torres during the public hearing in which I briefly testified on 11/13/19

to the City Council's Committee on Oversight and Investigations.

**CLAIM #6:**                    <u>**Violations of Procedural Due Process**</u>

      (<u>A</u>gainst Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe
      11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

3.  Defendants Jane Doe 11/13/19, Powers, Yeger, and Ayala are liable for this claim because they shirked their duty pursuant to 42 USC §1986 to have tried to intervene on my behalf against Defendant Torres during the public hearing in which I briefly testified on 11/13/19 to the City Council's Committee on Oversight and Investigations.


**CLAIM #7:**              **Violations of the Fourteenth Amendment**
**Equal Protection Rights**

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe 11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

3.  Defendants Jane Doe 11/13/19, Powers, Yeger, and Ayala are liable for this claim because they shirked their duty pursuant to 42 USC §1986 to have tried to intervene on my behalf against Defendant Torres during the public hearing in which I briefly testified on 11/13/19 to the City Council's Committee on Oversight and Investigations.


**CLAIM #8:**              **Violations of the Fourteenth Amendment**
**Prohibitions Against Selective-Enforcement**

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #9:**             <u>**Failure to Intervene in Violation of the**</u>
                          <u>**Fourteenth Amendment**</u>

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe 11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #10:**             <u>**Failure to Train and Supervise**</u>

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe 11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

3.      It stands to reason that the individual defendants also had a duty to train and supervise one another. Such supervision recently led the members of the City Council to conduct a vote that caused Andy King to be expelled from the City Council.

**CLAIM #11:**     <u>**Violation of the New York State's Open Meetings Law**</u>

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe
11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.


**CLAIM #12:**                              **Abuse of Process**

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe
11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.


**CLAIM #13:**                              **Deliberate Indifference**

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe
11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.


**CLAIM #14:    Fraudulent Misrepresentation and Fraudulent Inducement**

(Against Defendants City of New York, Torres, Perez, Yeger)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #15:      Violation of New York State General Business Law 349**

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Yeger)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

3.      In addition to what I have stated in this complaint, Defendants Perez and Sgt. Bradley engaged in deception by subjecting me to punishment on 11/13/19 in spite of the fact it was Defendant Torres who was totally out of line as I testified to the City Council's Committee on Oversight and Investigations.

4.      Mr. Lin engaged in deception by suggesting that Mr. Perez was the supervisor of the specific area where I talked with both of them as they stood next to one another on 11/13/19.

5.      Mr. Yeger engaged in deception by claiming that Mr. Torres is reasonable and that I wasn't permitted to testify in the manner that I did so on 11/13/19 to the City Council's Committee on Oversight and Investigations.

**CLAIM #16:                    Negligence**

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe 11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.


**CLAIM #17:**                                   **Municipal Liability**

**(Against Defendant City of New York)**

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      Defendant City of New York is liable for this claim due to the information that I

presented in this complaint.


**CLAIM #18:**      **Intentional and Negligent Infliction of Emotional Distress**

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.


**CLAIM #19:**                          **Conspiracy to Violate Civil Rights and**
                                         **Cover-Up Such Abuse**

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe
11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

3.      My claims that concern a cover-up are due to the fact that the microphones were turned off in the room in which I briefly testified to the City Council's Committee on Oversight and Investigations on 11/13/19 between the time when I was coerced to leave that room and that hearing ended.

**CLAIM #20:**                    **Unjust Enrichment**

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe 11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #21:**                    **Public and Private Nuisance**

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe 11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #22:**          **Violations of the Hatch Act (see 5 U.S.C. §1502(a)(1))**

(Against Defendants City of New York, Torres, Sgt. Bradley, Perez, Lin, Jane Doe 11/13/19, Powers, Yeger, Ayala)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

## DEMAND FOR A JURY TRIAL

1.      I demand a trial by jury in this action on each and every one of my damage claims.

## PRAYER FOR RELIEF

WHEREFORE, this Court should accept jurisdiction over this entire matter and grant me

additional relief by:

1.      Declaring that Defendant Ritchie Torres violated New York City Charter §1116 on

11/13/19 by how he treated me during the public hearing that he conducted for the City

Council's Committee on Oversight and Investigations in relation to my claims against him in this

action and ordering the City of New York to immediately terminate his employment and bar him

from working for it again.

2.      Restraining Defendant Ritchie Torres from working for the U.S. Congress between 2020

and 2024 to function as a measure of punitive damages and equitable relief that is designed to

prevent the very same person who willfully and maliciously caused irreparable harm to my First

Amendment and Fourteenth Amendment freedoms in a public hearing in which I briefly testified

to him on 11/13/19 to be able to enjoy ill-gotten fruits he achieved by engaging in acts that

constituted voter suppression and whistleblower retaliation on 11/13/19 as I testified to him.

Such relief will serve as an effective deterrent against similar and further abuse by him and other

government personnel.

3.      Granting me equitable and injunctive relief pursuant to 28 U.S.C. §2201 and FRCP Rule

65 by causing me to be exempt from any law, rule, and regulation that Defendant Ritchie Torres

has been and may continue to be involved in being enacted following 11/12/19 to not allow the

very same person who flagrantly violated my constitutional rights to be able to add insult to the

irreparable harm to my First Amendment freedoms that he caused me to be able to have any

control over how I live my life through legislation that he was involved in being enacted on and

after 11/13/19.

4.      Empaneling a jury to hear and decide this case strictly on its merits.

5.      Declaring that New York City Charter §49 is an unlawful prior restraint on the First

Amendment right to communicate directly to government officials and to petition for redress and

is therefore void.

6.      Declaring that all who testify in public hearings that the City Council conducts must be

provided an opportunity to give a short opening statement that may last up to one minute or as

long as others in those same hearings are permitted to give opening statements – whichever is

longer - in which they may not be interrupted without their consent and may freely choose what

they wish to then state.

7.      Ordering Defendant City of New York to make certain that both the NYPD and security

personnel who work for the City Council immediately act in accordance with 42 U.S.C. **§**1986

and New York City Charter **§**45 by intervening on behalf of those who testify in public hearings

that the City Council conducts to enable them to do so without interruption by members of the

City Council in instances in which members of the City Council interrupt their testimony during

the period in which those who testify are given to do so as such interruptions occur without their

consent while they testify in such hearings in accordance with their First Amendment and

Fourteenth Amendment rights and the findings in *Piesco v. City of New York, Dept. of*

*Personnel*, 933 F.2d 1149 (2d Cir. 1991).

8.      Ordering Defendant City of New York to have the City Council to immediately establish

a procedure that enables those who testify in public hearings that it conducts to be able to present

pertinent video recordings, reports, photographs, audio recordings, on large computer monitors

or televisions screens in conjunction with testimony that they give during such hearings by

having City Council personnel make arrangements prior to such hearings to have them setup in

the rooms that will host such hearings in a way that will enable the entire audience at such

hearings to be able to clearly and easily see and hear what is projected from those devices as

people testify in such hearings and use them with a laptop computer to be provided by the City

Council for that purpose while that laptop is connected to them due to arrangements that City

Council personnel make.

9.      Ordering Defendant City of New York to have the City Council to immediately establish

a procedure that enables those who testify in public hearings that it conducts to be able to

sufficiently pre-test such equipment that is setup by City Council personnel prior to the start of

such hearings to minimize possible technical problems that may otherwise arise with such

equipment as they testify.

10.     Restraining the City of New York from allowing public hearings that are scheduled to be

conducted by the City Council to have the rooms in which they are scheduled to be conducted

changed after public notices are issued about them that identify the room in which they will be

conducted.

11.     Ordering Defendant City of New York to make certain that all public hearings that are

conducted by the City Council have the video recordings that are recorded of them as a result of

arrangements that the City Council makes to be available on the Internet for the public to watch

no later than 3 calendar days after such hearings end.

12.     Ordering Defendant City of New York to compel all members of City Council committees to attend public hearings that such committees conduct to the extent that they are assigned to such committees for the entirety of those hearings and to pay proper attention to everyone who testifies in them throughout the duration of their testimony by maintaining eye contact on those who testify as they do so.

13.     Ordering Defendant City of New York to **a)** terminate the assignment of members of the City Council within 24 hours to committees of the City Council to which they're assigned in instances in which such members of the City Council fail to attend public hearings that are conducted by such committees for the entire duration of them, **b)** bar such members of the City Council from being reassigned to those committees within one year, and **c)** bar such members of the City Council from being assigned to other City Council committees for one year.

14.     Ordering the City of New York to immediately and permanently prohibit members of the City Council from having cell phones, pagers, and tablet computers with them in the rooms in which public hearings are conducted by the City Council while such hearings are being conducted and to strictly enforce this by **a)** requiring members of the City Council to walk through metal detectors to be setup at the entrances to such rooms, **b)** authorizing those who testify in such hearings to immediately confiscate any such devices that are found to be in the possession of members of the City Council during such hearings within the rooms in which they're conducted and deposit them in a basin that must be setup in that room by City Council personnel and filled with 1 gallon of corrosive salt water, and **c)** prohibiting anyone from touching that basin and devices that are deposited in it for 30 minutes after they are deposited in it.

15.     Ordering the City of New York to immediately make certain that all New York City

Councilmen and New York City Councilwomen who attend public hearings that the City Council conducts in which members of the public can testify keep their hands on top of the table in front of where they sit throughout the duration of the testimony that is presented during such hearings to minimize their ability to secretly engage in behavior that distracts their attention from those who testify in such hearings as such testimony is presented.

16.     Ordering the City of New York to immediately make certain that no members of the City Council nor members of the press are permitted to have beverages with them in public hearings that the City Council conducts until such time that everyone who attends such hearings are permitted to have the same types of beverages with them when they attend such hearings.

17.     Ordering the City of New York to immediately cause the written transcripts that are prepared from the public hearings that the City Council conducts as a result of arrangements that the City Council makes to be entirely accurate.

18.     Ordering the City of New York to immediately establish a procedure that enables those who testify in public hearings that the City Council conducts to have **a)** corrections made within 3 calendar days to the written transcripts that are prepared from the public hearings that the City Council conducts as a result of arrangements that the City Council makes and **b)** the corrected versions of those transcripts to then be uploaded to the City Council's web site to allow the public to access them within 24 hours after such corrections are made to those transcripts.

19.     Ordering the City of New York to widely and prominently publicize the following types of procedures within 24 hours and continuously thereafter for those who testify in public hearings that City Council conducts and watch video recordings of such hearings:

    a.  A procedure that fully and clearly apprises those who testify in such hearings about how they can arrange to have City Council personnel to have large computer

monitors or television screens as well as a laptop computer with its USB ports

enabled to be setup for them to enable them to effectively present relevant video

recordings, audio recordings, photographs, and other reports and presentations that

include PowerPoint presentations, Excel files, Word files, e-mail messages, and PDF

files in conjunction with their testimony in such hearings to the entire audience who

attends those hearings in a way that will allow everyone in that audience to be able to

clearly and easily see and hear the information that is presented and projected on and

from them during such hearings.

b.  A procedure that fully and clearly apprises those who testify in such hearings about

how they can arrange to be able to sufficiently pre-test that equipment in the rooms in

which such hearings will be conducted prior to those hearings to try to minimize the

possibility that technical problems may arise with that equipment during their

testimony.

c.  A procedure that fully and clearly apprises those who testify in such hearings about

how they can arrange to have corrections made to the written transcripts that are

prepared from such public hearings that the City Council conducts.

20.    Ordering the City of New York to immediately implement a system that requires

everyone who testifies in public hearings that the City Council conducts to sign-up to do so on

the dates when such hearings are conducted while giving everyone equal access to the ability to

sign-up for that purpose.

21.    Ordering the City of New York to immediately apply date and time stamps that are

accurate to the nearest second to the sign-up forms that are completed by those who testify in

public hearings that the City Council conducts immediately after those who sign-up for that

purpose do so.

22.     Ordering the City of New York's personnel to cause testimony that is presented in public hearings that the City Council conducts to be in the precise order in which those people sign-up to testify in such hearings.

23.     Restraining the City of New York from allowing segregated seating to exist in the audience sections in public hearings that the City Council conducts because that impermissibly impedes opportunities for audience members to engage in non-disruptive First Amendment expression with those sitting or standing nearby.

24.     Ordering the City of New York to strongly encourage the members of the press who attend public hearings that the City Council conducts to attend them for their entire duration by immediately reassigning **a)** the entire seating areas that have been designated for the press to the general public in every room that the City Council has used inside of City Hall and at 250 Broadway in Manhattan to conduct public hearings and **b)** all other areas to the general public that the City Council has previously assigned to members of the press in rooms in which the City Council has conducted public hearings until such time that every member of the press who attends such public hearings going forward agrees to consistently attend such public hearings for their entire duration and consistently complies with that agreement.

25.     Ordering the City of New York to require its personnel who attend public hearings that the City Council conducts to attend them for their entire duration.

26.     Ordering the City of New York to allow everyone who testifies in public hearings that the City Council conducts to have an equal amount of time in which to do so.

27.     Ordering the City of New York to cause the members of the press and the members of the public who attend public hearings that the City Council conducts to have equal access to the

same number of electrical outlets that exist in the rooms in which such hearings are conducted as they're conducted.

28.     Ordering the City of New York to allow the members of the public who attend public hearings that the City Council conducts to have equal access to the government officials who attend them as they do so with respect to the level of access that members of the press have access to them as they do so.

29.     Ordering the City of New York to allow the members of the public who attend public hearings that the City Council conducts to do so at any time during which they're conducted as long as the rooms in which they're conducted and overflow rooms that may be used for them are not filled to capacity.

30.     Ordering the City of New York to allow those who wish to testify in public hearings that the City Council conducts to be able to do so remotely and live by telephone and video after the ongoing Coronavirus pandemic ends.

31.     Ordering the City of New York to allow those who wish to testify in public hearings that the City Council conducts to be able to register to do so on the dates when such hearings are conducted for all public hearings that the City Council conducts.

32.     Ordering the City of New York to implement a procedure within 24 hours that it must immediately, widely, and prominently publicize that allows anyone to obtain free copies of all unedited video recordings through the Internet that are recorded by all video security cameras controlled by the NYPD within 48 hours after they're recorded that are installed in rooms in City Hall in which public hearings are conducted with respect to the length of time that such hearings are conducted in those rooms and those who attend such hearings are in those rooms in relation to having attended those hearings.

33.     Ordering the City of New York to implement a procedure within 24 hours that it must immediately, widely, and prominently publicize that allows everyone to obtain the video recordings that were just discussed as ".mp4", ".mov", and ".avi" files without needing special software to be able to open and playback those video recordings on computers that run both Macintosh and Microsoft Windows software.

34.     Ordering the City of New York to include information with the video recordings just discussed that identifies the current date and time in those video recordings and the video security camera that recorded them.

35.     Ordering the City of New York to implement a procedure within 24 hours that it must immediately, widely, and prominently publicize that allows anyone to obtain free copies of all unedited video recordings through the Internet that are recorded by all video security cameras controlled by the NYPD within 48 hours after they're recorded that are installed in all other public areas in City Hall.

36.     Ordering the City of New York to implement a procedure within 24 hours that it must immediately, widely, and prominently publicize that allows everyone to obtain the video recordings that were just discussed as ".mp4", ".mov", and ".avi" files without needing special software to be able to open and playback those video recordings on computers that run both Macintosh and Microsoft Windows software.

37.     Ordering the City of New York to include information with the video recordings just discussed that identifies the current date and time in those video recordings and the video security camera that recorded them.

38.     Ordering the City of New York to implement a procedure within 24 hours that it must immediately, widely, and prominently publicize that allows anyone to obtain free copies of all

unedited video recordings through the Internet that are recorded by all video security cameras controlled by the NYPD within 48 hours after they're recorded that are installed elsewhere on City Hall's grounds.

39.     Ordering the City of New York to implement a procedure within 24 hours that it must immediately, widely, and prominently publicize that allows everyone to obtain the video recordings that were just discussed as ".mp4", ".mov", and ".avi" files without needing special software to be able to open and playback those video recordings on computers that run both Macintosh and Microsoft Windows software.

40.     Ordering the City of New York to include information with the video recordings just discussed that identifies the current date and time in those video recordings and the video security camera that recorded them.

41.     Ordering the City of New York to implement a procedure within 24 hours that it must immediately, widely, and prominently publicize that allows anyone to obtain free copies of all unedited video recordings through the Internet that are recorded by all video security cameras controlled by the NYPD within 48 hours after they're recorded that are installed outside of City Hall's grounds and record areas of City Hall's property.

42.     Ordering the City of New York to implement a procedure within 24 hours that it must immediately, widely, and prominently publicize that allows everyone to obtain the video recordings that were just discussed as ".mp4", ".mov", and ".avi" files without needing special software to be able to open and playback those video recordings on computers that run both Macintosh and Microsoft Windows software.

43.     Ordering the City of New York to include information with the video recordings just discussed that identifies the current date and time in those video recordings and the video

security camera that recorded them.

44.     Ordering the City of New York's personnel to grant people access to City Hall's grounds in the specific order that they arrive at its entrances by Broadway and Park Row for that purpose.

45.     Ordering the City of New York to make certain that all members of the NYPD stay at least 15 feet away from me while I lawfully attend public forums that are conducted by the City Council and Mayor.

46.     Granting me the following additional relief against the defendants individually and jointly:

a.      Compensation for violations of my constitutional rights, defamation, abuse of process, nuisance, unjust enrichment, wire fraud, and fraudulent misrepresentations as well as pain, suffering, mental anguish, and humiliation that I experienced due to the illegal acts and omissions by the defendants.

b.      Declaratory, injunctive, and equitable relief in accordance with findings expressed in _Capitol Records, Inc. v. Thomas-Rasset_, 692 F.3d 899 (8th Cir. 2012) through the issuance of an order that enjoins Defendant City's personnel and agencies from continuing to commit illegal acts and omissions against me that violate my rights.

c.      Further declaratory, injunctive, and equitable relief through the immediate issuance of an order that:

i.      Orders Defendant City to immediately cause clear audio recordings to be recorded of all verbal communications that members of the NYPD and City Council's personnel engage in while they are on-duty as such and engage in such communications by telephone and radio.

ii.     Orders Defendant City of New York to provide all such audio recordings in

unedited and non-redacted form that includes information that identifies the date and time when those recordings began to be recorded as well as the speakers heard in those communications that are personnel of Defendant City within 24 hours of any adverse encounter that occurs between **a)** members of the public and **b)** the members of the NYPD and/or members of the City Council that are heard in those audio recordings while they are being recorded.

iii.   Orders Defendant City to immediately cause all other electronic communications (such as e-mail messages, cell phone text messages, and encrypted communications) that are engaged in by members of the NYPD and members of the City Council to be recorded while such activity occurs while they're on-duty as such and to preserve that information for possible use in litigation by people that they commit illegal acts and omissions against.

iv.   Orders Defendant City to provide all such electronic communications within 24 hours in unedited and non-redacted form that includes information that identifies the date and time when those communications occurred and the identities of those who engaged in them to members of the public who have adverse encounters with members of the NYPD and members of the City Council to the extent that those communications concern those adverse encounters.

v.   Orders Defendant City to provide me copies of all communications that its personnel have had about me since 2/1/16 in unedited and non-redacted form. This includes, but is not limited to all of the following:

1)   All communications that have taken place by using personally-owned devices, personal e-mail accounts, personal encrypted

messaging accounts, and personal cell phone plans as well as by

using computers and other devices that are owned or leased by

Defendant City and e-mail, cell phone, and encrypted messaging

accounts that are administered and/or controlled by Defendant

City.

d.      Further declaratory, injunctive, and equitable relief through the immediate issuance of

an order that:

i.      Orders Defendant City to immediately cause the CCRB and DOI to be provided

all video recordings within 24 hours after a complaint is reported to them about

illegal acts and omissions that are committed by members of the NYPD and other

personnel of Defendant City that are recorded by video security cameras that

Defendant City controls. This includes, but is not limited to illegal acts that are

related to public forums that the City Council and Mayor conduct and occur on

the dates and at the locations where such public forums are conducted.

ii.      Further orders Defendant City to make those video recordings available within 24

hours in unedited and non-redacted form to those who report such illegal acts and

omissions to the CCRB and DOI.

iii.      Orders the City of New York to immediately fire the following Defendants at the

earliest possible instead of practical or convenient time from the jobs that they

hold with Defendant City of New York largely pursuant to Section 1116 of the

New York City Charter in response to the illegal acts and omissions that they

committed against me in relation to my efforts to have lawfully **a)** attended and/or

fully testified in the public hearing that the City Council's Committee on

Oversight and Investigations conducted on 11/13/19 in which I briefly testified

and **b)** exercised my First Amendment and Fourteenth Amendment right to have

accessed City Hall's grounds and City Hall on 11/13/19 after 11 am:

> Sgt. Bradley, Rafael Perez, NYPD Officer Lin, Jane Doe 11/13/19, Keith
> Powers, Kalman Yeger, and Diana Ayala

iv.     Orders the following defendants to immediately and fully reimburse the City of

New York with pre-judgment and post-judgment interest for the total value of pay

and benefits that they received that directly correspond to the length of time

during which they were involved in the illegal acts and omissions that were

committed against me in on 11/13/19 that pertain to my claims against them in

this action:

> Sgt. Bradley, Rafael Perez, NYPD Officer Lin, Jane Doe 11/13/19, Keith
> Powers, Kalman Yeger, and Diana Ayala

v.      Restrains Defendant City's personnel and agencies from continuing to commit

illegal acts and omissions against me that violate my rights, especially in all areas

that are public forums.

vi.     Restrains the City of New York from allowing the NYPD and members of the

City Council's security team from provide more security and law-enforcement to

benefit members of the press, members of the City Council, and other personnel

who work for the City of New York in public forums and other public areas than

what members of the NYPD and members of the City Council's security team

extend to all members of the public who attempt to lawfully attend public

hearings that the City Council conducts.

e.      Declaratory relief by declaring that the public hearing that the City Council's

Committee on Oversight and Investigations was a public forum that was subject to New York State's Open Meetings Law and that all actions that were taken in relation to that hearing are void pursuant to Section 107 of New York State's Public Officer Law because that public forum was conducted in violation of New York State's Open Meetings Law.

f.      Injunctive and equitable relief by ordering Defendant City to immediately provide me the following in unedited and non-redacted form:

g.      Compensation for all costs and attorney fees that are related to my pursuit of this civil action.

h.      Equitable and injunctive relief that authorizes me and others that I may ask to help me to paint, write, or draw any message or image of any size indefinitely throughout New York City without needing pre-approval from anyone on any public street, sidewalk, public passageway, concourse, and park indefinitely by using resources that will be provided to me by the City of New York for that purpose.

i.      Equitable and injunctive relief that orders the City of New York to cause its NYPD to accord whatever messages and images that I may paint, write, or draw in public areas throughout New York City to receive equal law-enforcement protection that is accorded to Black Lives Matter signs on streets in New York City, especially the one located in front of Trump Tower in Manhattan.

j.      An award of damages against the following defendants pursuant to 18 U.S.C. §1986 for having not intervened on my behalf in relation to my effort to have lawfully **a)** completed my testimony in the public hearing that the City Council's Committee on Oversight and Investigations conducted on 11/13/19 and remained in that hearing until that hearing ended and b) accessed City Hall's grounds and City Hall's building on 11/13/19 after 11 am by

accessing them through City Hall's entrance by Broadway:

> Ritchie Torres, Sgt. Bradley, Rafael Perez, NYPD Officer Lin, Jane Doe 11/13/19, Keith Powers, Kalman Yeger, and Diana Ayala

k.      An award of damages against the following defendants pursuant to New York State General Business Law §349 for deception in relation to my efforts to have lawfully **a)** completed my testimony in the public hearing that the City Council's Committee on Oversight and Investigations conducted on 11/13/19 and remained in that hearing until that hearing ended and **b)** accessed City Hall's grounds and City Hall's building on 11/13/19 after 11 am by accessing them through City Hall's entrance by Broadway:

> Ritchie Torres, Sgt. Bradley, Rafael Perez, NYPD Officer Lin, Jane Doe 11/13/19, Keith Powers, Kalman Yeger, and Diana Ayala

l.      An award of punitive damages for all of my claims set forth in this pleading.

m.      An award of pre-judgment and post-judgment interest.

n.      Equitable relief that will have this Court adopt the practice in _USA v. Donziger_, No. 11-cv-0691(LAK)(RWL)(S.D.N.Y.) to similarly appoint private prosecutors to commence criminal prosecutions against the defendants that this action concerns in response to criminal acts and omissions that they committed and/or condoned against me that are addressed in this complaint to remedy the fact that prosecutors have negligently refused to do so.

o.      Restrains the City of New York from transferring the NYPD's authority to issue and revoke press credentials to another entity within Defendant City's government.

p.      Immediately revokes the NYPD's authority to issue and revoke press credentials and empowers me and a group of other whistleblowers who are independent of the influence of both **a)** Defendant City and **b)** alleged news organizations to act in the NYPD's place to

determine who will and will not have press credentials issued to them as well as those who will have their existing press credentials revoked to befit the public's interest in transparency, government accountability, and inappropriate and complicit censorship by the press that aids and abets societal ills within an illegitimate, corrupt, and dysfunctional government.

q.      Declares that New York City has proven to be and remains an anarchist jurisdiction largely because of illegal acts and omissions that the defendants in this action criminally perpetrated in New York City in relation to the constitutional rights that people have to lawfully attend and participate in public forums in New York City.

r.      Injunctive and equitable relief by ordering Defendant City to immediately provide me within 24 hours all "Unusual Occurrence Reports" and related reports that members of the NYPD were required to complete in relation to their acts and omissions against me that caused and otherwise enabled me to have been **a)** coerced to leave the room in which I briefly testified during the public hearing that the City Council's Committee on Oversight and Investigations conducted 11/13/19 insofar as that concerns the acts and omissions that were committed against me on 11/13/19 are concerned, **b)** escorted by Defendant Perez out of the building that is located at 250 Broadway in Manhattan on 11/13/19 instead of having been left alone to lawfully exit it in a timely manner, and **c)** prevented from accessing City Hall's grounds and City Hall's building on 11/13/19 after 11 am.

s.      Such other, further, and different relief as the interests of justice and equity may require.

Dated:      New York, New York
            November 1, 2020

From,


s_/Towaki Komatsu

*Plaintiff, Pro Se*
802 Fairmount Pl., Apt. 4B
Bronx, NY 10460
(347) 872-1205
Towaki_Komatsu@yahoo.com